**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | No. 20 C 4115 |
| IN RE FIFTH THIRD BANCORP | ) | |
| DERIVATIVE LITIGATION | ) | Judge Sara L. Ellis |
| | ) | |

**OPINION AND ORDER**

Fifth Third Bancorp ("Fifth Third") shareholders filed this shareholder derivative action

against Defendants Fifth Third; Fifth Third board members Nicholas K. Akins, B. Evan Bayh III,

Jorge L. Benitez, Katherine B. Blackburn, Emerson L. Brumback, Jerry W. Burris, Greg. D.

Carmichael, C. Bryan Daniels, Mitchell S. Feiger, Thomas H. Harvey, Gary R. Heminger, Jewell

D. Hoover, Eileen A. Mallesch, Michael B. McCallister, Marsha C. Williams (the "Director

Defendants"); and former Fifth Third officers Tayfun Tuzun and Frank Forrest (the "Officer

Defendants," and together with the Director Defendants, the "Individual Defendants"). In this

action, Plaintiffs seek to remedy wrongdoing allegedly committed by the Individual Defendants

from February 26, 2016 through the present (the "relevant time period"). Specifically, Plaintiffs

allege that the Individual Defendants breached their fiduciary duties to Fifth Third, were unjustly

enriched, wasted corporate assets, and committed violations of Sections 10(b) and 14(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. §§ 78j(b) and

78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants now move to dismiss the

consolidated complaint pursuant to Federal Rule of Civil Procedure 23.1 for failure to plead

demand futility and pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private

Securities Litigation Reform Act of 1995 (the "PSLRA") for failure to state a claim. Because

Plaintiffs have failed to specifically allege the futility of a demand upon the Director Defendants, the Court grants Defendants' motion to dismiss [58] without prejudice.

## BACKGROUND[1]

### I.      Fifth Third

Fifth Third, headquartered in Cincinnati, provides financial services to corporations, individuals, and non-profits, including an assortment of checking, savings, and money market accounts, wealth management solutions, payments and commerce solutions, insurance services, and credit products such as commercial loans and leases, mortgage loans, credit cards, installment loans, and auto loans.  Fifth Third operates full-service banking centers across Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, and North Carolina.

Fifth Third employed a cross-sell strategy during the relevant time period, in which employees could sell services and/or products to existing customers to meet aggressive sales targets, all supported and awarded through various incentive programs.  To meet these sales targets, management encouraged or pressured employees into using improper sales tactics, such

---

[1] The Court takes the facts in the background section from Plaintiffs' consolidated complaint and the exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motion to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).  Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).  The Court "may also take judicial notice of matters of public record."  *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).  Plaintiffs filed their consolidated complaint and response under seal, also providing redacted versions.  If the Court refers to a sealed document, it attempts to do so without revealing any information that could be reasonably deemed confidential.  Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning.  *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

as gaming. "Fifth Third [Bank] tracked internally investigated cases of what it called 'gaming.' Gaming, according to Fifth Third, includes opening unauthorized accounts."  Doc. 47 ¶ 133.

## II.     The Director Defendants

The Director Defendants are current and former members of Fifth Third's Board of Directors.  When this action was filed,[2] the Board consisted of fourteen members, Fifth Third's Chief Executive Officer, Carmichael, and thirteen independent directors: Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Feiger, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams.  Burris resigned from the Board in June 2020.

### A.     Committee Membership

The Director Defendants have all served on various Fifth Third committees.  The Audit Committee has oversight responsibilities relating to Fifth Third's accounting and financial reporting processes and the audits of its financial statements.  The Audit Committee also monitors Fifth Third's system of internal controls and compliance with applicable legal and regulatory requirements.  Akins, Benitez, Blackburn, Brumback, Burris, Harvey, Hoover, Mallesch, McCallister, and Williams have served on the Audit Committee.

Blackburn, Brumback, Hoover, and Williams also served on the Regulatory Oversight Committee, which had oversight responsibilities relating to compliance with regulatory findings and supervisory issues between 2015 and December 2016, after which some of its responsibilities moved to the Risk and Compliance Committee.  The Risk and Compliance Committee oversees the risk management policies of Fifth Third's global operation and oversight of its global risk management framework.  It also oversees Fifth Third's operational, legal, and

---

[2] One of the Plaintiffs, Stephen Pemberton, filed this case on July 13, 2020.  Subsequently, the Court consolidated his case with several other shareholder derivative actions, prompting the filing of the operative consolidated complaint.

reputational risks.  Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Heminger, Hoover, Mallesch, and Williams have served on the Risk and Compliance Committee.

Akins, Brumback, Heminger, Mallesch, McCallister, and Williams served on the Human Capital and Compensation Committee.  This committee oversees the development and implementation of Fifth Third's incentive compensation strategy, policies, and programs.  Finally, Akins, Bayh, Blackburn, Harvey, Heminger, and Williams have served on Fifth Third's Nominating and Corporate Governance Committee.  This committee develops, recommends, and performs annual reviews of Fifth Third's corporate governance policies and guidelines.  It also identifies and nominates director and committee member candidates.

### B.    Outside Relationships

Several of the Director Defendants have longstanding business and personal relationships with one another and Fifth Third.  Harvey, Daniels, and Feiger all have ties to MB Financial Bank, N.A. ("MB Financial"), where Harvey served as Chairman of the Board of Directors, Daniels served as a director, and Feiger served as president and CEO.  On May 3, 2019, MB Financial merged with and into Fifth Third Bank, N.A., with Fifth Third Bank, N.A. as the surviving entity.  Fifth Third Bank, N.A. is an indirect subsidiary of Fifth Third.  Feiger then served as the chairman and CEO of Fifth Third Bank Chicago until he retired from these positions on May 29, 2020.  Upon Fifth Third's acquisition of MB Financial, Daniels became a Fifth Third director.  Daniels is also the co-founder and principal of Prairie Capital, a private equity firm that has done business with MB Financial and Fifth Third.

Bayh previously served on the board of Marathon Petroleum Corporation, for which Heminger served as the CEO and Board Chair.  Mallesch, Burris, and Carmichael have all had

management and leadership positions at General Electric in the past, with Mallesch having

served as its Chief Financial Officer.

Finally, Blackburn serves as the Executive Vice President of the Cincinnati Bengals.

Fifth Third has paid the Bengals $1.8 million for sponsorship arrangements, tickets, and

advertising expenses. Around the same time that Blackburn became a director, Fifth Third

signed a five-year extension contract with the team, paying a total of $7.9 million to the Bengals.

Fifth Third's 2020 proxy statement discloses that "[b]y virtue of Ms. Blackburn's being an

executive officer and a principal owner of the Cincinnati Bengals, she is deemed to be a related

party having a direct material interest in these arrangements." *Id*. ¶ 430.

### C.    Director Compensation and Stock Trades

The Director Defendants receive compensation from Fifth Third for their service as

Board members, including stock awards. Carmichael has served as Fifth Third's President since

September 2012, its CEO since November 2015, a director since 2015, and the elected Chairman

of the Board since 2018. At the end of fiscal year 2019, Carmichael received $8,999,237 in

compensation from Fifth Third, including $1,100,070 in salary, $4,462,507 in stock awards,

$787,498 in option awards, $2,200,000 in non-equity incentive plan compensation, and $449,162

in other compensation. As of December 31, 2019, Carmichael owned 1,336,633 shares of Fifth

Third's common stock. From 2016 through 2019, Carmichael made the following sales of Fifth

Third's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 10/29/2019 | 55,251 | $29.59 | $1,634,877.09 |
| 02/13/2018 | 87,613 | $32.37 | $2,836,032.81 |
| 11/16/2016 | 36,821 | $25.11 | $924,575.31 |
| 11/10/2016 | 17,689 | $23.45 | $414,807.05 |

*Id*. ¶ 383.

Similarly, both Hoover and Brumback sold Fifth Third's common stock during the relevant time period. Hoover made the following sales of Fifth Third's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 06/03/2019 | 3,739 | $26.51 | $99,120.89 |
| 02/12/2018 | 3,700 | $32.40 | $119,880.00 |
| 04/28/2017 | 2,000 | $24.82 | $49,640.00 |

*Id*. ¶ 387. Brumback made the following sale of Fifth Third's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 03/05/2018 | 3,000 | $33.44 | $100,320.00 |

*Id*. ¶ 385.

### III.    Fifth Third's Code of Business Conduct and Ethics

Fifth Third maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which applies to all officers, directors, and employees. The Code of Conduct states that "[k]eeping the customer at the center of everything we do and delivering a world-class customer experience every time are paramount to our success," and that "every employee plays a part in building and maintaining a strong culture at Fifth Third, a culture in which ethics and compliance are the standard." *Id*. ¶ 235. The Code of Conduct requires all employees to raise any issues when they become aware of misconduct or other violations of the Code.

The Code of Conduct reiterates Fifth Third's "commit[ment] to providing customers with financial products and services in ways that avoid any practices that could be deemed predatory, unfair, deceptive or abusive." *Id.* ¶ 239. In a section entitled "Fair and Honest Business Practices," it specifically provides:

> Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to:
>
> • Incentive gaming.
> • Falsifying documents or inflating performance results.

> • Manipulating records.
> • Opening bogus or fake accounts.
> • Opening accounts or selling products without customer
> authorization.
> • Offering customers unnecessary products.
> • Falsifying records or applications in order to benefit yourself or
> other Fifth Third employees.

*Id.* ¶ 238.

The Code of Conduct also provides that those subject to it cannot "buy, sell or

recommend the securities (or derivatives in respect thereof) of any issuer (including Fifth Third)

for any proprietary, customer, employee, or other account while in possession of material, non-

public information (MNPI)," further indicating that Fifth Third has "zero tolerance for internal

fraud." *Id.* ¶¶ 241–42. The Code of Conduct requires the reporting of all internal fraudulent

activity to Fifth Third's bank protection division when suspected. Further, in a section titled

"Maintaining Accurate Records and Accounts," the Code of Conduct provides:

> Business and financial records are critical to Fifth Third Bancorp's
> operations. We rely on the integrity and accuracy of those records
> for both internal decision-making and for the benefit of our
> investors, government agencies, regulators and others to whom we
> report. It is imperative that all records and public communications,
> including, but not limited to, those filed or produced with the
> Securities Exchange Commission, are complete, fair, accurate,
> timely, clear and transparent.

*Id.* ¶ 243.

Fifth Third also has Corporate Governance Guidelines, which it most recently revised in

September 2019. The Corporate Governance Guidelines provide in relevant part:

> In addition to monitoring Fifth Third's Chief Executive Officer
> and senior executives, the Board is responsible for the following
> matters, among other things:
>                              ***
> • enhancing Fifth Third's integrity and reputation by ensuring that
> the corporation establishes, implements and maintains policies,
> practices and procedures for full compliance with all applicable

7

> laws and for meeting the high ethical standards that the Board and the public expect of a leading financial institution.

*Id.* ¶ 246.  The Guidelines also state:

> Directors are subject to the provisions of various policies, other than these Guidelines, which have been adopted by the Board of Directors, including, but not limited to, the Code of Business Conduct and Ethics, Director Air Travel Guidelines, the Enterprise Insider Trading and Ethical Investing Policy, the Information Disclosure Policy, the Transactions with Insiders Policy, the Non-Retaliation Policy for Employees who Report Potential Violations, and the Social Media Use Policy.  These policies are approved annually by the Board and available to all Board members in the Diligent Boards portal.

*Id.*

## IV.  Prior Actions Before the Relevant Period at Issue

### A.  The 2015 Consumer Financial Protection Bureau ("CFPB") Credit Card Action

On September 28, 2015, the CFPB issued a press release announcing that it intended to take action against Fifth Third Bank "for violations of the Dodd-Frank Act for deceptive acts or practices" relating to Fifth Third Bank's marketing and sales practices with respect to a credit card add-on product.  *Id.* ¶ 94.  The CFPB found that Fifth Third enrolled bank customers or cardholders in the add-on product without the customer's consent between January 2007 and February 2013.

The CFPB and Fifth Third entered into a Consent Order relating to the 2015 CFPB Credit Card Action.  Fifth Third agreed to pay at least $3 million as redress to damaged consumers and a $500,000 civil penalty.  Additionally, Fifth Third agreed to establish a Board-level Regulatory Oversight Committee that would monitor and coordinate compliance with the Consent Order.  The Consent Order also imposed specific requirements upon Fifth Third's Board to ensure compliance with Fifth Third's obligations under the Consent Order.

### B.     The 2015 CFPB Auto Lending Enforcement Action

In the same September 28, 2015 press release, the CFPB announced the 2015 CFPB Auto Lending Enforcement Action against Fifth Third.  This action resulted from a joint CFPB and Department of Justice ("DOJ") examination and investigation that began in January 2013 into Fifth Third's indirect auto-lending program's compliance with the Equal Credit Opportunity Act's prohibition on discriminating against loan applicants on the basis of characteristics such as race and national origin.  The CFPB and DOJ found that Fifth Third violated the Equal Credit Opportunity Act between January 2010 and September 2015 by charging African American and Hispanic borrowers higher markups for their auto loans than white borrowers.  On September 28, 2015, the CFPB and Fifth Third entered into another Consent Order relating to the 2015 CFPB Auto Lending Enforcement Action, which required Fifth Third's Regulatory Oversight Committee to monitor and coordinate compliance with the Consent Order.

### C.     Wells Fargo Consent Order

On September 8, 2016, the CFPB filed a Consent Order against Wells Fargo.  In that order, the CFPB determined that Wells Fargo employees opened unauthorized deposit accounts that could have been funded by the transfer of funds from existing accounts without the consumer's knowledge or consent.  The Consent Order imposed specific requirements on Wells Fargo's Board of Directors, similar to the obligations imposed on the Fifth Third Board in the 2015 CFPB Credit Card Action.  The CFPB's action against Wells Fargo resulted in congressional investigations and received national attention.  For example, CNN published an article with the title "5,300 Wells Fargo employees fired over 2 million phony accounts," reporting that Wells Fargo needed to make changes to its sales practices and internal oversight. *Id*. ¶ 119.

### V.      The CFPB's Investigation into Fifth Third's Sales Practices

About two months after the disclosure of the Wells Fargo Consent Order, on November 3, 2016, the CFPB notified Fifth Third of an investigation into its sales practices, providing Fifth Third with a Civil Investigation Demand ("CID") addressed to Carmichael.  The CID indicated that the CFPB had concerns with Fifth Third's practices in, among other things, "opening an account for any product or service offered by the Company without the knowledge and consent of a consumer," "changing, without the consumer's knowledge and consent, the type of account or service in which the consumer is enrolled," and "engaging in unauthorized transactions on behalf of a consumer." *Id.* ¶ 120.  The CFPB issued five additional CIDs to Fifth Third concerning the use of unauthorized accounts and predatory consumer practices between 2017 and 2019, all addressed to Carmichael.

### VI.     The Director Defendants' Knowledge of the Alleged Misconduct

The commencement of the CFPB investigation was the latest in a string of events that should have alerted the Director Defendants to the existence of pervasive issues within Fifth Third's retail banking division.  For example, a June 2010 internal email from Fifth Third's "head of retail banking" stated that the Chicago "leadership team ha[s] a reputation of less than desirable sales management practices" and that "[b]ullying and threats are often used to achieve results." *Id.* ¶ 122(a).  The email further noted "consistent problems around unauthorized credit card sales in Chicago." *Id.*  And in a 2011 letter to management, a Fifth Third employee raised concerns about Fifth Third's culture, highlighting unethical behavior with respect to customer accounts and perceived sexual harassment.  In particular, the employee described Fifth Third as "becoming a 'predatory' institution," with customers "hav[ing] 2 or 3 other checking accounts that they didn't even know they had." *Id.* ¶ 122(b).

10

Fifth Third's various board and committee meeting minutes reflect the Director Defendants' knowledge of risks associated with Fifth Third's cross-selling strategy. Notes from Audit Committee meetings on March 18, 2013, March 17, 2014, and March 16, 2015, attended by Brumback, Hoover, McCallister, Williams, and sometimes Blackburn, Forrest, and Tuzun, also indicate that they discussed call volume on the ethics line that alleged some type of account gaming. The minutes for the September 19, 2016, Regulatory Oversight Committee meeting, attended by Bayh, Benitez, Blackburn, Brumback, Carmichael, Forrest, Heminger, Hoover, and Williams, indicate that, in addition to discussing the Wells Fargo Consent Order related to cross-selling, the committee discussed Fifth Third's product sales practices and that Fifth Third had recently moved away from product specific sales goals. Notes from the February 27, 2017, Risk and Compliance Committee meeting, attended by Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Carmichael, Forrest, Heminger, Hoover, Mallesch, McCallister, Tuzun, and Williams, reflect the identification of Fifth Third's top operational risks as including sales practices and conduct risk. And in a June 19, 2017, Audit and Risk and Compliance Committee joint meeting, Forrest noted that compliance, operational, and strategic risk remained "above tolerance," with "Operational Risk's move into moderate tolerance . . . delayed" and subject to further evaluation "in subsequent quarters.'" Doc. 48-1 ¶ 351.

## VII.    Fifth Third's SEC Filings

### A.    Annual Reports

On February 25, 2016, Fifth Third filed its annual report with the SEC for the fiscal year ended December 31, 2015 on a Form 10-K (the "2015 10-K"), which Akins, Bayh, Benitez, Blackburn, Brumback, Carmichael, McCallister, Tuzun, and Williams signed. The 2015 10-K

stated that Fifth Third benefited from cross-sell opportunities generated by synergies formed by its business segments.

The 2015 10-K also highlighted Fifth Third's comprehensive compliance and risk management systems, stating that "Fifth Third focuses on managing regulatory compliance risk in accordance with [its] integrated risk management framework, which ensures consistent processes for identifying, assessing and monitoring, and reporting risks." Doc. 47 ¶ 158. The report also emphasized Fifth Third's internal reporting systems for overseeing compliance concerns and Fifth Third management's commitment to addressing compliance concerns, stating in part that "Fifth Third . . . focuses on reporting and escalation of compliance issues to senior management and the Board." *Id*. ¶ 159. It also noted that "[t]he Management Compliance Committee addresses Fifth Third-wide compliance issues, industry best practices, legislative developments, regulatory concerns, and other leading indicators of compliance risk" and "reports to the Enterprise Risk Management Committee, which reports to Risk and Compliance Committee of the Board of Directors." *Id*. Further, the 2015 10-K generally identified risk factors Fifth Third faced, including that "the CFPB . . . ha[s] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary." *Id*. ¶ 160.

Subsequent Form 10-Ks included statements similar to those in the 2015 10-K. Bayh, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, Tuzun, and Williams signed the 2016, 2017, 2018, and 2019 Form 10-Ks. Akins signed all but the 2017 Form 10-K. The 2019 Form 10-K, filed on March 2, 2020, stated that the CFPB had notified Fifth Third Bank that "it intends to file an enforcement action in relation to alleged unauthorized account openings." *Id*. ¶ 186. It further went on to say that "Fifth Third believes that the facts do not warrant an enforcement proceeding and intends to defend itself vigorously if

such an action should be filed" and that "[t]he impact of this potential enforcement action has been reflected in our reasonably possible losses." *Id*. ¶ 188.

### B.    Proxy Statements

In Fifth Third's 2017 Proxy Statement, it noted that the 2017 executive compensation plan changed to include the addition of "customer experience [ ] as a funding modifier." *Id*. ¶ 140.  The statement further explained that "[t]he addition of customer experience to the plan will add specific focus to the cornerstone of our business strategy of 'putting the customer at the center of all we do.'" *Id*.  The 2017 Proxy Statement also included changes to performance goals so as to award executives for objectives such as customer growth and the number or type of customer relationships.

On March 6, 2018, Fifth Third filed its 2018 Proxy Statement.  Akins, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams solicited the 2018 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act.  The 2018 Proxy Statement indicated that "[t]he Board of Directors has also adopted the Fifth Third Bancorp Code of Business Conduct and Ethics which applies to our directors; Chief Executive Officer, Chief Financial Officer, and Controller; and our other employees." *Id*. ¶ 167.  It further stated that executive compensation "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder capital is used efficiently to generate competitive returns, and assesse[d] the cost efficiency of the Company's operations." *Id*. ¶ 170.

Similarly, the 2019 Proxy Statement, solicited by Akins, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams, stated that "[d]irectors receive annual ethics training and directors must review and acknowledge the Code

of Business Conduct and Ethics." *Id.* ¶ 175.  The 2020 Proxy Statement, solicited by Akins, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams, touted Fifth Third's compensation program as supported by certain "best practices" such as a "[r]obust code of business conduct and ethics," as well as the fact that directors received annual ethics training and had to follow Fifth Third's Corporate Governance Guidelines and Code of Conduct.  *Id.* ¶ 192.

## VIII.   CFPB Complaint Against Fifth Third

On March 9, 2020, the CFPB filed a complaint against Fifth Third in the United States District Court for the Northern District of Illinois, *Bureau of Consumer Financial Protection v. Fifth Third Bank, N.A.*, No. 20 C 1683 (the "2020 CFPB Action").  The CFPB complaint alleged that Fifth Third violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices, the Truth in Lending Act, and the Truth in Savings Act.  The CFPB claimed that Fifth Third used a cross-sell strategy to increase the total number of products and services to existing customers and used an incentive-compensation program that rewarded managers and their subordinate employees for selling new products and services to existing customers.  The CFPB also claimed that Fifth Third opened deposit and credit card accounts without customers' knowledge or consent and imposed aggressive sales goals for its employees to enroll consumers in its online banking services.

The CFPB asserted that "despite [Fifth Third] knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers." *Id.* ¶ 197.  Even Fifth Third's Director of Corporate Investigations and its corporate designee in the 2020 CFPB

Action, Darrin Steinmann, acknowledged that Fifth Third Bank does not "have a systematic way of detecting gaming." *Id*. ¶ 137.

After the lawsuit became public, Fifth Third's stock price fell approximately 3.5%, from closing at $18.30 per share on March 9, 2020 to closing at $17.66 per share on March 11, 2020, two trading sessions later. Fifth Third's stock price further declined by $1.76 the following trading session to close at $15.90 per share, a total decline of approximately 13%.

## IX.     Fifth Third's Response to the CFPB Action

In response to the 2020 CFPB Action, on March 9, 2020, Fifth Third filed a Current Report on Form 8-K with the SEC (the "March 9, 2020 Form 8-K"), along with an attached press release entitled "Fifth Third Bancorp Rejects Charges in CFPB's Civil Lawsuit, Points to Its Customer Commitment and Proven Track Record of Aligning Employee Incentives with Customer-Focused Best Practices" (the "March 2020 PR"), a fact sheet (the "March 2020 Fact Sheet"), and a list of frequently asked questions (the "March 2020 FAQ").

The March 9, 2020 Form 8-K stated that "[o]n March 9, 2020, Fifth Third Bancorp issued a press release regarding its litigation with the Consumer Financial Protection Bureau. Fifth Third is also furnishing a fact sheet and answers to frequently asked questions relating to this matter." *Id*. ¶ 200. In both the March 2020 PR and the March 2020 Fact Sheet, Fifth Third rejected the CFPB's allegations. The March 2020 Fact Sheet stated, in part:

> While Fifth Third Bank respects and values the important role that the Consumer Financial Protection Bureau (CFPB) plays in protecting consumers, the allegations in the civil lawsuit brought by the CFPB against Fifth Third are unsubstantiated, based on limited, non-systemic, and remediated events, and reflect misunderstandings of our products, services, and work culture.
>
> When a federal court examines the evidence, we believe it will agree with Fifth Third that the civil suit filed today is unnecessary and unwarranted.

*Id*. ¶ 202.  The March 2020 Fact Sheet admitted that Fifth Third identified over a thousand unauthorized accounts opened between 2010 and 2016, but highlighted that this amounted to only 0.01% of all accounts and that Fifth Third found no evidence of systemic misconduct.  Fifth Third further acknowledged that it had received "424 complaints regarding unauthorized accounts" from the same subset of analyzed accounts.  *Id*. ¶ 203.  The March 2020 Fact Sheet indicated that "[i]ncentives have always been modest" and that Fifth Third's "retail employee compensation structure is designed to deter the opening of unauthorized accounts."  *Id*. ¶ 204.  The March 2020 FAQ admitted to "[l]imited instances of employee misconduct" and stated that "only a small percentage [of compensation] is based on sales performance."  *Id*. ¶ 205.

Fifteen days after the filing of the 2020 CFPB Action, on March 24, 2020, Fifth Third filed another Current Report on Form 8-K (the "March 24, 2020 Form 8-K") with the SEC, which indicated that Fifth Third had made amendments to its Code of Regulations.  Specifically, the March 24, 2020 Form 8-K states:

> Section 17 of Article III of the Regulations was also revised to allow indemnification of employees to the fullest extent permitted by Ohio law.  Lastly, a new Section 18 of Article III was added to the Regulations in order to expressly allow, with certain exceptions, the advancement of expenses (including attorney's fees) to anyone defending an action pursuant to the indemnification provisions of the Regulations.

*Id*. ¶ 208.  The amended Section 17 of Article III states, in part:

> Indemnification.  The Corporation shall indemnify, to the full extent permitted or authorized by applicable law, as it may from time to time be amended, any person made or threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that he or she is or was a director, officer, or employee of the Corporation, or is or was serving at the request of the Corporation as a director, trustee,

officer, or employee of a bank, other corporation, partnership, joint venture, trust, or other enterprise.

*Id*. ¶ 209. The newly added Section 18 of Article III states:

Advancement of Expenses. To the extent permitted by applicable law, expenses (including attorneys' fees) incurred by a director subject to Section 17 in defending any action, suit or proceeding referred to in Section 17 shall be paid by the Corporation as incurred, in advance of the final disposition of such action, suit or proceeding, upon receipt by the Corporation of an undertaking by or on behalf of such director that satisfies the conditions for such advancement under Ohio law. To the extent permitted by applicable law, liabilities and expenses (including attorneys' fees) incurred by any person subject to Section 17 other than a director in defending any action, suit or proceeding referred to in Section 17 may be paid by the Corporation as incurred, in advance of the final disposition of such action, suit or proceeding, if and to the extent so determined by the Board of Directors (including pursuant to policies adopted from time to time by the Board of Directors), subject to compliance by such person with the applicable conditions for such advancement under Ohio law and any other conditions determined by the Board of Directors.

*Id*. ¶ 210.

On April 14, 2020, Fifth Third filed another Current Report on Form 8-K (the "April 2020 Form 8-K") with the SEC, which contained a presentation to be made during Fifth Third's 2020 annual shareholder meeting. The presentation made no mention of the 2020 CFPB Action, instead touting Fifth Third's resilient balance sheet, proactive management, and its diversified revenue mix. Similar to the April 2020 Form 8-K, Fifth Third's First Quarter 2020 Earnings Presentation filed with the SEC on April 21, 2020, failed to mention the 2020 CFPB Action or any subsequent lawsuits filed against Fifth Third. But Fifth Third's Quarterly Report on Form 10-Q for the period ending on March 31, 2020, specifically mentioned the 2020 CFPB Action, as well as a securities class action filed against Fifth Third on April 7, 2020.

X.      **Stock Repurchases and Damages to Fifth Third**

The Director Defendants caused Fifth Third to initiate repurchases of its common stock throughout the relevant time period.  In total, Fifth Third spent an aggregate amount of over $5.6 billion to repurchase approximately 216,504,051 shares of its own common stock at artificially inflated prices from March 2016 through the end of February 2020.  In total, Plaintiffs calculate that Fifth Third overpaid for repurchases of its own stock by over $2.1 billion.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).  To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Securities fraud claims must also satisfy Rule 9(b)'s particularity requirement, which requires a party to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614–15 (7th Cir. 2011).  "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is

required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Congress further heightened the pleading standards for securities fraud claims when it enacted the PSLRA "[a]s a check against abusive litigation by private parties" in securities fraud suits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs II*"), 551 U.S. 308, 313 (2007). The PSLRA requires "complaints alleging securities fraud [to] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Cornielsen*, 916 F.3d at 598–99 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The PSLRA also requires "[a]ny complaint alleging a material misstatement or omission [to] 'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.'" *Id.* at 599 (quoting 15 U.S.C. § 78u-4(b)(1)). On motion by a defendant, the Court must dismiss a complaint that does not meet these requirements. 15 U.S.C. § 78u-4(b)(3)(A).

Shareholder derivative actions must also satisfy Rule 23.1(b)(3), which requires a complaint to state with particularity "any effort by the plaintiff to obtain the desired action from the directors" and, if applicable, "the reasons for not obtaining the action or not making effort." Fed. R. Civ. P. 23.1; *In re Abbott Lab'ys Derivative S'holders Litig.*, 325 F.3d 795, 803–04 (7th Cir. 2003) ("Rule 23.1 requires the plaintiff 'to allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort.'" (citation omitted)).

## ANALYSIS

Defendants seek to dismiss Plaintiffs' consolidated complaint pursuant to Rules 23.1 and 12(b)(6), arguing that Plaintiffs have failed to sufficiently assert demand futility under Ohio law or otherwise state a claim. Because Defendants' demand futility argument is dispositive, the Court need only address that argument.

The Court looks to the substantive law of Fifth Third's state of incorporation, Ohio, in addressing demand futility. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108–09 (1991). Plaintiffs do not allege that they made a demand on the Director Defendants and so they must instead allege why making such a demand would be futile. *See In re Ferro Corp. Derivative Litig.* ("*Ferro Corp. II*"), 511 F.3d 611, 617 (6th Cir. 2008) ("Ohio recognizes an exception to the general demand rule, which permits a shareholder to proceed with an independent suit without making a demand when the shareholder can demonstrate that the demand would have been futile."); *Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d 664, 670 (S.D. Ohio 2003) ("Under Ohio Rule 23.1, a complaining shareholder must (1) spell out the efforts made to have the directors or other shareholders take the action demanded; (2) explain why he failed in this effort or did not make it; and (3) show that he fairly and adequately represents the interests of other similarly situated shareholders.").

Under Ohio law, "[t]he board of directors has the primary authority to file a lawsuit on behalf of the corporation." *Drage v. Procter & Gamble*, 694 N.E.2d 479, 482 (Ohio Ct. App. 1997). Ohio law presumes "that any action taken by a director on behalf of the corporation is taken in good faith and for the benefit of the corporation." *Id.* While "[t]he shareholders may make a demand on the directors to bring a suit on behalf of the corporation, . . . no shareholder has an independent right to bring suit unless the board refuses to do so *and* that refusal is wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the part of the directors." *Id*.

Plaintiffs carry the burden of showing futility and must plead with particularity that "a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within

the ambit of the business judgment rule." *Caston v. Hoaglin*, No. 2:08-cv-200, 2009 WL

3078214, at *7 (S.D. Ohio Sept. 23, 2009) (citation omitted); *Davis*, 259 F. Supp. 2d at 670

("Futility means that the directors' minds are closed to argument and that they cannot properly

exercise their business judgment in determining whether the suit should be filed."). The standard

to establish demand futility is difficult and "is not just a procedural technicality." *Monday v.

Meyer*, No. 1:10 CV 1838, 2011 WL 5974664, at *4 (N.D. Ohio Nov. 29, 2011).

The Court considers demand futility with respect to the Board as it existed at the time of

the initial filing of the complaint. *McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001); *Drage*,

694 N.E.2d at 483. Thus, Plaintiffs must set forth particularized facts establishing that at least

eight of the fourteen Fifth Third Board members on July 13, 2020 were not disinterested and thus

could not have fairly considered a demand.[3] *See In re Cardinal Health, Inc. Derivative Litig.*,

518 F. Supp. 3d 1046, 1064 (S.D. Ohio 2021) (pleading demand futility requires particularized

facts "creating a reasonable doubt that a majority of the board of directors is capable of making a

disinterested and independent decision about whether to initiate litigation"). Plaintiffs argue that

they have met this requirement by pleading that the Director Defendants were not independent

and that they all face a substantial likelihood of personal liability on Plaintiffs' claims. The

Court addresses these arguments in turn.

## I.     The Directors' Independence

Defendants first argue that Plaintiffs' allegations concerning the Director Defendants'

relationships with each other, the amendment of the Code of Regulations, and the existence of a

directors' and officers' insurance policy (the "D&O Policy") do not create the required

---

[3] Because Burris had resigned from Fifth Third's Board at the time Pemberton initiated this lawsuit on July 13, 2020, the Court's references to the Director Defendants going forward in this Opinion do not include Burris.

reasonable doubt as to the Director Defendants' independence to excuse demand futility.[4] With respect to the first basis, "[d]irectorial independence may be compromised by financial, familial or social ties to other persons who are interested in the board's decision, but only if the plaintiffs plead facts that would support the inference that the director would be more willing to risk his or her reputation than to risk the relationship with the interested person." *In re Keithley Instruments, Inc., Derivative Litig.*, 599 F. Supp. 2d 875, 893 (N.D. Ohio 2008) (citation omitted). And "allegations of friendship or a business relationship must be accompanied by substantially more in the nature of serious allegations that would demonstrate a reasonable doubt as to a director's independence." *Fener v. Gallagher*, No. 04 C 8093, 2005 WL 2234656, at *5 (N.D. Ill. Sept. 8, 2005) (citation omitted).[5] Further, Plaintiffs must do more than allege in conclusory terms that "the directors would not want to sue themselves or each other." *Drage*, 694 N.E.2d at 483. Rather, Plaintiffs must allege that a majority of the directors are "antagonistic, adversely interested, or involved in the transactions attacked." *Ferro Corp. II*, 511 F.3d at 618 (citation omitted).

Here, Plaintiffs contend that Harvey, Daniels and Feiger's prior relationships demonstrate the futility of making a demand on them because they have longstanding ties to MB Financial, which merged into Fifth Third in 2019. Specifically, Harvey served as MB Financial's Chairman of the Board, Daniels served as a director, and Feiger served as president and CEO. But "[n]othing about the relationship between [Harvey, Daniels, and Feiger], as alleged by Plaintiffs, so much as hints at an inference that [they] would sacrifice [their] personal reputation

---

[4] Plaintiffs do not address Defendants' arguments concerning the D&O Policy and so the Court understands that they do not pursue the policy's existence as a basis for excusing demand futility. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (a party waives an argument "by not responding to alleged deficiencies in a motion to dismiss").

[5] *Fener* relies on Delaware law, which "Ohio courts routinely look to . . . for guidance in deciding corporate law issues generally, and demand futility issues specifically." *Cardinal Health*, 518 F. Supp. 3d at 1064 n.7 (quoting *In re Keithley*, 599 F. Supp. 2d at 888 n.10).

for the sake of [their] relationship" with each other. *In re Keithley*, 599 F. Supp. 2d at 893 ("The only fact set forth in the Complaint regarding the relationship between Reddy and Keithley is that both serve on the board of directors at another unaffiliated company. In all likelihood, such an allegation—that two individuals on a board also serve together on another board—could be levied against hundreds, if not thousands, of public company directors."). Therefore, this allegation falls far short of that required to establish a reasonable doubt as to Harvey, Daniels, and Feiger's independence.[6]

Next, Plaintiffs assert that a demand upon Blackburn would be futile because Fifth Third sponsors the Cincinnati Bengals, of which Blackburn is the Executive Vice President. More specifically, Plaintiffs claim that Blackburn's direct material interest—namely the $1.8 million sponsorship arrangement between the team and Fifth Third—precludes her from initiating or authorizing a lawsuit against the other Director Defendants because of the team's need for these funds. But even considering Blackburn's ties to the Bengals, Plaintiffs have not alleged particularized facts that suggest that these ties have compromised Blackburn's independent discretion. *See Khanna v. McMinn*, No. CIV.A. 20545-NC, 2006 WL 1388744, at *17 (Del. Ch. May 9, 2006) ("Neither the terms of BEA Systems' relationship with Covad (e.g., whether the companies have entered into a long-term contract), nor particularized facts supporting the Plaintiffs' conclusory statement in their brief that BEA Systems' business with Covad could be 'taken away' by McMinn and others, are provided." (footnote omitted)). And even the Court were to find that Blackburn's ties to the team call into question her independence, she is only one director out of fourteen – insufficient for futility purposes.

---

[6] The consolidated complaint also alleges that Bayh and Heminger have a relationship outside of Fifth Third and that Carmichael and Mallesch previously held management and leadership positions at General Electric. Plaintiffs do not focus on these relationships in their response to the motion to dismiss and, for the same reasons as discussed with respect to Harvey, Daniels, and Feiger, the Court would not find that their outside relationships sufficiently compromised their independence so as to make demand futile.

Finally, Plaintiffs assert that the Director Defendants are not independent because they amended Fifth Third's Code of Regulations in March 2020, after the CFPB announced its lawsuit against Fifth Third, to protect their own personal and financial interests. Prior to the amendments, Section 17 stated that Fifth Third shall indemnify each director and officer, which the amendments then expanded beyond officers and directors to include employees as well. The amendments also added a Section 18 to "expressly allow, with certain exceptions, the advancement of expenses (including attorney's fees) to anyone defending an action pursuant to the indemnification provisions of the Regulations." Doc. 47 ¶ 208. Plaintiffs focus on the timing of the amendments, arguing that by changing the language *fifteen* days after the filing of the 2020 CFPB Action, the Director Defendants attempted to ensure their financial protection with respect to that lawsuit. But, as Defendants point out, the amendments to the Code of Regulations did not create any new rights for the Director Defendants but rather merely codified Fifth Third's existing obligations to indemnify them and advance expenses under Ohio law based on their service as Fifth Third directors. *See* Ohio Rev. Code Ann. § 1701.13(E) (providing for indemnification of directors against expenses, including attorney's fees, and for payment of such expenses "as they are incurred"). Because the amendments did not add anything that was not already mandated by Ohio law, the changes to the Code of Regulations do not actually suggest that the Director Defendants cannot be independent. Thus, Plaintiffs fall short in showing the lack of independence of a majority of the Director Defendants.

## II.      Substantial Likelihood of Liability

Plaintiffs also may allege demand futility through allegations that suggest that the Director Defendants face a substantial likelihood of personal liability on the asserted claims. *In re Keithley*, 599 F. Supp. 2d at 895 ("The demand futility issue thus turns entirely on whether the

allegations in the Complaint sufficiently establish a substantial likelihood of liability as to [the majority of the] directors").  The Court thus must examine whether a majority of the Director Defendants face a substantial likelihood of personal liability for their alleged wrongdoing on each of Plaintiffs' claims.

### A.      Breach of Fiduciary Duty Based on Failure of Oversight Claim

Plaintiffs argue that the Director Defendants breached their fiduciary duty of oversight by ignoring red flags related to Fifth Third's consumer sales practices, as well as failing to implement or otherwise oversee Fifth Third's internal controls, thereby permitting Fifth Third to issue false and misleading statements.  Defendants maintain that the consolidated complaint does not suggest that a majority of the Director Defendants face a substantial likelihood of personal liability on this claim.

Directors of an Ohio corporation face personal liability if clear and convincing evidence shows that they "acted with reckless disregard for the corporation's best interest, or with deliberate intent to cause injury to the corporation."  *Cardinal Health*, 518 F. Supp. 3d at 1065 (citing Ohio Rev. Code Ann. § 1701.59(E)).  "In cases like this one, directors face liability when they ignore 'red flags' that put them on notice of possible misconduct, and they recklessly fail to investigate and take affirmative action to protect the interests of the company."  *Emps. Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-cv-04813, 2021 WL 1890490, at *20 (S.D. Ohio May 11, 2021); *see also Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, CA. No. 1091-VCL, 2007 WL 2982247, at *7 (Del. Ch. Oct. 9, 2007) (requiring clear and convincing evidence of the directors' reckless disregard).  "Red flags that should prompt action by a board of directors include public news reports of corporate misconduct."  *Emps. Ret. Sys.*, 2021 WL 1890490, at *20.  Directors also "have a duty to exercise oversight and to monitor the corporation's operational viability,

legal compliance, and financial performance" under Ohio law.  *Id.* (citing *Marchand v. Barnhill*, 212 A.3d 805, 809 (Del. 2019)).

Plaintiffs assert that the Director Defendants conducted little, if any, oversight over the handling of customer accounts and the statements included in Fifth Third's SEC filings; thus, the Director Defendants consciously disregarded their duties to monitor these areas of operation. Plaintiffs also assert that the Director Defendants knew of red flags regarding the risk associated with Fifth Third's improper cross-selling strategy, pointing to the CFPB's 2015 Auto-Lending and Credit Card Actions as examples of that issue.  But Fifth Third entered into Consent Orders with the CFPB in those actions, in which Fifth Third agreed to establish a Board-level Regulatory Oversight Committee that would monitor and coordinate compliance.  Those prior actions, therefore, cannot be considered red flags for the Director Defendants because "they would be reasonable in concluding that [Fifth Third] cured the earlier flagged deficiencies when it entered into the [Consent Orders]."  *In re Abbott Depakote S'holder Derivative Litig.*, 909 F. Supp. 2d 984, 996 (N.D. Ill. 2012) (board could rely on Abbott's entry into a corporate integrity agreement agreeing to reform its sales and marketing practices "to believe that Abbott did indeed reform its sales and marketing practices after 2003").  Further, Plaintiffs' allegations concerning knowledge of the Wells Fargo cross-selling scandal and the 2015 CFPB Consent Decrees do not suggest that the Director Defendants recklessly failed to investigate or take affirmative action to protect the interests of the company even though some of the Director Defendants knew of the issues.  Rather, the consolidated complaint shows that the Board established the Regulatory Oversight Joint Committee charged with overseeing Fifth Third's efforts to comply with or correct regulatory findings or supervisory issues, taking concrete steps to ensure oversight of potential issues.  Thus, the consolidated complaint does not allow for the inference that the

26

Board "consciously disregarded its fiduciary duties in response to those red flags." *Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, No. 10872-VCMR, 2016 WL 4076369, at *12 (Del. Ch. Aug. 1, 2016) ("In this case, even if the alleged red flags actually constituted evidence of misconduct at Qualcomm, it is unreasonable to infer that the Board consciously disregarded its fiduciary duties in response to those red flags. The Complaint concedes that the Board continuously monitored each of the three alleged red flags as well as the NDRC Decision."), *aff'd*, 158 A.3d 449 (Del. 2017).

Further, the fact – standing alone – that some of the directors served on the Audit and/or Finance Committees does not suggest a likelihood of liability. *See Monday*, 2011 WL 5974664, at *7 ("Courts repeatedly reject allegations of membership on committees, and recitation of the roles of the committees, as establishing a likelihood of liability."). "In order to allege futility based on a director's committee membership, the Complaint would have to show some specific report or piece of information that the committee was given which would have tipped them off to misconduct." *Id.* While Plaintiffs do suggest that certain information about cross-selling came before the committees, they do not "allege in any detail what each individual committee member did or did not do to supposedly breach his or her duties" upon receipt of that information. *In re Goodyear Tire & Rubber Co. Derivative Litig.*, No. 503CV2180, 2007 WL 43557, at *4 (N.D. Ohio Jan. 5, 2007). Instead, the committee meeting notes suggest that certain committees took action to address Fifth Third's sales practice management. For example, the September 19, 2016, Regulatory Oversight Committee meeting minutes reflect discussion of Fifth Third's product sales practices and additional measures that Fifth Third had recently implemented, specifically moving away from product specific sales goals that allegedly encouraged cross-selling, in light of the Wells Fargo cross-selling scandal. *See also* Doc. 48-1 ¶ 124 (March 18,

2013, March 17, 2014, and March 16, 2015, Audit Committee meetings discussed certain actions taken by management to address call volume that alleged account gaming).  If anything, then, the committee meeting notes undermine the inference that the Director Defendants ignored red flags suggesting a need for additional oversight of Fifth Third's sales practices.  *Cf. Inter-Mktg. Grp. USA, Inc. v. Armstrong*, C.A. No. 2017-0030, 2020 WL 756965, at *14 (Del. Ch. Jan. 31, 2020) ("[B]ecause Armstrong clearly stated that pipeline integrity was 'not discussed at the board level,' Plaintiff reasonably infers that that the board-level reports did not actually address pipeline integrity."); *Marchand*, 212 A.3d at 816, 822 (plaintiff alleged that the board conducted no "regular discussion of food safety issues," there was "no regular process or protocols that required management to keep the board apprised of food safety compliance practices," the board received and ignored "reports that contained what could be considered red, or at least yellow, flags," the board was given only "certain favorable information about food safety," and "no board committee that addressed food safety existed").  Plaintiffs, therefore, have not sufficiently alleged that the majority of the Director Defendants face a substantial likelihood of personal liability on the failure of oversight claim.  *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 372–73 (Del. 2006) ("[A report's] findings reflect that the Board received and approved relevant policies and procedures, delegated to certain employees and departments the responsibility for filing SARs and monitoring compliance, and exercised oversight by relying on periodic reports from them.  Although there ultimately may have been failures by employees to report deficiencies to the Board, there is no basis for an oversight claim seeking to hold the directors personally liable for such failures by the employees.").

**B.      Breach of Fiduciary Duty Based on False and Misleading Statements**

Plaintiffs contend that the Director Defendants deliberately misled their shareholders in violation of their fiduciary duties by representing that Fifth Third's cross-selling strategy and success resulted from legitimate sales practices, not false, illegally generated cross-sell numbers. Defendants argue that Plaintiffs fail to plead particularized allegations sufficient to show that the Director Defendants face a substantial likelihood of personal liability for a breach of the fiduciary duty of disclosure based on the dissemination of allegedly false and misleading statements.[7]

Plaintiffs assert no specific allegations that, individually, the Director Defendants had direct involvement in the preparation of Fifth Third's filings apart from affixing their signatures. *See Monday*, 2011 WL 5974664, at *6 (plaintiffs failed to allege sufficient facts to show how and when defendants participated in the purported misleading statements). Indeed, "[e]ven the fact that [the Director] Defendants signed and approved [Fifth Third's] annual reports does not mean that they had actual knowledge of the [] errors contained within the reports." *Ferro Corp. II*, 511 F.3d at 621. And, as the Court previously discussed, Plaintiffs have not sufficiently alleged red flags that would have put the Director Defendants on notice of the allegedly false and misleading statements. Thus, Plaintiffs have not adequately pleaded that the Director Defendants face a substantial likelihood of personal liability for the dissemination of false and misleading statements. *See Drage*, 694 N.E.2d at 486 ("[A]llegations in appellant's amended complaint of the nondefendant directors' acquiescence, even if true, do not state with particularity a reason that demand upon the nondefendant directors would be futile.").

---

[7] Defendants question whether Ohio law even recognizes a claim for breach of fiduciary duty of disclosure, while Plaintiffs argue to the contrary. The Court need not decide this issue to resolve Defendants' motion to dismiss.

### C. Breach of Fiduciary Duty Based on Insider Trading Claim

A breach of fiduciary duty claim based on insider trading requires allegations sufficient to support a reasonable inference that "(1) the corporate fiduciary possessed material, nonpublic company information; and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *In re Gas Nat., Inc.*, No. 1:13 CV 02805, 2015 WL 3557207, at *21 (N.D. Ohio June 4, 2015). Defendants argue that Plaintiffs' consolidated complaint does not suggest the futility of making a demand against the Director Defendants on this claim because, among other things, Plaintiffs only allege that three of the Director Defendants committed insider trading. *See Goodyear*, 2007 WL 43557, at *6 (demand futility requires "a reasonable doubt . . . that a majority of the board is incapable of exercising its disinterested business judgment in considering a demand"). Indeed, as Defendants point out, Plaintiffs contend that only Brumback, Carmichael, and Hoover had knowledge of material, non-public information and made stock trades based on that information. Three board members does not constitute a majority, however, meaning Plaintiffs have failed to sufficiently allege demand futility as to this claim. *See Ferro Corp. II*, 511 F.3d at 619 ("Demonstrating futility as to three board members out of ten, however, does not establish futility as to the Board."); *Goodyear*, 2007 WL 43557, at *6 ("Only Gibara is alleged to have engaged in insider trading. Because a majority of the directors are not alleged to have engaged in insider trading, the Court finds that the plaintiffs' insider trading allegations do not raise a reasonable doubt that the Board is incapable of being impartial in considering a demand.").

### D.     Breach of Fiduciary Duty Based on Corporate Waste

In support of their corporate waste claim, Plaintiffs allege that the Director Defendants caused Fifth Third to incur millions of dollars in legal liability and to lose financing from investors and business from future customers who no longer trust Fifth Third and its products. Plaintiffs also allege that the Director Defendants caused Fifth Third to repurchase its common stock at artificially inflated prices. Defendants argue that Plaintiffs' consolidated complaint does not suggest a substantial likelihood of the Director Defendants' personal liability on this claim.

Under Ohio law, corporate waste constitutes one form of demonstrating breach of fiduciary duty and does not amount to a separate cause of action. *See In re Keithley*, 599 F. Supp. 2d at 903 ("[U]nder Ohio law, corporate waste and gross mismanagement are ways in which fiduciary duty can be breached, not separate causes of action independent of a fiduciary breach."). Thus, in order to show demand futility for breach of fiduciary duty based on corporate waste, Plaintiffs must allege that the Director Defendants undertook their actions concerning the repurchase of Fifth Third's stocks and the payment of legal fees "'with deliberate intent to cause injury to the corporation' or 'with reckless disregard for the best interests of the corporation'— and then only if that misconduct is proved by 'clear and convincing evidence.'" *Stanley v. Arnold*, No. 1:12-cv-482, 2012 WL 5269147, at *5 (S.D. Ohio Oct. 23, 2012) (citing Ohio Rev. Code Ann. § 1701.59(E)).

Here, Plaintiffs again claim that, because the Director Defendants knew of numerous red flags regarding Fifth Third's improper practices, including the failure of oversight, the selling of personal holdings of Fifth Third common stock, and the issuance of misleading statements, the Director Defendants acted with reckless disregard for Fifth Third's best interests. But, as discussed above, the consolidated complaint lacks specific allegations that suggest that the

31

Director Defendants knew about these alleged red flags. *See In re Ferro Corp. Derivative Litig.* *("Ferro Corp. I"),* No. 1:04CV1626, 2006 WL 2038659, at *1 (N.D. Ohio Mar. 21, 2006), *aff'd,* 511 F.3d 611 (6th Cir. 2008), *and aff'd,* 511 F.3d 611 (6th Cir. 2008) (mere allegations that directors knew about alleged wrongdoings simply because they served as directors or on oversight committees "would circumvent the demand requirement in almost any derivative suit and are simply insufficient under Ohio law"). Without more, they have not met the requirements to show demand futility as to this claim.

### E. Unjust Enrichment Claim

Defendants further assert that Plaintiffs fail to adequately allege facts to show that the Director Defendants face a substantial likelihood of liability on Plaintiffs' unjust enrichment claim. Under Ohio law, a claim for unjust enrichment must allege: (1) a benefit conferred upon the Director Defendants; (2) the Director Defendants' knowledge of said benefit; and (3) "retention of the benefit by [the Director Defendants] under circumstances where it would be inequitable for [the Director Defendants] to do so without compensation." *In re Gas Nat., Inc*, 2015 WL 3557207, at *19.

Plaintiffs allege that the Director Defendants were unjustly enriched because they received excessive compensation, including stock options, due to their breaches of fiduciary duties. "Alleging improper or excessive grants of executive compensation, as grounds for demand futility, has traditionally been difficult." *Monday*, 2011 WL 5974664, at *7. Courts typically defer to the business judgment of directors when it comes to compensation, as "[t]he value of assets bought and sold in the marketplace, including the personal services of executives and directors, is a matter best determined by the good faith judgments of disinterested and independent directors, men and women with business acumen appointed by shareholders

32

precisely for their skill at making such evaluations." *In re info USA, Inc. S'holders Litig.*, 953 A.2d 963, 984 (Del. Ch. 2007). Here, the consolidated complaint sets forth information about the Director Defendants' compensation, including their receipt of Fifth Third stock. But Plaintiffs do not tie the Director Defendants' compensation to harm suffered by Fifth Third or the shareholders or otherwise suggest why the compensation was improper or excessive. Thus, Plaintiffs fall short of pleading facts that would suggest that the Director Defendants "intended to harm or acted with conscious disregard when determining executive compensation." *Monday*, 2011 WL 5974664, at *7; *see also In re Gas Nat., Inc.*, 2015 WL 3557207, at *20 ("Plaintiffs' bare assertion that they have stated a valid claim for unjust enrichment because it would be unconscionable to allow [the Individual Defendants] to retain the compensation they received while knowingly breaching their fiduciary duties to Gas Natural and causing the Company to incur severe damages falls short of stating a cognizable claim of unjust enrichment." (alteration in original) (internal quotation marks omitted)). The Court finds that Plaintiffs have not established demand futility with respect to their unjust enrichment claim.

### F. Section 10(b) Claim

Next, Defendants argue that Plaintiffs fail to set forth particularized facts showing that the Director Defendants face a substantial likelihood of personal liability on the Section 10(b) claim. Section 10(b) and SEC Rule 10b-5 "prohibit fraudulent or misleading statements of material fact in connection with the purchase or sale of a security." *Walleye Trading LLC v. AbbVie Inc.*, 962 F.3d 975, 977 (7th Cir. 2020). Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of" the SEC's rules and regulations. 15 U.S.C. § 78j(b). Relevant here, Rule 10b-5 implements Section 10(b) by making it unlawful to "make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).

To state a claim under Section 10(b) and Rule 10b-5(b), Plaintiffs must allege that "(1) [the Director Defendants] made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which [Plaintiffs] justifiably relied (6) and that the false statement proximately caused [Plaintiffs'] damages." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 896 (N.D. Ill. 2020) (citations omitted).  Defendants argue that Plaintiffs' allegations with respect to the alleged false statements do not meet the first element (falsity), the third element (scienter), and the sixth element (loss causation).  Because Defendants' scienter argument is dispositive, the Court only addresses that argument.

To meet the scienter requirement, Plaintiffs must allege with particularity facts giving rise to a strong inference that each Director Defendant acted with the required state of mind, which is "'an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.'"  *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)).  Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "*each* act or omission alleged to violate this chapter."  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  To meet this "strong inference" standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  Plaintiffs must allege facts showing that each

34

of the Director Defendants "had the requisite scienter at the time that they made each allegedly fraudulent statement." *In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533, at *6 (N.D. Ill. Feb. 23, 2007); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 692–95, 697–98 (7th Cir. 2008) (where the plaintiffs alleged that both a corporate defendant and its executive officers violated Section 10(b), addressing separately whether the plaintiffs had adequately pleaded scienter for the individual officers and the corporate defendant).

Here, Plaintiffs argue that the consolidated complaint gives rise to a strong inference that the Director Defendants knew of the risks involved in the unauthorized conduct related to cross-selling. First, Plaintiffs assert a "core operations" theory, urging the Court to infer scienter because of the significance of the consumer business operation to the Fifth Third's overall operations. *See W. Palm Beach Firefighters Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 661 (N.D. Ill. 2020) ("Scienter can be inferred when executives make statements about core or critical aspects of their own companies."). But even assuming that each Director Defendant knew of the significance of Fifth Third's consumer business operations, "it does not necessarily follow that they disbelieved their statements or sought to deceive [shareholders] with their statements." *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 CV 1713, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018).

Plaintiffs also focus on the numerous and specific red flags of which they contend the Director Defendants knew or should have known. First, Plaintiffs allege that the Consent Orders to which Fifth Third agreed in the 2015 CFPB Credit Card and Auto Lending Enforcement Actions alerted the Director Defendants to problems with Fifth Third's sales and marketing practices. Plaintiffs further argue that the Director Defendants knew of Wells Fargo's cross-selling issue, which at least some of them discussed at the September 19, 2016, Regulatory

35

Oversight Committee meeting. But knowledge of prior CFPB enforcement actions do not suggest that the Director Defendants willfully or recklessly disregarded the existence of irregularities. *See Stambaugh v. Corrpro Cos.*, 116 F. App'x 592, 595, 597 (6th Cir. 2004) (no scienter arising "from the prior SEC enforcement action because the complaint contained no allegation establishing that current officers should have reason to know of accounting irregularities occurring at an Australian subsidiary" (internal quotation marks omitted)).

Plaintiffs maintain that the "starkest" red flag demonstrating scienter is the CFPB's multi-year investigation of Fifth Third, which resulted in the filing of the 2020 CFPB Action. Specifically, Plaintiffs point out that Fifth Third received six CIDs regarding the use of unauthorized accounts and predatory consumer practices at Fifth Third, alerting the Director Defendants to the allegedly problematic sales practices, including the opening of unauthorized accounts. Instead of alleging knowledge of the omitted facts, however, all that the allegations concerning the CIDs demonstrate at this stage is that Carmichael knew of the investigation, but not necessarily of the problem itself. *See Higginbotham*, 495 F.3d at 758 ("[T]here is a big difference between knowing about the reports . . . and knowing that the reports are false."). Plaintiffs further assert that the Director Defendants' knowledge of the cross-selling misconduct and the related risks is evidenced by various Board and committee meeting minutes from prior to and throughout the relevant period at issue. But like with the CIDs, the meeting notes only suggest that the Director Defendants had some knowledge of customer complaints, not that the statements they made were false.

Further, while government investigations such as that conducted by the CFPB can reinforce allegations of scienter, *see In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("That the SEC and DOJ initiated investigations provides additional support for finding

that scienter has been adequately pleaded."), making such an inference on its own amounts to improperly inferring fraud by hindsight, *see Societe Generale*, 2018 WL 4616356, at *3 (the PSLRA's heightened pleading requirements are intended "to discourage claims of so-called fraud by hindsight" (citations omitted) (internal quotation marks omitted)); *see also Conagra Brands*, 495 F. Supp. 3d at 659 ("The Seventh Circuit has emphasized that 'hindsight' cannot be the 'only basis' of a proposed scienter inference, since there is no 'fraud by hindsight.'" (citing *Higginbotham*, 495 F.3d at 759)).  "Courts in this district have declined to allow plaintiffs to use a must have known theory as an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly." *Conagra Brands*, 495 F. Supp. 3d at 659 (citations omitted) (internal quotation marks omitted).  Further, Plaintiffs point to nothing in the 2020 CFPB Action that suggests that the Director Defendants had personal knowledge of any problematic practices at the time they made statements concerning cross-selling.  As such, the Court cannot infer scienter from conclusory statements made in another litigation.  *See In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, at *1–2, 6–7 (N.D. Ill. July 12, 2006) (February 2005 press release did not support an inference of scienter because its findings were "simply hindsight conclusions" that did "not assist in determining the state of mind behind the misstatements at the time they were made" between August 1999 and April 2004).  At most, the CFPB investigation and litigation allows an inference that Carmichael should have known about the fraud, but what Carmichael should have known does not suffice to show that he, or any of the other relevant Director Defendants, acted recklessly.  *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020) ("Knowledge of the risk of fraud does not automatically mean that Cboe was severely reckless, or intended that fraud to continue.").  And even if Carmichael

acted recklessly, Plaintiffs still need a majority of Director Defendants to have done so in order to plead demand futility. *Emps. Ret. Sys.*, 2021 WL 1890490, at *18 (demand is excused when "a complaint adequately alleges a *majority* of the board of directors face a substantial likelihood of liability because they acted with reckless disregard for the company's best interest" (emphasis added)). Because Plaintiffs have not sufficiently pleaded allegations that give rise to a strong inference of scienter as to a majority of the Director Defendants, they have not established demand futility as to the Section 10(b) claim.

### G.     Section 14(a) Claim

Plaintiffs allege that Director Defendants violated Section 14(a) of the Exchange Act by omitting certain material information from Fifth Third's Proxy Statements. "Section 14(a) of the Exchange Act makes it unlawful to solicit shareholder approval by using proxy statements that do not comply with the rules and regulations of the Securities Exchange Commission." *Id.* at *6 (citing 15 U.S.C. § 78n(a)(1)). "To state a claim under Section 14(a), a plaintiff must allege: (i) that the proxy statement contained a material misstatement or omission that (ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 637 (7th Cir. 2021). Defendants assert that Plaintiffs fail to establish a substantial likelihood of holding the Director Defendants personally liable on this claim, arguing, among other things, that Plaintiffs have not sufficiently alleged a material misstatement or omission.

Both Rule 9(b) and the PSLRA require Plaintiffs to identify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if based on information and belief, all facts on which they form that belief. *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 868 (S.D. Ohio 2013). "Omission of information from a proxy statement

will violate Section 14(a) and Rule 14a–9 only if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Local 295/Local 851 IBT Emp. Grp. v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 716 (S.D. Ohio 2010).

Here, Plaintiffs assert that the Director Defendants caused the issuance of materially misleading statements and failed to disclose material facts in the Proxy Statements from 2018 to 2020. Specifically, they argue that the Proxy Statements hid from shareholders the true operational and financial state of Fifth Third by omitting the fact that Fifth Third's apparent success was based in part on false cross-sell numbers. They further allege that the Proxy Statements falsely and misleadingly stated that Fifth Third's directors and officers were subject to the Code of Conduct while omitting that the Code of Conduct was not being followed or enforced.

Here, the Court agrees that Plaintiffs have failed to sufficiently plead the required false and misleading statements so as to suggest that the Director Defendants face personal liability as to those statements. Initially, Plaintiffs must plead with particularity "each statement alleged to have been misleading." 15 U.S.C. § 78u-4(b)(1). They cannot "simply . . . allege that material information was omitted from a proxy statement in order to state a claim under § 14(a)" and instead "must identify a precise 'statement' in a proxy that is either affirmatively misleading or that is rendered misleading by the operation of a materially omitted fact." *La. Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*, No. 12 CV 1750, 2012 WL 4958561, at *8 (N.D. Ohio Oct. 16, 2012). Plaintiffs only generally cite to the Proxy Statements without identifying specific statements made misleading by the Director Defendants' alleged omissions concerning cross-selling and related investigations, which does not suffice. *See Kugelman v. PVF Cap. Corp.*, 972

F. Supp. 2d 993, 999 (N.D. Ohio 2013) ("Upon review, the Court finds that plaintiff fails to meet the pleading requirements set forth in the PSLRA because she fails to plead which *specific* statements in the Proxy Statement are rendered misleading by defendants' omissions.").  And even had Plaintiffs identified specific statements, "[s]ection 14(a) does not require that . . . uncharged, unadjudicated charges of mismanagement be disclosed."  *Mogell v. Calhoun*, No. CV 15-1239, 2016 WL 3369233, at *5 (C.D. Ill. Mar. 15, 2016) (alteration in original) (quoting *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 322 (S.D.N.Y. 2007)).

Plaintiffs argue that the Proxy Statements were additionally false and misleading with regard to executive compensation because the Proxy Statements represented that Fifth Third used a pay for performance element but did not disclose that the price of Fifth Third's stock was artificially inflated, meaning that executive compensation was similarly artificially inflated.  The Proxy Statements only provide the framework for how Fifth Third determines executive compensation, and Plaintiffs fail to provide any facts to suggest why the failure to include information about the allegedly artificially inflated nature of Fifth Third's stock made the Proxy Statements' representations about how executive compensation was determined misleading.  *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2012 WL 1068761, at *2 (N.D. Ill. Mar. 29, 2012) ("[P]laintiffs must point to a specific statement that is made misleading by [an] omission,' and offer 'specific, contradictory information' known to Anixter sufficient to establish that Anixter made any misleading statements." (second alteration in original) (citations omitted)).  Thus, omissions about the artificially inflated stock price do not support a Section 14(a) claim.

Finally, the Court finds that Plaintiffs have not alleged a false or misleading statement based on representations that Fifth Third's directors are bound by the Code of Conduct because

40

"a company's adoption and publication of a code of ethics does not imply that all of its directors and officers are in compliance with that code." *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 859 (N.D. Ill. 2009). Thus, statements about the applicability of the Code of Conduct to the Board did not require the Director Defendants to provide detailed information about compliance with that code. Nor do Plaintiffs suggest how omission of the Director Defendants' failure to comply with the Code of Conduct renders the statement about their being bound by it false or misleading; even if the Director Defendants did not follow the Code of Conduct, they still remained bound by it. Accordingly, the Court finds that Plaintiffs have failed to demonstrate demand futility as to the Section 14(a) claim.

## III.    Demand Futility Summary and Plaintiffs' Request to Amend

In summary, the Court cannot find that Plaintiffs have sufficiently alleged demand futility as required by Rule 23.1 to proceed with this shareholder derivative action. Plaintiffs' failure to comply with the demand requirements for shareholder derivative actions thus requires the Court to dismiss the consolidated complaint.

This does not end the matter, however, as the Court also must address Plaintiffs' March 23, 2022, motion for adjournment of hearing on Defendants' motion to dismiss, Doc. 100. In that motion, Plaintiffs indicate that they anticipate filing a motion for leave to amend to allow them to add additional allegations that would strengthen their claims. They represent that they only learned of this information after the parties completed briefing the motion to dismiss, with the information they rely on made public at the latest on July 9, 2021, when Fifth Third filed its amended answer in the 2020 CFPB Action. Plaintiffs do not explain – and the Court cannot fathom – why they waited over eight months, with only days remaining before the Court's anticipated ruling date on the motion to dismiss, to raise potential amendment with the Court, nor

41

does their motion provide any reason to think that this allegedly new information would affect the demand futility arguments the Court has addressed herein. The Court, therefore, denies Plaintiffs' motion to adjourn the hearing and provides the parties with its ruling on Defendants' motion to dismiss based on failure to plead demand futility. That being said, the Court dismisses the consolidated complaint without prejudice and provides Plaintiffs with one final opportunity to amend their complaint to cure the deficiencies identified in this Opinion. If they cannot, the Court will dismiss this case with prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss [58]. The Court dismisses the consolidated complaint without prejudice. The Court denies Plaintiffs' motion for adjournment of hearing on Defendants' motion to dismiss [100]. The Court gives Plaintiffs until April 29, 2022, to file an amended complaint if they can do so consistent with F.R.C.P. 11 and this Opinion.

Dated: March 30, 2022

SARA L. ELLIS
United States District Judge

42