**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE FIFTH THIRD BANCORP DERIVATIVE LITIGATION | Case No: 1:20-cv-4115<br><br>District Judge Sara L. Ellis<br><br>**JURY TRIAL DEMANDED** |

# VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Stephen Pemberton, Peter T. Hansen, William Cox, Merrill Dill, and Vince G. Meyer, as Trustee of the Vince G. Meyer Trust (collectively, "Plaintiffs"), by and through their undersigned attorneys, submit this Verified Amended Consolidated Shareholder Derivative Complaint (the "Amended Complaint" or "AC") against the defendants named herein. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' (defined below) public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fifth Third Bancorp ("Fifth Third" or the "Company"), legal filings such as the amended complaint filed by the United States Consumer Financial Protection Bureau ("CFPB") entitled *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:21-cv-00262-DRC (S.D. Ohio) (hereinafter, the "CFPB Amended Complaint" or "CFPB AC"), the amended securities class action complaint entitled *Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds v. Fifth Third Bancorp, et al.*,

Case No. 1:20-cv-02176 (N.D. Ill.) (the "Securities Class Action"), news reports, securities analysts' reports and advisories about the Company, documents produced by the Company in response to Plaintiff Meyer's demand pursuant to Section 1701.37(C) of the Ohio Revised Code, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF ACTION

1. This is a shareholder derivative action brought for the benefit of Nominal Defendant Fifth Third seeking to remedy wrongdoing committed by certain of Fifth Third's directors and/or officers identified below (collectively, "Defendants"), from February 26, 2016 through the present (the "Relevant Period").

2. Fifth Third was founded in 1858. The Company currently operates as a diversified financial services company in the U.S. As of June 30, 2019, the Company operated 1,207 full-service banking centers and 2,551 ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, and North Carolina. Fifth Third is the indirect holding company of Fifth Third Bank, National Association ("Fifth Third Bank" or the "Bank").

3. For more than a decade, Fifth Third knew or consciously disregarded that its employees were engaging in abusive and deceptive consumer practices designed to overstate the Bank's financial and operational results. Specifically, Fifth Third employees were opening unauthorized deposit accounts and credit cards, transferring consumer funds without consent, enrolling customers in online-banking services without consent, misrepresenting terms and conditions to banking customers, falsifying records, and assigning personal-identification numbers and passwords to consumer accounts without customers' knowledge or consent. In

effect, under Defendants' watch, those employees defrauded their customers in an attempt to drive up "cross-selling," i.e., selling multiple products to each customer, which in turn gave the false impression of organic growth.

4. From 2010 through at least 2019, Fifth Third used this cross-sell strategy to increase the total number of products it provided to new and existing customers. According to the Bank, cross-selling improves customer loyalty and retention because it makes it harder for the customer to separate from the Bank. For this reason, Fifth Third Bank set a cross-sell goal of at least four products per customer.

5. Cross-selling, or organic growth, was extremely material and critical to Fifth Third's plan to grow. It is far more profitable and efficient to grow the Bank's business from its existing pool of customers, than externally, through the acquisition of new customers.

6. During the Relevant Period, Fifth Third tracked cross-selling effectiveness and, until at least 2017, pressured employees to meet-cross selling goals. For example, Fifth Third's head of retail banking wrote that "bullying and threats are often used to achieve results," and another employee said that "[w]e are becoming a predatory institution" and that "[t]he motivation for these practices is simple, if you don't meet your sales goals you get fired." Moreover, Fifth Third's employee compensation structure conditioned employee-performance ratings on meeting sales goals and quotas, and the Company's incentive-compensation program rewarded managers and their subordinate employees for cross-selling. This all translated into unrelenting pressure on employees to open numerous accounts per customer and engage in the unlawful account-creation practices.

7. Fifth Third's success in cross-selling was central to its financial results—as cross-selling inflated the Company's financial results and gave the impression that the Company was

growing organically and legally. Thus, Defendants were highly motivated to foster, and preserve, the unlawful practices, as it showed growth in the opening of customer accounts and, most importantly, drove up the share price. It also resulted is lucrative compensation to Company executives, as the Company employed a "pay-for-performance" element to executive compensation, including linking incentive awards to the Company's growth.

8. Because the cross-selling was central to the Banks' financial and operational results, the Individual Defendants chose not to implement any system, technology, or other reasonable method to detect or stop unauthorized account activity. Instead, the Individual Defendants relied on a rudimentary self-report system that required customers to self-identify as victims or Fifth Third employees to allege improper activity. Relying primarily on self-reporting was absurd given that the Bank's misconduct relied on concealing the unauthorized accounts from its customers.

9. Fifth Third knew that many customers did not detect Fifth Third's improper acts or practices and that many others did not lodge a complaint, and that many of Fifth Third's employees feared retribution for alleging improper conduct. And even when consumers or employees alleged improper sales conduct, Fifth Third created obstacles to identifying additional unauthorized accounts.

10. Despite knowing that the self-report system significantly understated the scope of the problem, and despite knowing of data and other information that would be useful in implementing better controls to detect and stop the unauthorized account activity, Defendants knowingly chose to stop further problems from occurring. As a result, hundreds of thousands (or more) unauthorized accounts were created in an effort to meet the targets set by Company management.

11. Throughout the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (1) as a result of Fifth Third Bank's aggressive incentive policies to promote its cross-sell strategy, Fifth Third Bank employees engaged in unauthorized conduct related to customer accounts; (2) since at least 2008, Fifth Third Bank, and by extension, Fifth Third, was aware of such unauthorized conduct and, thus, the Company and Fifth Third Bank were in violation of relevant laws and regulations designed to protect their consumers; (3) Fifth Third failed to properly implement and monitor its cross-sell program, detect and stop misconduct, and identify and remediate harmed consumers; (4) the foregoing subjected the Company to a foreseeable risk of heightened regulatory scrutiny, investigation, and/or fines and penalties; (5) Fifth Third's revenues were, in part, the product of unlawful conduct and thus, unsustainable; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

12. Additionally, prior to and during the Relevant Period, the Director Defendants (defined below) failed to establish and maintain adequate internal controls to protect Fifth Third Bank's customers from the misconduct alleged herein. The Director Defendants knew, or were severely reckless in not knowing, that the Company's current internal and disclosure controls allowed the illegal account-creation to begin and helped perpetuate it. Yet, the Director Defendants failed to implement any system, technology, or other reasonable method to detect and stop the unauthorized account activity. Instead, the Director Defendants took an ignorance-is-bliss approach for fear that greater identification of illegal consumer practices would have caused Fifth Third reputational and financial harm.

13. Further, during the Relevant Period, Defendants Carmichael, Brumback, and Hoover participated in improper insider sales of Company stock.

14. Defendants' actions are referred to herein as the "Relevant Period Misconduct."

15. Defendants' Relevant Period Misconduct occurred while Defendants ignored multiple red flags, including but not limited to, prior misconduct at Fifth Third Bank, which ultimately resulted in several lawsuits and investigations, including an enforcement action by the Consumer Financial Protection Bureau (the "CFPB").

16. On March 2, 2020, the Company filed its Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2019 (the "2019 Form 10-K"). According to the 2019 Form 10-K, the CFPB "notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings." Indeed, despite Defendants' blanket statements in the Company's periodic reports stating that the Company and/or its affiliates are involved in certain regulatory investigations by various government agencies from time to time, this was the first time that Defendants specifically disclosed the existence of the CFPB investigation and a forthcoming enforcement action to the investing public. The failure to timely publicly disclose the foregoing investigation/potential enforcement action can only be the product of bad faith, given, among other things, that: (i) the Company received the first of several Civil Investigative Demands ("CIDs") from the CFPB in November 2016 notifying Fifth Third that the CFPB was investigating certain sales practices at the Company and Fifth Third Bank; (ii) the Company had entered into two consent orders with the CFPB in 2015 as a result of two enforcement actions filed in connection with misconduct, including singing up the Bank's existing credit card customers without their consent; and (iii) the misconduct at Wells Fargo Bank and resulting fallout over its cross-selling practices, all of which was widely reported by media outlets and known to and discussed by Defendants, as set forth in detail herein.

17. As a result, the Company's stock price dropped $0.72 per share, over the

following trading sessions to close at $23.68 per share on March 5, 2020. The $0.72 per share decline was the equivalent market capitalization decline of approximately $512 million. However, the true scope of the Company's alleged wrongdoing and liability with respect to unauthorized account openings was left undisclosed in the 2019 Form 10-K and was actively downplayed by the Company, causing the Company's stock price to continue to trade at artificially inflated prices.

18. Finally, on March 9, 2020, just seven days after the Company's first public disclosure of the CFPB investigation, the CFPB announced that it had filed a lawsuit against Fifth Third Bank in the United States District Court, Northern District of Illinois, Eastern Division.[1] The 2020 CFPB Lawsuit revealed additional information regarding the CFPB's investigation into Fifth Third Bank, none of which had been previously disclosed by the Company. Specifically, the CFPB's complaint "allege[d] that for several years…Fifth Third [Bank], without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts." The CFPB further alleged that, "despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third [Bank] took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers." The CFPB concluded that Fifth Third Bank "violated the Consumer Financial Protection Act's ['CFPA'] prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations."

---

1 The case is docketed as *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case Number 1:20-cv-01683 (the "2020 CFPB Action").

19. On this news, the Company's stock price dropped $0.64 per share, or approximately to close at $17.66 per share on March 11, 2020 and dropped an additional $1.76 per share the following trading day to close at $15.90 per share on March 12, 2020. These stock price declines represented a market capitalization decline of $1.7 billion.

20. Between March 2, 2020 and March 12, 2020 when these adverse disclosures were being digested by the market, the price of Fifth Third's stock dropped $8.50 per share, representing a market capitalization decline of $6 billion.

21. The Bank's retail banking operations and sales practices were closely monitored and reviewed by the Board and the Company's management. On September 28, 2015, the CFPB issued a press release announcing that it was taking action against Fifth Third Bank ". . . for violations of the Dodd-Frank Act for deceptive acts or practices…" relating to Fifth Third Bank's marketing and sales practices. This CFPB action related to Fifth Third Bank's "Debt Protection" credit card add-on product (the "2015 CFPB Credit Card Action")—which were added to customers credit card accounts without their consent. On that same date, the CFPB announced a separate enforcement action against Fifth Third Bank relating to its indirect auto-lending program (the "2015 CFPB Auto Lending Enforcement Action"). Both actions resulted in Consent Orders which required, among other things, that the Company establish a Board-level Regulatory Oversight Committee that would monitor and coordinate compliance with, among other things, laws and regulations prohibiting the Bank from signing up customers for products without their consent. Despite this, Defendants continued to fail to monitor compliance with such consumer financial laws, as Fifth Third employees continued illegally issuing credit cards to customers without their consent.

22. At the time of the 2015 CFPB Credit Card Action and 2015 CFPB Auto Lending

Enforcement Action and Consent Orders, the following Director Defendants (defined below) were members of the Board of Directors of Fifth Third (the "Fifth Third Board" or "Board"): Defendants Nicholas A. Akins ("Akins"), B. Evan Bayh III ("Bayh"), Jorge L. Benitez ("Benitez"), Katherine B. Blackburn ("Blackburn"), Emerson L. Brumback ("Brumback"), Greg D. Carmichael ("Carmichael"), Gary R. Heminger ("Heminger"), Jewell D. Hoover ("Hoover"), Michael B. McCallister ("McCallister"), and Marsha C. Williams ("Williams").

23. Blackburn, Brumback, Hoover, and Williams were members of the Regulatory Oversight Committee charged with oversight and ensuring the Bank's compliance with rules and regulations prohibiting the Bank from signing customers up for products without their consent.

24. On the heels of extensive media coverage, followed by civil lawsuits and regulatory investigations, in September 2016, the CFPB filed a Consent Order against Wells Fargo Bank, N.A. ("Wells Fargo") based on its cross-selling scheme that was substantially similar to the conduct of Fifth Third, as alleged herein (the "Wells Fargo Cross-Selling Scandal"). The Well Fargo Cross-Selling Scandal was well known and monitored by the Bank since the media coverage of it began. At the time of the Wells Fargo Consent Order was filed, in addition to the Director Defendants identified above, Defendants Jerry W. Burris ("Burris") and Eileen A. Mallesch ("Mallesch") were also members of the Fifth Third Board.

25. This action is against the following members of the Fifth Third Board: Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Daniels, Feiger, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams (the "Director Defendants").

26. As a result of the wrongful conduct of the Defendants as alleged herein, various investigations and actions have been commenced, including but not limited to, the 2020 CFPB Lawsuit, a securities class action styled *Heavy & General Laborers' Local 472 & 172 Pension*

*and Annuity Fund, etc. v. Fifth Third Bancorp, et al.*, Case Number 1:20-cv-02176 (N.D. Ill. Apr. 7, 2020) (the "Securities Class Action") and various consumer class actions.

27. Moreover, on June 16, 2021, the CFPB filed an amended complaint in the 2020 CFPB Action described above. The CFPB AC provides specific detail about the extent of the fraud, and alleges that "Fifth Third [knew] or consciously disregard[ed] that its admissions and claims understate the real number of unauthorized account openings and other improper sales conduct," and that there are in fact "hundreds of thousands of Fifth Third [Bank] accounts that bear indicia of non-authorization," with misconduct by Bank employees and deficient Bank practices stretching back to 2008 and continuing until at least 2020. CFPB AC ¶¶ 98, 99.

28. The CFPB AC has also revealed that "Fifth Third [Bank] admitted in 2017 that it had opened consumer-financial products without consumer authorization during each year from 2010 to 2017." CFPB AC ¶ 5.

29. The CFPB AC states that "Fifth Third [Bank] has, and members of Fifth Third's senior management are and have been familiar with, data and other information that would be useful in implementing available unauthorized-account-identification methods for at least years 2010 to 2021" (CFPB AC ¶ 119) — when Defendants Carmichael and Tuzun had specific responsibilities over the implicated aspects of the Bank's operations. CFPB AC ¶¶ 28, 30. The CFPB AC further alleges that this dereliction of duty was knowing and intentional, stating that "Fifth Third, through its senior management, chose not to attempt to identify unauthorized consumer-financial products beyond those Fifth Third has admitted to opening because greater identification might cause Fifth Third reputational and financial harm." CFPB AC ¶¶ 19, 95, 152, 167.

30. The CFPB AC cites internal correspondence from executives in Defendant

Carmichael's direct line of report contemporaneously detailing illicit sales practices and stating that such practices were ***widely known within the organization***. CFPB AC ¶¶ 19, 95, 152, 168. The CFPB AC expressly singles out Defendant Carmichael as "responsible for reviewing or overseeing Fifth Third's retail-banking business, its data maintenance and use, and its sales and investigative practices" when misconduct was occurring. *Id.*

31. CFPB issued its first CID to Fifth Third in November 2016. Addressed directly to Defendant Carmichael, the CID spotlighted "Specific Sales Practices" that resulted in unauthorized account openings. At that point, Defendants Carmichael and Tuzun—who had been aware of misconduct at the Bank for years—knew not only that the Bank was under investigation, but that it was being investigated for the very unauthorized-account problem about which alarms had been ringing since 2010. The Regulatory Oversight Committee had oversight responsibilities relating to compliance with regulatory findings and supervisory issues between 2015 and December 2016, after which some of its responsibilities moved to the Risk and Compliance Committee.

32. Between 2017 and 2019, Fifth Third received ***five additional CIDs*** from CFPB regarding predatory consumer practices at the Bank, and in 2017 Fifth Third admitted that it had opened unauthorized consumer financial products "every year from 2010 to 2017." CFPB AC at ¶ 5. During this multi-year investigation, the Bank provided nearly a half-billion data points, thousands of Company documents, and extensive testimony to CFPB regulators. *See* Securities Class Action Amended Complaint at ¶ 9.

33. Based on its intensive investigation, CFPB concluded that Fifth Third had "known for more than a decade that [the Bank's] acts or practices have led to the opening of products in consumers' names without consumers' knowledge or consent." CFPB AC at ¶ 4.

34. Fifth Third admitted opening consumer financial products without authorization "every year from 2010 to 2017." CFPB AC at ¶ 5. Yet the practices continued, as CFPB revealed same misconduct by Bank employees and deficient Bank practices continuing until at least 2020. CFPB AC at ¶ 64.

35. Ultimately, the CFPB uncovered "***hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization***." CFPB AC at ¶ 99 [Emphasis added].

36. The CFPB also uncovered internal Bank documents showing how its policies encouraged widespread unauthorized activity. In a resignation letter to Bank management, one employee described "predatory" sales practices and tactics, "many" of which "were brought to us by the regional and market management," and which were "openly discussed" on conference calls. The departing employee explained that "[t]he motivation for these practices is simple": "if you don't meet your goal you get fired. That's what I've been told, and that's what other employees have been told . . . ." As another former Bank employee put it, several regional bank and branch managers (including former Wells Fargo employees) encouraged "gaming," or opening false accounts to meet unrealistic sales goals. And another stated it was known internally that the only way to meet account goals was to open bogus accounts. Defendants were apprised of these well-known facts (or should have been apprised as they were the same red flags raised in 2015), as Fifth Third engaged in monthly testing and review of account documentation and employed a special investigations group to keep senior executives apprised of suspicious activities. *See* CFPB's Opposition to Motion to Transfer Venue (D.E. 39) in *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:21-cv-00262-DRC (S.D. Ohio) at p. 4.

37. The CFPB AC also confirms that Fifth Third knew the unauthorized-account

problem was widespread but failed to address its full scope. According to CFPB, "Fifth Third has, and members of Fifth Third's senior management are and have been familiar with, data and other information that would be useful in implementing available unauthorized-account-identification methods . . . ." CFPB AC ¶ 119. However, as explained above, Defendants chose not to use that data or information to identify the true level of unauthorized activity because greater identification would have caused Fifth Third reputational and financial harm.

## II. JURISDICTION AND VENUE

38. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9 promulgated thereunder.

39. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

40. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

41. Fifth Third is a corporation that conducts business and maintains offices in this District. Defendants have sufficient minimum contacts with Illinois and this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

42. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1401 because: (i) Fifth Third conducts business and maintains offices in this District; (ii) one or more of the Defendants resides in this District; (iii) a substantial portion of the transactions and wrongs

complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III. PARTIES

### A. Plaintiffs

43. Plaintiff ***Stephen Pemberton*** ("Pemberton") is a current shareholder of Fifth Third common stock. Plaintiff has continuously held Fifth Third common stock at all relevant times.

44. Plaintiff ***Peter T. Hansen*** ("Hansen") is a current shareholder of Fifth Third common stock. Plaintiff has continuously held Fifth Third common stock at all relevant times.

45. Plaintiff ***William Cox*** ("Cox") is a current shareholder of Fifth Third common stock. Plaintiff has continuously held Fifth Third common stock at all relevant times.

46. Plaintiff ***Merrill Dill*** ("Dill") is a current shareholder of Fifth Third common stock. Plaintiff has continuously held Fifth Third common stock at all relevant times.

47. Plaintiff ***Vince G. Meyer, as Trustee of the Vince G. Meyer Trust*** ("Meyer") is a current shareholder of Fifth Third common stock. Plaintiff has continuously held Fifth Third common stock at all relevant times.

### B. Nominal Defendant Fifth Third

48. Nominal Defendant Fifth Third is an Ohio corporation with its principal executive offices located at 38 Fountain Square Plaza, Cincinnati, Ohio 45263. Fifth Third's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "FITB."

### C. Director Defendants

49. ***Defendant Greg D. Carmichael*** ("Carmichael") has served as the Company's President since September 2012, Chief Executive Officer ("CEO") since November 2015 and has served as a member of Board since 2015, and as Chairman of the Board since 2018. Defendant Carmichael previously served as Fifth Third Bank's Chief Operating Officer from June 2006 to September 2012, and as Chief Information Officer from June 2003 to June 2006.

50. The Company's website[2] states the following about Defendant Carmichael:

> Greg D. Carmichael serves as chairman and chief executive officer of Fifth Third Bancorp, the ninth-largest U.S.-based consumer bank. Since Greg became CEO, the Company has grown in assets to more than $200 billion* and is recognized as one of the most innovative banks in the country. It has approximately 20,000 employees and about 1,100 banking centers across states.* Its four main businesses are Commercial Banking, Branch Banking, Consumer Lending and Wealth & Asset Management. The Bank has commercial and consumer lending presence across the United States.
>
> In 17 years of service to the Company, Greg's direction and vision have helped drive the Bank's transformation and overall success. Greg joined Fifth Third in 2003 as executive vice president and chief information officer. He was named chief operating officer in 2006, then president in 2012. He was appointed to the Board of Directors in July 2015, became CEO in November 2015 and was elected chairman of the Board in January 2018.
>
> Before coming to Fifth Third, Greg served as chief information officer for Emerson Electric, a worldwide provider of technology and energy solutions. His background also includes leadership roles in information technology with General Electric.
>
> Greg and his wife live in Cincinnati. They have three adult sons.
>
> **Education**
>
> Greg earned a bachelor's degree in computer science from the University of Dayton and a master's degree from Central Michigan University.
>
> **Professional and Civic**
>
> In 2020, Greg joined the board of directors of Encompass Health. He also serves

2 *See* https://www.53.com/content/dam/fifth-third/docs/bios/Greg_Carmichael_Bio.pdf. Last visited April 6, 2022. References to other Defendants' biographical information is also from this website.

on the board of directors of the American Bankers Association and of the National Veterans Memorial and Museum. He is vice president of the Ohio Business Roundtable and a member of the Commercial Club of Cincinnati's executive committee. Greg is a member of the Bank Policy Institute's board and chairman of its Business Innovation Technology Security Committee. He also has served for seven years on the board of trustees of Bethesda Inc.

In March 2020, Greg was a founding member of the Restart Task Force, initiated by the Cincinnati USA Regional Chamber to bring together Greater Cincinnati CEOs to guide the business community's response to the coronavirus pandemic.

51. According to the Company's DEF 14A Proxy Statement filed on March 4, 2020 (the "2020 Proxy Statement"), as of December 31, 2019, Carmichael beneficially owned 1,336,633 shares of the Company's common stock.

52. Defendant Carmichael received the following compensation:

| Name | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Carmichael | 2019 | $1,100,070 | $0 | $4,462,507 | $787,498 | $2,200.000 | $449,162 | $8,999,237 |
| | 2018 | $1,088,531 | $0 | $4,887,480 | $862,496 | $4,100,000 | $235,145 | $11,173,652 |
| | 2017 | $1,000,064 | $0 | $4,526,248 | $798,750 | $2,000,000 | $363,230 | $8,688,292 |

53. During the Relevant Period, Defendant Carmichael made the following Company stock sales:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 10/29/2019 | 55,251 | $29.59 | $1,634,877.09 |
| 02/13/2018 | 87,613 | $32.37 | $2,836,032.81 |
| 11/16/2016 | 36,821 | $25.11 | $924,575.31 |
| 11/10/2016 | 17,689 | $23.45 | $414,807.05 |

54. ***Defendant Nicholas K. Akins*** ("Akins") has served as a Company director since 2013. Defendant Akins served as a member of the Board's Audit Committee in 2014 and 2015, as a member of the Finance Committee since 2016, as a member of the Human Capital and Compensation Committee from 2014 to 2019, as Chair of the Nominating and Corporate Governance Committee since 2016, and as a member of the Technology Committee which was

established in 2020. Defendant Akins also served as a member of the Board's Regulatory Oversight Committee during its term of existence in 2015 to 2016. Per the Company's website (as of January 12, 2021), Defendant Akins presently serves on the following committees: Finance, Nominating and Corporate Governance (as its Chair), and Technology.

55. For the fiscal year ended December 31, 2019, Defendant Akins received $230,000 in compensation from the Company. This included $105,000 in fees earned or cash paid and $125,000 in stock awards.

56. The 2020 Proxy Statement stated the following about Defendant Akins:

> *Experience*:
>
> Mr. Akins' qualifications for service as a director include business expertise as the Chief Executive Officer of a large, multi-state electric utility where he focuses on local operating utilities, community involvement, government relations, and regulations at the state, local, and federal levels. Mr. Akins has experience in all facets of operational, financial, and compliance-related activities in a heavily regulated business and industry. He also has experience overseeing cyber-related activities in business systems and critical infrastructure.
>
> *Skills and Attributes*:
>
> Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, ESG, Executive Management, Legal and Regulatory, Risk Management, and Strategic Planning

57. ***Defendant B. Evan Bayh III*** ("Bayh") has served as a director of the Company since 2011. Defendant Bayh served as a member of the Board's Nominating and Corporate Governance Committee since 2012 and as a member of the Board's Risk and Compliance Committee from 2011 through 2019. Per the Company's website (as of January 12, 2021), Defendant Bayh presently serves on the following committees: Nominating and Corporate Governance and Technology.

58. For the fiscal year ended December 31, 2019, Defendant Bayh received total

compensation of $220,000. This included $95,000 in cash and $125,000 in stock awards.

59. The 2020 Proxy Statement stated the following about Defendant Bayh:

> Mr. Bayh's qualifications for service as a director include two decades of experience in government service. First as Governor of Indiana and then in the United States Senate, Mr. Bayh dealt with a variety of financial, economic, and policy issues that impact a wide variety of businesses. He had supervisory authority over thousands of employees and oversaw a budget in excess of $10 billion. As a member of the Senate Banking Committee and Chair of the International Trade and Finance Subcommittee, Mr. Bayh gained perspective on issues of particular relevance to Fifth Third Bancorp. He also has extensive knowledge of cybersecurity issues as e Committee and Central Intelligence Agency External Advisory Board.

60. ***Defendant Jorge L. Benitez*** ("Benitez") has served as a Company director since 2015. Defendant Benitez joined the Board's Audit Committee in September 2018 and remained as a member through 2019, served as a member of the Risk and Compliance Committee from 2015 through 2019 and served as a member of the Board's Nominating and Corporate Governance Committee since 2016. Per the Company's website (as of January 12, 2021), Defendant Benitez presently serves on the following committees: Finance, Nominating and Corporate Governance, and Technology (as its Chair).

61. For the fiscal year ended December 31, 2019, Defendant Benitez received $230,000 in compensation from the Company. This included $105,000 in fees earned or cash paid and $125,000 in stock awards.

62. The 2020 Proxy Statement stated the following about Defendant Benitez:

> *Experience*:
>
> Mr. Benitez's qualifications for service as a director include extensive experience developing and executing business strategies across a range of industries, particularly consumer products and travel and transportation services. He also has significant experience implementing large-sale systems integration programs, as well as experience running operating units within a large multinational publicly-traded corporation.
>
> *Skills and Attributes*:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, Digital Innovation and FinTech, ESG, Executive Management, Risk Management, and Strategic Planning

63. ***Defendant Katherine B. Blackburn*** ("Blackburn") has served as a Company director since 2014. Defendant Blackburn served as a member of the Board's Audit Committee from 2015 through September 2018, served as a member of the Risk and Compliance Committee from September 2018 through 2019, served as a member of the Board's Nominating and Corporate Governance Committee since 2017, and served as a member of the Board's Regulatory Oversight Committee during its limited term of existence in 2016. Per the Company's website (as of January 12, 2020), Defendant Blackburn presently serves on the following committees: Audit and Nominating and Corporate Governance.

64. For the fiscal year ended December 31, 2019, Defendant Blackburn received $220,000 in compensation from the Company. This included $95,000 in fees earned or cash paid and $125,000 in stock awards.

65. The 2020 Proxy Statement stated the following about Defendant Blackburn:

*Experience*:

Ms. Blackburn's qualifications for service as a director include business experience in running operations for the Cincinnati Bengals professional football franchise. She has extensive experience with human resource and personnel matters, cost and efficiency management, and business negotiations. Ms. Blackburn also has extensive experience with management of diversity and inclusion initiatives for large organizations through her role on the National Football League's Diversity Committee. Additionally, Ms. Blackburn holds a law degree and brings to the Board knowledge and familiarity of Fifth Third and the City of Cincinnati.

*Skills and Attributes*:

Compensation and Benefits, Corporate Governance, Digital Innovation and FinTech, ESG, Executive Management, Legal and Regulatory, Risk Management, and Strategic Planning

66. ***Defendant Emerson L. Brumback*** ("Brumback") has served as a Company director since 2009. Defendant Brumback served as a member of the Board's Audit Committee from 2010 through 2015 and as the Audit Committee's Chair from 2016 through 2019. Defendant Brumback also served as a member of the Finance Committee since 2011, served as a member of the Board's Human Capital and Compensation Committee from 2010 through April 2014, and served as a member of the Board's Regulatory Oversight Committee during its term of existence in 2015 to 2016. Per the Company's website (as of January 12, 2021), Defendant Brumback presently serves on the following committees: Finance, Human Capital and Compensation, and Risk and Compliance (as its Chair).

67. For the fiscal year ended December 31, 2019, Defendant Brumback received $255,000 in compensation from the Company. This included $130,000 in fees earned or cash paid and $125,000 in stock awards.

68. The 2020 Proxy Statement stated the following about Defendant Brumback:

> *Experience*:
>
> Mr. Brumback's qualifications for service as a director include banking expertise through his 30 years of experience in the financial services industry with several banking organizations. He has gained valuable insight through his experience in executive positions overseeing many aspects of the banking field, including retail banking, commercial banking, banking operations, and systems. Mr. Brumback also brings his experience as a former board member with another financial services company.
>
> *Skills and Attributes*:
>
> Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning

69. During the Relevant Period, Defendant Brumback made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 03/05/2018 | 3,000 | $33.44 | $100,320.00 |

70. ***Defendant Jerry W. Burris*** ("Burris") served as a director of the Company from 2016 until resigning in June 2020. Defendant Burris served as a member of the Board's Audit Committee from December 2016 through at least 2019 and served as a member of the Board's Risk and Compliance Committee from 2017 through at least 2019.

71. For the fiscal year ended December 31, 2019, Defendant Burris received $230,000 in compensation from the Company. This included $105,000 in fees earned or cash paid and $125,000 in stock awards.

72. The 2020 Proxy Statement stated the following about Defendant Burris:

> *Experience*:
>
> Mr. Burris' qualifications for service as a director include management expertise as the President and Chief Executive Officer of Associated Materials and as a division president with General Electric. Mr. Burris's expertise includes strong technical marketing skills, a sound understanding of how to best integrate technology, rapid innovation, mergers and acquisitions, and cost and efficiency management. He also brings experience from his service on a public company board's compensation and governance and audit committees.
>
> *Skills and Attributes*:
>
> Compensation and Benefits, Corporate Governance, ESG, Executive Management, Risk Management, and Strategic Planning

73. ***Defendant C. Bryan Daniels*** ("Daniels") has served as a Company director since 2019. Defendant Daniels served as a member of the Board's Audit Committee in 2019. Per the Company's website (as of January 12, 2021), Defendant Daniels presently serves on the following committees: Risk and Compliance and Technology.

74. For the fiscal year ended December 31, 2019, Defendant Daniels received $176,075 in compensation from the Company. This included $42,500 in fees earned or cash paid

and $133,575 in stock awards.

75. The 2020 Proxy Statement stated the following about Defendant Daniels:

*Experience*:

Mr. Daniels's qualifications for service as a director include extensive and varied experiences as an executive, director, and investor in the financial services industry. As a founder of Prairie Capital, he brings to the Board a rich and multi-faceted understanding of many different industries, companies, and business practices. Mr. Daniels also has substantial experience with technology in several industries, including financial services.

*Skills and Attribu*tes:

Corporate Governance, Cybersecurity, Digital Innovation and FinTech, Executive Management, Financial Services Industry, Risk Management, and Strategic Planning

76. ***Defendant Mitchell S. Feiger*** ("Feiger") has served as a Company director since June 2020. Defendant Feiger was the chairman and CEO of Fifth Third Bank (Chicago) from March 2019 and retired from those positions on May 29, 2020. He previously had served as president and CEO of MB Financial.

77. ***Defendant Thomas H. Harvey*** ("Harvey") has served as a Company director since 2019. Defendant Harvey served as a member of the Board's Nominating and Corporate Governance Committee and Risk and Compliance Committee since September 2019. Per the Company's website (as of January 12, 2021), Defendant Harvey presently serves on the following committees: Audit, Nominating and Corporate Governance, and Technology.

78. For the fiscal year ended December 31, 2019, Defendant Harvey received $176,075 in compensation from the Company. This included $42,500 in fees earned or cash paid and $133,575 in stock awards.

79. The 2020 Proxy Statement stated the following about Defendant Harvey:

*Experience*:

> Mr. Harvey's qualifications for services as a director include 25 years of experience in the financial services industry. His experience in executive positions with multiple foundations and other organizations provides him with strong organizational and leadership skills and extensive investment experience and makes him particularly well-suited to serve on Fifth Third's Board of Directors. Mr. Harvey also has unique and diverse knowledge and experience with the emergence and growth of technology in the banking industry.
>
> *Skills and Attributes*:
>
> Accounting and Financial Reporting, Corporate Governance, ESG, Executive Management, Financial Services Industry, and Strategic Planning

80. ***Defendant Gary R. Heminger*** ("Heminger") has served as a Company director since 2006. Defendant Heminger served as a member of the Board's Audit Committee in 2008 and 2009, served as a member of the Board's Finance Committee from 2009 to 2015 and as its Chair from 2016, served as a member of the Board's Human Capital and Compensation Committee since (at least) 2008, and served as a member of the Board's Nominating and Corporate Governance Committee from 2014 through 2019. Per the Company's website (as of January 12, 2021), Defendant Harvey presently serves on the following committees: Finance (as its chair), Human Capital and Compensation, and Risk and Compliance.

81. For the fiscal year ended December 31, 2019, Defendant Heminger received $265,000 in compensation from the Company. This included $140,000 in fees earned or cash paid and $125,000 in stock awards.

82. The 2020 Proxy Statement stated the following about Defendant Heminger:

> Experience:
>
> Mr. Heminger's qualifications for service as a director include valuable business knowledge gained from his responsibilities in overseeing all operations, performance, reporting, and financial metrics for Marathon's refining, marketing, transportation, and Speedway business. He has financial experience through his oversight of all financial data, working capital, and merger and acquisition activity.

> *On October 31, 2019, Marathon Petroleum Corporation announced Mr. Heminger's plans to retire as Chairman and Chief Executive Officer of Marathon Petroleum Corporation and as Chairman of MPLX GP LLC to be effective at the conclusion of Marathon Petroleum Corporation's 2020 Annual Meeting scheduled for April 29, 2020. Mr. Heminger will not stand for reelection to the Marathon Petroleum Corporation Board of Directors at the 2020 Annual Meeting.
>
> Skills and Attributes:
>
> Accounting and Financial Reporting, Compensation and Benefits, Corporate Governance, ESG, Executive Management, Risk Management, and Strategic Planning

83. ***Defendant Jewell D. Hoover*** ("Hoover") has served as a Company director since 2009. Defendant Hoover served as a member of the Board's Audit Committee since 2010, served as a member of the Board's Finance Committee from 2016 to 2019, served as a member of the Board's Risk and Compliance Committee since 2010, including as its Chair from 2016 through 2019, and served as a member of the Board's Regulatory Oversight Committee during its term of existence in 2015 to 2016. [redacted].[3] Per the Company's website (as of January 12, 2021), Defendant Hoover presently serves on the following committees: Audit and Risk and Compliance.

84. For the fiscal year ended December 31, 2019, Defendant Hoover received $265,000 in compensation from the Company. This included $140,000 in fees earned or cash paid and $125,000 in stock awards.

85. The 2020 Proxy Statement stated the following about Defendant Hoover:

> *Experience*:

[3] [redacted]

> Ms. Hoover's qualifications for service as a director include 28 years of service with the Office of the Comptroller of the Currency, including service as the Deputy Comptroller of the agency's Western District. Ms. Hoover also has gained valuable banking experience and knowledge as a bank consultant for corporate governance, director training, and problem bank resolution matters. Additionally, she has first-hand knowledge of Fifth Third through her service as a director of its North Carolina affiliate and a predecessor banking organization. Ms. Hoover is also a National Association of Corporate Directors ("NACD") Board Leadership Fellow.
>
> *Skills and Attributes*:
>
> Accounting/Financial Reporting, Corporate Governance, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning

86. During the Relevant Period, Defendant Hoover made the following sales of the Company's common stock:

| **Date** | **Number of Shares** | **Price** | **Proceeds** |
|---|---|---|---|
| 06/03/2019 | 3,739 | $26.51 | $99,120.89 |
| 02/12/2018 | 3,700 | $32.40 | $119,880.00 |
| 04/28/2017 | 2,000 | $24.82 | $49,640.00 |

87. ***Defendant Eileen A. Mallesch*** ("Mallesch") has served as a Company director since 2016. Defendant Mallesch served as a member of the Board's Audit Committee since September 2018, served as a member of the Board's Human Capital and Compensation Committee since 2017 and served as a member of the Board's Risk and Compliance Committee from December 2016 through September 2018. Per the Company's website (as of January 12, 2021), Defendant Mallesch presently serves on the following committees: Audit (as its Chair), Finance, Human Capital and Compensation, and Risk and Compliance.

88. For the fiscal year ended December 31, 2019, Defendant Mallesch received $220,000 in compensation from the Company. This included $95,000 in fees earned or cash paid and $125,000 in stock awards.

89. The 2020 Proxy Statement stated the following about Defendant Mallesch:

> *Experience*:
>
> Ms. Mallesch's qualifications for service as a director include financial management experience from her roles as Chief Financial Officer for both Nationwide Mutual Insurance Company and Genworth Financial Life Insurance/Service Co. She has more than 25 years of broad finance and strategy experience in a variety of industries, ranging from insurance and telecommunications to consumer products and manufacturing. In addition, Ms. Mallesch brings vast knowledge in enterprise resource planning and large-scale technology integrations, strategic planning, and managing acquisitions, divestitures, and risk and compliance management. Ms. Mallesch is also a National Association of Corporate Directors ("NACD") Governance Fellow.
>
> *Skills and Attributes*:
>
> Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, ESG, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning.

90. ***Defendant Michael B. McCallister*** ("McCallister") has served as a Company director since 2011. Defendant McCallister served as a member of the Board's Audit Committee from 2012 through April 2015, served as a member of the Board's Finance Committee since 2016, served as a member of the Board's Human Capital and Compensation Committee since 2015 and as its Chair since 2017. Per the Company's website (as of January 12, 2021), Defendant McCallister presently serves on the following committees: Audit, Finance, and Human Capital and Compensation (as its Chair).

91. For the fiscal year ended December 31, 2019, Defendant McCallister received $235,000 in compensation from the Company. This included $110,000 in fees earned or cash paid and $125,000 in stock awards.

92. The 2020 Proxy Statement stated the following about Defendant McCallister:

> *Experience*:
>
> Mr. McCallister's qualifications for service as a director include 39 years of experience in the health care sector at Humana, Inc. combined with an intimate knowledge of Humana's operational, financial, and strategic development. Beyond

> Humana, Mr. McCallister plays a leadership role in key business advocacy organizations. He served on the board of the Business Roundtable and is the past chair of the organization's Health and Retirement Task Force.
>
> *Skills and Attributes*:
>
> Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, ESG, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning

93. ***Defendant Marsha C. Williams*** ("Williams") has served as a Company director since 2008. In or around 2018, Defendant Williams was appointed Lead Independent Director of the Company. Defendant Williams served as a member of the Board's Audit Committee from 2009 through April 2017 and as Lead Independent Director, served as an ex-officio member in 2018 and 2019, served as a member of the Board's Finance Committee since 2014, served as a member of the Board's Human Capital and Compensation Committee from 2009 through 2015 and as Lead Independent Director, served as an ex-officio member in 2018 and 2019, served as a member of the Board's Nominating and Corporate Governance Committee from 2010 through 2011 and again since 2016, served as a member of the Board's Risk and Compliance Committee from 2010 through April 2017 and as Lead Independent Director, served as an ex-officio member in 2018 and 2019, and served as a member of the Board's Regulatory Oversight Committee during its term of existence in 2015 and as its Chair in 2016. Per the Company's website (as of January 12, 2021), Defendant Williams presently serves on the following committees: Finance, Human Capital and Compensation, and Nominating and Corporate Governance.

94. For the fiscal year ended December 31, 2019, Defendant Williams received $300,000 in compensation from the Company. This included $150,000 in fees earned or cash paid and $150,000 in stock awards.

95. The 2020 Proxy Statement stated the following about Defendant Williams:

*Experience*:

Ms. Williams's qualifications for service as a director include her extensive experience in financial matters including 42 years in finance and her service as the Chief Financial Officer of Orbitz and Equity Office Properties Trust as well as her service on the board of directors of other publicly traded corporations and mutual funds. Ms. Williams also possesses knowledge and experience in the financial services industry gained through her 15 years of service with other banking organizations.

*Skills and Attributes*:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Digital Innovation/FinTech, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning

96. Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams are herein referred to collectively as the "Director Defendants".

97. Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Feiger, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams are sometimes collectively referred to herein as the "Demand Futility Director Defendants."

**D. <u>Officer Defendants</u>**

98. ***Defendant Tayfun Tuzun*** ("Tuzun") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from 2013 until his resignation effective on November 9, 2020. Among his responsibilities as CFO, Tuzun is responsible for the Bank's financial planning and reporting, operational excellence, managing the Bank's customer and talent goals, and furthering the Bank's "core values." Prior to serving as CFO, Tuzun was Fifth Third's Treasurer and Assistant Treasurer, positions in which he was responsible for the Bank's balance sheet, capital and liquidity management, risk management and compliance, operational excellence, maintaining a strong financial team, and promotion of the Bank's "core values" of

accountability, integrity, respect and inclusion, and teamwork and collaboration.

99. ***Defendant Frank Forrest*** ("Forrest") is the Company's Executive Vice President and Special Advisor to the Chief Executive Officer, as of January 2020. For the six (6) years prior thereto, Defendant Forrest served as the Company's Chief Risk Officer ("CRO").

100. Defendants Tuzun, Forrest and the Director Defendants are collectively referred to herein as "Defendants".

**E. Non-Party Directors**

101. The Fifth Third Board included additional directors at the commencement of the Relevant Period who are not included in this action because they were no longer members of the Fifth Third Board at the time of commencement of the Pemberton action. These former non-party directors are Bridgeman, Hackett, Kabat, and Meijer. Additionally, Linda W. Clement-Holmes joined the Board on July 17, 2020 and is not named as a defendant in this action because she was not a member of the Board at the time of the wrongful conduct alleged herein and was not a Board member at the time of commencement of the Pemberton action.

102. ***Ulysses L. Bridgeman, Jr.*** ("Bridgeman") served as a Company director from 2007 to 2016. Bridgeman served as a member of the Board's Audit Committee from at least 2008 through 2009, served as a member of the Board's Nominating and Corporate Governance Committee from 2010 through April 2016, and served as a member of the Board's Risk and Compliance Committee from 2010 through April 2014.

103. ***Linda W. Clement-Holmes*** ("Clement-Holmes) has served as a Company director since July 17, 2020.

104. ***James P. Hackett*** ("Hackett") served as a Company director from 2001 to 2016. Hackett served as a member of the Board's Executive Committee in 2008. In January 2009, the

Executive Committee was changed to become a Finance Committee as reported in the Company's Current Report on Form 8-K filed on January 21, 2009. Hackett served as a member of the Board's Finance Committee from 2009 through April 2016 and served as a member of the Board's Nominating and Corporate Governance Committee from 2010 through April 2014.

105. ***Kevin T. Kabat*** ("Kabat") served as a Company director from 2007 to 2016. Kabat served as a member of the Board's Executive Committee from at least 2008. In January 2009, the Executive Committee was changed to become a Finance Committee as reported in the Company's Current Report on Form 8-K filed on January 21, 2009. Kabat served as a member of the Board's Finance Committee from 2009 through April 2016 and served as a member of the Board's Trust Committee from at least 2008 through March 2014 when that committee was eliminated.

106. ***Hendrik G. Meijer*** ("Meijer") served as a Company director from 2001 to 2017. Meijer served as a member of the Board's Human Capital and Compensation Committee from at least 2008 through April 2017, served as a member of the Board's Nominating and Corporate Governance Committee from 2014 through 2015, and served as a member of the Board's Risk and Compliance Committee from at least 2008 through April 2017.

## SUBSTANTIVE ALLEGATIONS

## IV. BACKGROUND, PRIOR BAD ACTS, and DEFENDANTS' KNOWLEDGE

### Background

107. Fifth Third is an Ohio-based diversified financial services company founded in 1975. The Company is organized as a banking holding company and is the indirect holding company of Fifth Third Bank.

108. The Company operates 1,149 full-service banking centers and 2,481 branded

ATMs across the Midwest. As of December 31, 2019, the Company had $169 billion in assets.

109. Through its subsidiaries including Fifth Third Bank, the Company offers a wide range of financial products including checking, savings and money market accounts, wealth management solutions, payments and commerce solutions, insurance services and credit products such as commercial loans and leases, mortgage loans, credit cards, installment loans and auto loans. These products and services are delivered through a variety of channels including the Company's Banking Centers, other offices, telephone sales, the internet, and mobile applications.

110. As stated in its 2019 Form 10-K:

> On May 3, 2019 MB Financial Bank, N.A. merged with and into Fifth Third Bank (now Fifth Third Bank, National Association), with Fifth Third Bank, National Association as the surviving entity. Fifth Third Bank, National Association is an indirect subsidiary of Fifth Third Bancorp.

111. On September 10, 2019, Fifth Third announced that Fifth Third Bank had received approval from the Office of the Comptroller of the Currency (the "OCC") to convert from an Ohio state-chartered bank to a national bank.

112. As stated in each of its Proxy Statements filed with the SEC on forms DEF 14A from 2008 through 2020, the following Fifth Third Board committees serve in a dual capacity of Fifth Third and Fifth Third Bank:

- Audit Committee
- Finance Committee
- Risk and Compliance Committee
- Trust Committee (which committee was eliminated in March 2014)
- Regulatory Oversight Committee (which committee was eliminated in December 2016)
- Technology Committee

**Prior Bad Acts**

**The 2015 CFPB Credit Card Action**

113. On September 28, 2015, the CFPB issued a press release announcing that it was taking action against Fifth Third Bank "…for violations of the Dodd-Frank Act for deceptive acts or practices…" relating to Fifth Third Bank's marketing and sales practices. The 2015 CFPB Credit Card Action related to Fifth Third Bank's "Debt Protection" credit card add-on product.

114. In the 2015 CFPB Credit Card Action, the CFPB found, among other things, that Fifth Third Bank enrolled bank customers/cardholders in the subject program without the customer's consent.

115. The wrongful conduct at Fifth Third Bank (relating to the 2015 CFPB Credit Card Action) occurred between approximately January 1, 2007 through February 2013.

116. The CFPB found that Fifth Third Bank's representations constituted deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

117. On September 28, 2015, the CFPB and Fifth Third Bank entered into a Consent Order relating to the 2015 CFPB Credit Card Action. As part of this Consent Order, Fifth Third Bank was required to establish a Board level Special Regulatory Oversight Committee, which was required to monitor and coordinate compliance with the Consent Order.

118. The Consent Order imposed specific requirements upon the Board, which included the Director Defendants, and provided:

> **IT IS FURTHER ORDERED** that:
>
> 49. Although this Consent Order requires the Respondent to submit certain documents for the review or non-objection by the Regional Director, ***the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal***

> ***consumer financial law and this Consent Order***.
>
> 50. In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of Respondent, ***the Board must***:
>
> a. Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;
>
> b. Require timely reporting by management to the Board on the status of compliance obligations; and
>
> c. Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section. [Emphasis added in bold italics]

119. Additionally, pursuant to the Consent Order in the 2015 CFPB Credit Card Action, Fifth Third Bank was ordered to pay at least $3 million as redress to damaged consumers and a civil penalty paid to the CFPB in the amount of $500,000.

120. This was clearly a red flag to Defendants alerting them to problems with the Company's sales and marketing practices to retail customers that existed as early as 2007.

121. The fact that Fifth Third entered into Consent Orders with the CFPB in 2015 and agreed to establish a Board-level Regulatory Oversight Committee that would monitor and coordinate compliance does not mean that this Board-level Regulatory Oversight Committee cured or monitored these earlier flagged deficiencies. In fact, just the opposite was true.

122. For example, according to the CFPB AC, Fifth Third failed to investigate bank branches or branch regions even when the branches or regions were known by Fifth Third to have historically engaged in sales misconduct. Despite knowing since at least 2010 that Chicago had a history of unauthorized credit cards and questionable sales practices, Fifth Third failed to investigate broadly the Chicago region's sales acts or practices. CFPB AC ¶¶ 116-17.

123. In moving for judgment on the pleadings in the CFPB Action in July 2021, Fifth

Third Bank not only admitted it had conceded the existence of unauthorized credit card accounts to the Bureau six years before—in 2015—but asserted that disclosure as the basis for a statute of limitations defense against the Bureau: "[The Bank's] written communications establish the Bureau's actual—not just constructive—notice of its claim for unauthorized credit card accounts." CFPB Action, ECF No. 86-1 at 1. Fifth Third Bank similarly admitted to CFPB in 2017 that it had opened consumer financial products without authorization every year from ***2010 to 2017***, at a time when these admissions were overseen by Defendants Carmichael and Tuzun as the Company's most senior executives. CFPB AC ¶¶ 5, 37.

124. Despite the formation of the Board-level Regulatory Oversight Committee, the Board failed to detect or stop ongoing unauthorized credit card activity. According to the CFPB Amended Complaint, since 2010, more than 218,000 Fifth Third Bank consumer credit cards have been issued but never activated or used for consumer-initiated transactions, and more than 4,000 Fifth Third Bank consumer credit-card accounts have been opened but have had no consumer-initiated purchases and have been associated with a Fifth Third Bank email address where the consumer was not a Fifth Third Bank employee. CFPB AC ¶¶ 75-76.

125. Further, "Fifth Third [Bank] credit cards were susceptible to unauthorized applications and issuance in part because Fifth Third bank branches accepted applications over the phone at least until 2017." *Id.* ¶ 68.

126. Fifth Third Bank "allowed its branch employees to take credit-card applications over the phone and to write 'phone application' along with the date and time on the signature line of the application. In those instances, and where only a portion of that information was written, the bank retained no other indication of consumer consent." *Id.* ¶ 69.

127. Fifth Third Bank "had no detection capabilities or reporting if an employee failed

to forward the phone application to a central repository. Fifth Third [Bank] considered disallowing bank-branch phone applications for credit cards by 2010. That year, Fifth Third [Bank's] head of retail banking advised the head of Fifth Third's consumer bank that Fifth Third continued 'to have problems with unauthorized credit card apps' that could be addressed by suspending 'the ability of financial center personnel to take apps without a wet signature.' He further advised that requiring a 'wet signature' would 'reduce the issue of customers receiving cards they did not anticipate.' *Id.* ¶¶ 70-71.

128. "Around that same time, Fifth Third executives discussed the possibility of limiting credit-card sales to instances in which 'the customer is physically in the Financial Center' and eliminating phone applications 'where we have no customer signature.' Fifth Third chose not to impose that limitation until at least seven years later." *Id.* ¶ 72.

129. "Fifth Third acknowledged that the absence of a credit-card application could indicate an unauthorized card." *Id.* ¶ 73. However, "Fifth Third did not investigate all issued credit cards for which it has no application on file." *Id.* ¶ 74.

130. "Since 2010, more than 218,000 Fifth Third consumer credit cards have been issued but never activated or used for consumer-initiated transactions." *Id.* ¶ 75.

131. Also "[s]ince 2010, more than 4,000 Fifth Third consumer credit-card accounts have been opened but have had no consumer-initiated purchases and have been associated with a Fifth Third email address where the consumer was not a Fifth Third employee." *Id.* ¶ 76.

**The 2015 CFPB Auto Lending Enforcement Action**

132. In the same September 28, 2015 press release discussed above, the CFPB announced the 2015 CFPB Auto Lending Enforcement Action against Fifth Third Bank resulting from a CFPB examination and investigation with the Department of Justice ("DOJ") that began

in January 2013. As stated in the press release, "[t]he examination evaluated Fifth Third's indirect auto-lending program for compliance with the Equal Credit Opportunity Act, which prohibits creditors from discriminating against loan applicants in credit transactions on the basis of characteristics such as race and national origin."

133. The wrongful conduct at Fifth Third Bank at issue in the 2015 CFPB Auto Lending Enforcement Action occurred between approximately January 2010 and September 2015

134. Through their joint investigation, the CFPB and DOJ found that Fifth Third Bank violated the Equal Credit Opportunity Act by charging African American and Hispanic borrowers higher dealer markups for their auto loans compared to non-Hispanic white borrowers and that these markups were without regard to the creditworthiness of the borrowers.

135. On September 28, 2015, the CFPB and Fifth Third Bank entered into another separate Consent Order relating to the 2015 CFPB Auto Lending Enforcement Action. As part of this Consent Order, Fifth Third Bank was required to utilize its Compliance Committee (which is defined as the Board level Special Regulatory Oversight Committee) to monitor and coordinate compliance with this Consent Order.

136. The Consent Order imposed specific requirements upon the Board, which included the Director Defendants, and provided:

> **IT IS FURTHER ORDERED** that:
>
> 26. The Compliance Committee must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Fair Lending Director and the DOJ.
>
> 27. Although this Consent Order requires Respondent to submit certain documents for review or non-objection by the Fair Lending Director and the DOJ, ***the Board will have the ultimate responsibility for proper and sound oversight of Respondent and for ensuring that Respondent complies with federal consumer financial law and this Consent Order***.

> 28. In each instance in this Consent Order that requires the Board or Compliance Committee to ensure adherence to, or perform certain obligations of Respondent, the Board or Compliance Committee must:
>
> a. Authorize and adopt whatever actions are necessary for Respondent to fully comply with this Consent Order;
> b. Require timely reporting by management to the Board or Compliance Committee on the status of compliance obligations; and
> c. Require timely and appropriate corrective action to remedy any failure to comply with the Board or Compliance Committee directives related to this Section. [Emphasis added in bold italics]

137. Additionally, pursuant to the Consent Order in the 2015 CFPB Auto Lending Enforcement Action, Fifth Third Bank was ordered to pay $18 million as redress to damaged consumers.

138. This was yet another red flag to Defendants alerting them to systemic issues within another area of Fifth Third Bank's business that caused harm to consumers. Despite the Board's responsibility for ensuring that Fifth Third Bank complied with federal consumer financial law, the Individual Defendants failed to implement any system or technology to detect unauthorized account activity.

**Director Defendants' Prior Knowledge**

139. As evidenced by the establishment of the Company's Regulatory Oversight Committee in 2015 and disclosure of these Consent Orders in Fifth Third's annual report for the fiscal year ending December 31, 2015 and filed with the SEC on February 2, 2016 (the "2015 Form 10-K"), the Director Defendants had knowledge of the 2015 CFPB Credit Card Action, the 2015 CFPB Auto Lending Enforcement Action and the Company's related weaknesses in its oversight of internal controls.

140. Additionally, the Director Defendants knew and recklessly disregarded information publicly disclosed about Wells Fargo and the Wells Fargo Cross-Selling Scandal

which was substantially similar to the conduct occurring at Fifth Third, as alleged herein.

141. [redacted]

[redacted]

142. On September 8, 2016, the CFPB filed a Consent Order against Wells Fargo (the "Wells Fargo Consent Order"). As part of the Wells Fargo Consent Order, the CFPB found that Wells Fargo employees opened deposit accounts that may not have been authorized and that may have been funded through simulated funding or transferring funds from consumers' existing accounts without their knowledge or consent. Many of these unauthorized accounts generated fees directed to these unsuspecting Wells Fargo customers.

143. Additionally, the CFPB found that Wells Fargo employees submitted applications for credit-card accounts that may not have been authorized by using consumers' information and requested debit cards and created personal identification numbers ("PINs") to activate them, both without their knowledge or consent.

144. Additionally, the CFPB found that Wells Fargo employees used email addresses not belonging to consumers to enroll consumers in online-banking services without their knowledge or consent.

145. The Wells Fargo Consent Order included specific requirements imposed on the Wells Fargo Board of Directors that were similar to the obligations imposed on the Fifth Third

Board in 2015 CFPB Credit Card Action.

146. The Wells Fargo Consent Order required Wells Fargo to pay civil redress to impacted Wells Fargo customers and a civil monetary penalty of $100 million.

147. In his September 8, 2016, prepared remarks relating to the Wells Fargo Consent Order, the Director of the CFPB, Richard Cordray, stated in relevant part:

> Much bank growth these days is occurring by cross-selling customers on more products and services. This is a common approach, and it should lead banks to devote more attention and resources to strong customer service, since the easiest and best way to earn more business from existing customers is by giving them superior value and excellent service….
>
> But what happened here instead is that Wells Fargo built an incentive-compensation program that made it possible for its employees to pursue underhanded sales practices, and it appears that the bank did not monitor the program carefully….
>
> Unchecked incentives can lead to serious consumer harm, and that is what happened here….
>
> Our investigation found that since at least 2011, thousands of Wells Fargo employees took part in these illegal acts to enrich themselves by enrolling consumers in a variety of products and services without their knowledge or consent.
>
> ***
>
> ***Today's action should serve notice to the entire industry***. If the incentive compensation schemes or sales targets are implemented in ways that threaten harm to consumers and lead to violations of the law, then banks and other financial companies will be held accountable.

[Emphasis added].

148. This was yet another red flag to Defendants and, at the very least, should have prompted the Defendants to examine the Company's own sales practices to ensure they complied with the law.

149. The Wells Fargo Cross-Selling Scandal and the Wells Fargo Consent Order also resulted in congressional investigations and received national attention and press with countless

articles and news stories. By way of example, on September 9, 2016, *CNN* published an article entitled "5,300 Wells Fargo employees fired over 2 million phony accounts" which stated, "As part of the settlement, ***Wells Fargo needs to make changes to its sales practices and internal oversight***."[4] [Emphasis added]

150. As recounted in the Consolidated Complaint filed in the Securities Class Action:

> Less than two months after the Wells Fargo unauthorized account scandal was disclosed, and one month after Wells Fargo's CEO was fired, the CFPB notified Fifth Third that the Bureau was investigating the same activities at the Company. According to a court filing Fifth Third made in the CFPB action, "The Bureau commenced its investigation into Fifth Third's sales practices on November 3, 2016, with a Civil Investigative Demand ("CID") addressed to the Bank's President and CEO [Defendant Carmichael]." The Investigative Demand notice sent to Carmichael identified that it concerned "Specific Sales Practices" at Fifth Third, including "opening an account for any product or service offered by the Company without the knowledge and consent of a consumer," "changing, without the consumer's knowledge and consent, the type of account or service in which the consumer is enrolled," and "engaging in unauthorized transactions on behalf of a consumer." Between 2017 and 2019, the CFPB issued five additional Civil Investigative Demands to Fifth Third regarding the use of unauthorized accounts and predatory consumer practices at the Company. [5]

151. The commencement of the CFPB investigation was the starkest red flag to date alerting Defendants to the existence of pervasive issues within Fifth Third Bank's retail banking division.

152. Defendants' knowledge of the misconduct at Fifth Third Bank precedes these events:

(a) In an email dated June 8, 2010, a Fifth Third Bank employee who was identified by the CFPB as the "head of retail banking" noted:

> Performance is high, but my belief around [the] method of achieving success is somewhat suspect. [Redacted] and his leadership team have a

---

[4] Matt Eagan, *5,300 Wells Fargo Employees fired over 2 million phony accounts*, CNN (Sep. 9, 2016), https://money.cnn.com/2016/09/08/investing/wells-fargo-created-phony-accounts-bank-fees/index.html.

[5] *See* Securities Class Action, ECF 53, ¶ 21.

> reputation of less than desirable sales management practices. Bullying and threats are often used to achieve results. As you probably know, there have been consistent problems around unauthorized credit card sales in Chicago.[6]

(b) In a 2011 letter to management (the "Letter"), a Fifth Third Bank employee raised concerns regarding the Company's culture. The Letter raised concerns regarding unethical behavior at Fifth Third Bank with respect to customer accounts, as well as perceived sexual harassment and indicated that the employee attempted to previously raise the concerns through the Company's ethics hotline (which is overseen by the Audit Committee); however, the concerns went unresolved. The Letter states in relevant part:

> I have tried to raise concerns through the ethics hotline, however it doesn't appear that anything has come of it. I have notified them on numerous occasions. I have notified my FCM and CSM as well, and they have forwarded my concerns to their management team never to receive a response as well. My management team supports me 100%, and operates as I do with a high degree of integrity. Their support is the sole reason I have lasted here for 2 years and I owe them a great deal of respect.
>
> ***
>
> [...] I can only speak on behalf of my region, but I would consider many of the sales practices and tactics used to be predatory. Many of these sales practices were brought to us by regional and market management. They are openly discussed on our conference calls. Policies such as "everyone should have 2-3 checking accounts", or people "upgrading" (switching existing MasterCard customers to Visa rewards) credit cards for [a] customer without telling them they are applying for new credit". ***We are becoming a "predatory" institution.***
>
> Every week I come across at least 1 or 2 customer[s] that have been taken advantage of. ***The most common thing I see is customers that have 2 or 3 other checking accounts that they didn't even know they had***. Some customers have secure checking accounts only to be used for ID Alert. When they can simply add ID alert to the DDA they already have. Some customers have the Secure Checking account as a secondary and are paying for ID alert on their primary checking account. I come across Hispanic customers that don't understand or speak English that were sold products

[6] Opposition to Motoin to Transfer Venue (D.E. 39-2) in *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:21-cv-00262-DRC (S.D. Ohio).

> they don't understand by individuals that don't speak Spanish.
>
> ***
>
> The motivation for these practices is simple, ***if you don't meet your goal you get fired***. That's what I've been told, and that's what other employees have been told, they are pushing the ethical envelope in order to save their jobs. I do not open as many accounts as some of my peers and the main reason is I refuse to partake in the practices. I brought specific issues to the attention of my manager and the regional manager, on numerous occasions. ***Being able to open and close accounts existing customer accounts or adding 3 ddas to existing customers is being perceived as production. We aren't gaining new households; we're simply rotating our existing customer base for numbers***, in fact we're losing more customers than we're gaining, and costing the bank money. Many customers are frustrated with the sales practice and subsequently leaving the bank.[7]

[Emphasis added].

153. These communications were additional red flags to Defendants.

154. [redacted]

[redacted]

[7] *Id.*, Ex. 2, ECF No. 39-3.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

155. According to Fifth Third's Code of Business Conduct and Ethics, all employees are required to fully comply with all applicable laws, and to facilitate such reporting and escalating, the Code requires Fifth Third employees and executives to refer all cases of suspected fraud to the appropriate channels, including an ethics hotline. Thus, in [redacted].

156. Despite this increase in suspected fraud, the Board failed to act or implement adequate controls to stop the unauthorized account activity.

## V. DEFENDANTS' RELEVANT PERIOD MISCONDUCT

157. In the 2015 CFPB Credit Card Action, it was noted that the wrongful conduct at Fifth Third Bank occurred between approximately January 1, 2007 through February 2013. In the 2015 CFPB Auto Lending Enforcement Action, it was noted that the wrongful conduct at Fifth Third Bank occurred between approximately January 2010 and September 2015. Unbeknownst to Plaintiffs and the investing public, the Relevant Period Misconduct started in at least 2008.

158. As part of the Company's business practices, Defendants permitted Fifth Third Bank to employ a "cross-sell" strategy for many years. Cross-selling is a business strategy (hereinafter referred to as "Cross-Selling") that purportedly allows banks and nearly every other business to achieve organic growth cheaper than obtaining new clients and serves to promote customer retention. Fifth Third Bank used Cross-Selling to increase the total number of products and services provided to existing customers.

159. Employees of Fifth Third Bank were incentivized to aggressively support and utilize Cross-Selling, as performance ratings and retention were conditioned upon achieving ambitious sales goals. Further, incentive compensation awards for managers were largely premised on lower-level employees selling new products and services to existing customers through Cross-Selling.

160. The sales goals imposed upon Fifth Third Bank employees and incorporated into the incentive-based compensation program were often set at a level higher than the anticipated sales for thousands of employees.

161. Throughout the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (1) as a result of Fifth Third Bank's aggressive incentive policies to promote its Cross-Sell strategy, Fifth Third Bank employees engaged in unauthorized conduct related to customer accounts; (2) since at least 2008, Fifth Third Bank, and by extension, Fifth Third, was aware of such unauthorized conduct and, thus, that the Company and Fifth Third Bank were in violation of relevant laws and regulations designed to protect its consumers; (3) Fifth Third failed to properly implement and monitor its Cross-Sell program, detect and stop misconduct, and identify and remediate harmed consumers; (4) the foregoing subjected the Company to a foreseeable risk of heightened regulatory scrutiny, investigation, and/or fines and penalties; (5) Fifth Third's revenues were in part the product of unlawful conduct and thus unsustainable; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

162. Additionally, prior to and during the Relevant Period, the Director Defendants failed to establish and maintain adequate internal controls to protect Fifth Third Bank's customers from the conduct alleged herein.

163. Plaintiffs and the investing public did not learn of the Relevant Period Misconduct until the CFPB issued a press release announcing the filing of the 2020 CFPB Action against Fifth Third Bank on March 9, 2020, notwithstanding the Company's incomplete disclosure of this matter in the Company's 2019 Form 10-K filed with the SEC on March 2, 2020.

164. For nearly ten years, Defendants permitted Fifth Third Bank to operate with a toxic sales culture that rewarded and/or disciplined employees based on their securements (or lack thereof) of sales to consumers and existing customers. Such practices included "gaming."

165. Defendants were aware of the questionable business tactics associated with

Cross-Selling. As alleged in the 2020 CFPB Action and confirmed by the Company's internal documents, "Fifth Third [Bank] tracked internally investigated cases of what it called 'gaming.' Gaming, according to Fifth Third, includes opening unauthorized accounts."[8] Other examples of "gaming" include the Relevant Period Misconduct described hereunder.

166. Defendants permitted, engaged in, maintained, and encouraged improper sales practices that incentivized unlawful misconduct related to consumer accounts, exposing numerous consumers to harmful risks. Employees were either penalized or rewarded for their participation, or lack thereof, in the Company's improper sales practice programs. For example, Fifth Third Bank used internal employee pressure tactics, including conditioning continued employment and/or employee performance ratings upon management and subordinates conformity to lofty sales goals. Managers were further incentivized through compensation programs that awarded benefits based on certain performance goals - *i.e.*, selling new products and services to existing customers (Cross-Selling). Sales goals were often set at a level higher than the anticipated sales for thousands of employees. The achievement or nonachievement of sales goals was used as a key component in performance ratings. Low performance ratings could result in disciplinary action, including termination.

167. Application of these programs resulted in a toxic culture that incentivized widespread employee misconduct to meet performance goals and/or achieve incentive awards. As outlined in the 2020 CFPB Action:

> Fifth Third's employees, without consumers' knowledge or consent, opened deposit accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; issued credit cards; enrolled consumers in online-banking services; and opened lines of credit on consumers'

---

[8] Opposition to Motion to Transfer at p. 5, ECF No. 39 in *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:21-cv-00262-DRC (S.D. Ohio); *id.*, Ex. 5 at 14:7-9 (suggesting that potential gaming is exemplified when "[c]ustomer alleges or complains that they received a credit card and they didn't apply for the credit card"), ECF No. 39-6.

> accounts. ***In short, Fifth Third focused on its own financial interests to the detriment of consumers***. [Emphasis added]

168. Fifth Third Bank employees engaged in these unauthorized transactions without the respective customer's knowledge and/or consent.

169. Defendants failed to adequately address and/or institute appropriate internal controls relating to the issues surrounding Cross-Selling or "gaming." In fact, it is noted by the Company's corporate designee in the 2020 CFPB Action, Darrin Steinmann, that ***"[Fifth Third Bank does not] have a systematic way of detecting gaming***." [Emphasis added]. Darrin Steinmann has been the Company's Director of Corporate Investigations for more than twenty-five years.

170. Strikingly, Defendants caused Fifth Third Bank to admit that between 2010 and 2016, it had opened at least 1,000 unauthorized accounts.[9] In reality, Fifth Third Bank has "opened more than 1,100 unauthorized consumer-financial products." CFPB AC ¶ 51.

171. Further, in CFPB Motion for Judgment on the Pleadings filed on July 12, 2021 in the CFPB Action (*see Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:21-cv-00262-DRC (S.D. Ohio) (D.E. 86)), the Bank admits (i) it knew had an unauthorized-accounts problem by 2010; (ii) the problem persisted to the point that Fifth Third received around 500 consumer complaints and contemporaneously identified, through manual processes, around 1,100 aggrieved consumers; (iii) after the CFPB filed suit in 2020, Fifth Third examined "suspicious" accounts that it had opened from 2010 to 2016, identified "red flag" accounts, and analyzed them to determine whether they were improperly opened; (iv) Fifth Third identified and remediated 800 additional consumers; and (v) as a result, 800 consumers entitled

[9] Defendant's Motion to Transfer Venue at p. 6 in *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:21-cv-00262-DRC (S.D. Ohio) (ECF No. 20).

to relief went unidentified and un-remediated for more than three years.

172. In addition, between 2017 and 2019, the CFPB issued ***five additional CIDs*** to Fifth Third regarding the use of unauthorized accounts and predatory consumer practices at the Company. This wide-ranging, multi-year CFPB investigation had to have required the direct and protracted participation of the Board-level Regulatory Oversight Committee as that committee was created as a result of the 2015 Consent Orders, which focused on the same issues. In responding to the investigation, the Bank provided the CFPB with nearly ***a half-billion data points***, ***thousands of Company documents***, ***and extensive witness testimony***– an immense effort that necessitated the active involvement of Defendants Carmichael and Tuzun and the Regulatory Oversight Committee.

173. In 2017, Fifth Third was forced to admit to the CFPB that it had opened consumer financial products without authorization every year from 2010 to 2017. CFPB AC at ¶ 5. Thus, it is implausible that the admission of such serious misconduct could have been made by Fifth Third without the knowledge and approval of Carmichael as the Bank's CEO and Board member, Defendant Tuzun as its CFO and the Regulatory Oversight Committee, the Audit Committee and the risk and Compliance Committee, especially in light of the analogous Wells Fargo fake account scandal which had forced the ignominious exit of that bank's CEO and Chairman in October 2016.

174. As part of the CFPB's investigation, Fifth Third admitted to numerous practices that violated various banking laws and regulations. For example, Fifth Third admitted to: (i) knowing that its employees had opened unauthorized accounts by at least 2010; (ii) contemporaneously detecting around 1,100 unauthorized accounts opened by Fifth Third employees from 2010 to 2016; and (iii) later, in the course of the CFPB investigating, identifying

an additional 800 consumers who were entitled to relief for unauthorized accounts but went unidentified and un-remediated for more than three years. Fifth Third also admitted to almost 400 instances of abusive practices, including: (i) changing without consumer consent the types of accounts or services in which consumers were enrolled; (ii) making false representations about the terms and conditions of consumer-financial products or services to induce consumers to accept, change, or enroll in such products and services; (iii) using or obtaining consumers' credit reports without an authorized purpose; and (iv) without consumer authorization, assigning personal-identification numbers or falsified consumer-contact information, including by creating email addresses or using inaccurate email addresses, in order to facilitate unauthorized enrollment of consumers. Fifth Third has further admitted to opening other unauthorized consumer financial products and services, including Express Banking, Identity Alert, and Access 360 prepaid debit cards, and to enrolling consumers in overdraft protection without their consent in 2015 and 2016.

175. These ***five additional CIDs*** to Fifth Third regarding the use of unauthorized accounts and predatory consumer practices at the Company are ***red flags*** and demonstrate the continued lack of internal controls by the Board and the Regulatory Oversight Committee at the Bank after the 2015 Consent Orders.

176. Despite this admission that unauthorized accounts were opened, Defendants failed to address the growing problem and instead, continued to incentivize employees and managers based on Cross-Selling metrics.

177. The Fifth Third Board, along with the Regulatory Oversight Committee, took insufficient steps to detect and stop sales misconduct and to identify and remediate harmed consumers after the 2015 Consent Orders.

178. Fifth Third failed to implement any system or technology to detect: (i)

unauthorized accounts; (ii) unauthorized use or obtention of credit reports; (iii) unauthorized account changes; (iv) false representations of the terms and conditions of consumer-financial products or services; or (v) falsifications of consumer email addresses or passwords to facilitate unauthorized enrollment of consumers in financial products or services.

179. Defendants' proposed inference—that the Regulatory Oversight Committee, which is personally responsible for overseeing sales management and risk compliance at the Bank, was somehow unaware that the intentional expansion of consumer banking (a core focus of the Bank) was taking place through wrongful sales practices that the Bank (along with Defendants Carmichael and Tuzun) knew of since at least 2010—is either (1) an inference too implausible to overcome Plaintiffs' competing inference, or (2) itself evidence of extreme recklessness.

180. "Instead, Fifth Third's detection efforts relied on consumers to self-identify as victims or employees to allege improper activity," which significantly underestimated the actual level of unauthorized account activity. CFPB AC ¶ 102. "Fifth Third was aware that many consumers did not detect Fifth Third's improper acts or practices and that many others did not lodge a complaint." CFPB AC ¶ 103. "Fifth Third was also aware that many of Fifth Third's employees feared retribution for alleging improper conduct." CFPB AC ¶ 104.

181. Fifth Third has, and members of Fifth Third's senior management (along with the Audit Committee and the Risk and Compliance Committee) are and have been familiar with, data and other information that would be useful in implementing available unauthorized-account-identification methods for at least years 2010 to 2021.

182. Nonetheless, Fifth Third has failed to use any systematic or technological or other reasonable methods to identify unauthorized accounts beyond those it has admitted to opening or

to identify accounts, employees, and bank branches that should be further scrutinized.

183. Fifth Third, through its senior management (and Board members), chose not to attempt to identify unauthorized consumer-financial products beyond those Fifth Third has admitted to opening because greater identification might cause Fifth Third reputational and financial harm.

184. Defendants caused the Company's DEF 14A Proxy Statement to be filed on March 9, 2017 (the "2017 Proxy Statement") which explained that the 2017 executive compensation plan changes included the addition of "customer experience [] as a funding modifier." The 2017 Proxy Statement explains that "[t]he addition of customer experience to the plan will add specific focus to the cornerstone of our business strategy of 'putting the customer at the center of all we do.'"

185. The 2017 Proxy Statement also includes changes that certain of the Defendants made to performance goals, including criteria that would award executives for the following: "Workforce, customer or market-related objectives (including, but not limited to, employee satisfaction, customer satisfaction, ***customer growth, number or type of customer relationships*** and market share)" [emphasis added]. Therefore, the Company's executives were also being incentivized by Defendants to increase customer growth and the number or type of customer relationships. As a result of Defendants' actions, the Company's executives were motivated to push Cross-Selling and aggressive incentives on the Company's employees.

186. Defendants failed to implement, monitor, and oversee the incentive programs tied to Fifth Third Bank's Cross-Selling business strategy adequately and sufficiently.

187. Upon learning of the unauthorized accounts, Defendants failed to detect, stop, identify, and remediate harm caused to customers.

188. According to the complaint filed in the 2020 CFPB Action, the Relevant Period Misconduct included the following:

***Unauthorized Deposit Accounts***

189. Defendants approved unrealistic sales targets for employees to open new deposit accounts, which were funded with a minimum amount that was specified within a particular period. This practice took place from 2010 until 2016, at least. Some unauthorized accounts were temporarily "funded" with transferred amounts from the customer's authorized account for purposes of meeting established sales goals or qualifying for incentive programs— and then transferred back to that customer's account.

190. According to the CFPB Amended Complaint, since 2010, "[i]n more than 26,000 instances . . . a new Fifth Third deposit-account was funded with $100 or less from an existing Fifth Third account and had no activity other than the subsequent transfer, within 90-days, of those funds back to the original account." CFPB AC ¶ 55. Moreover, "[s]ince 2010, more than 124,000 new Fifth Third deposit-accounts have been funded with $100 or less and defunded to a zero balance within 90 days."

191. The CFPB's extensive investigation also revealed that Fifth Third employees earned sales credit for suppressing paper account statements, after which the consumer would only receive account statements by email. But "[i]n thousands of instances, Fifth Third suppressed paper account-statements and had no consumer email address to which it could send an electronic account-statement for receipt by a consumer." CFPB AC ¶¶ 59-61.

192. Through "at least 2020, Fifth Third failed to use any of these indicia or a combination of them to identify unauthorized accounts or victimized consumers." CFPB AC ¶ 64.

193. These practices exposed consumers to harmful risks, including failures to meet their own financial obligations, incurring costs or fees, and/or negative effects on consumer-reporting agency information.

194. Moreover, Defendants permitted the Company to improperly pass on fees to numerous customers on these unauthorized deposit accounts.

***Unauthorized Credit Cards***

195. Employee sales targets for credit card sales were similarly aggressive. Employees were rewarded based on the amount of new credit cards they sold. In order to meet these unreasonable sales goals, employees issued numerous new cards to existing customers without their knowledge or consent. According to the 2020 CFPB Action, the Bank noticed a spike in credit card sales to existing customers by 2009, at the latest. Yet, Defendants continued to allow the Company's employees to underscore credit card sales goals and maintain related incentive programs. [redacted]

196. Fifth Third Bank's credit cards were susceptible to unauthorized applications and issuance of credit cards in part because Fifth Third Bank branches accepted applications over the phone until at least 2017. This allowed employees to issue credit cards without a physical, i.e., "wet", signature. Fifth Third knew, or should have known, about the risks of this process as far back as 2010. That year, "Fifth Third's head of retail banking advised the head of Fifth Third's consumer bank that Fifth Third continued 'to have problems with unauthorized credit card apps' that could be addressed by suspending 'the ability of financial center personnel to take apps without a wet signature.'" The head of retail banking "further advised that requiring a 'wet

signature' would 'reduce the issue of customers receiving cards they did not anticipate.'" Around the same time, the Company's executives discussed the possibility of limiting credit-card sales to instances where the Bank has a physical signature, but ultimately chose not to impose such a limitation until at least seven years later. CFPB AC ¶¶ 68-72.

197. According to the CFPB's investigation, since 2010, "more than 218,000 Fifth Third consumer credit cards have been issued but never activated or used for consumer-initiated transactions" and "more than 4,000 Fifth Third consumer credit-card accounts have been opened but have had no consumer-initiated purchases and have been associated with a Fifth Third email address where the consumer was not a Fifth Third employee." CFPB AC ¶¶ 75-76.

198. These practices exposed customers to actual harm, and additional risks, including unjustified fees, and negative effects on consumer-reporting agency information.

***Unauthorized Enrollment in Online Banking***

199. Defendants also permitted the further imposition of aggressive sales goals for employees to enroll consumers in online-banking services and, similar to the aforementioned, employees were provided incentive compensation for enrolling consumers in these programs. Consequently, customers were enrolled in online banking services without their knowledge/consent from 2010 until at least 2016.

200. Fifth Third's sales programs rewarded employees for enrolling customers in online banking services, provided the customer logged in to the service at least three times. To create unauthorized enrollments, Fifth Third employees would set up a customer's passwords and log in at least three times without the customer's knowledge or consent. To avoid detection, Fifth Third employees enrolled the customer using an email address unknown to the customer, such as a Fifth Third email address or other non-customer email address. CFPB AC ¶¶ 81-82.

201. According to the CFPB's investigation, "[s]ince 2010, Fifth Fifth Third has completed more than 48,000 consumer enrollments in online banking using a Fifth Third email address" and the Company "has not scrutinized those enrollments" and "has not used any systemic or technological method to identify unauthorized or suspicious online-banking enrollments." CFPB AC, ¶¶ 84-86.

202. This practice exposed customers to risks of harm, including data theft, money theft, and improper usage of their personal data.

***Opening Early Access Lines of Credit Prior to the Relevant Period***

203. Prior to the Relevant Period, Fifth Third Bank offered a fee-based line of credit that allowed customers to withdraw funds before funds were available in a deposit account, known as "Early Access." Defendants allowed the Company to also impose aggressive sales goals for employees to sell these lines of credit and provided incentive-based compensation for enrolling consumers in "fee-based products," that included Early Access. According to the 2020 CFPB Action, unauthorized Early Access lines of credit were being opened by employees by June 2010, when senior management was informed of the increasing calls to the Company's internal whistleblower hotline (maintained by Fifth Third) about the practice. Yet, Defendants permitted employees to continue to open new Early Access lines of credit until at least 2014, and maintained unauthorized accounts even after new accounts were no longer offered by Fifth Third Bank.

204. From as early as 2008, and from 2010, at the latest, Defendants were aware of the above-mentioned unauthorized practices employed and the aggressive sales culture that encouraged the Relevant Period Misconduct. Yet, Defendants engaged in and/or allowed the Relevant Period Misconduct to continue unremedied and undisclosed for several years.

205. In a letter sent in connection with a former Fifth Third Bank employee's

resignation before the beginning of the Relevant Period,[10] and offered as an exhibit in the 2020 CFPB Action, and submitted herewith as Exhibit 1, the former employee expressed concerns about the aforementioned toxic culture through Fifth Third Bank's ethics hotline, but the concerns remained unaddressed. In addition to allegations of widespread sexual harassment throughout Fifth Third Bank, the letter outlined numerous instances of "unethical" and "predatory" practices permitted at Fifth Third Bank, including instilling policies such as, '"everyone should have 2-3 checking accounts', or people 'upgrading' (switching existing MasterCard customers to Visa rewards) credit cards for customer without telling them they are applying for new credit[.]'" The letter further stated, in relevant part:

> Every week I come across at least 1 or 2 customers that have been taken advantage of. The most common thing I see is customers that have 2 or 3 other checking accounts that they didn't even know they had . . . . I come across Hispanic customers that don't understand or speak English that were sold products they don't understand by individuals that don't speak Spanish.
>
> * * *
>
> […] Uneducated customers of ours are being targeted to get sales; this is subsequently causing more unnecessary overdrafts by spreading out a customer's funds and also service fees for many customers.

206. According to the letter, the motivation to engage in the Relevant Period Misconduct was simple, "if you don't meet your goal you get fired."

207. However, Fifth Third did nothing to curtail unauthorized Early Access lines of credit after 2010. "From 2010 through 2014, more than 19,000 Fifth Third Early Access accounts were opened and closed on the same day without being used." CFPB AC ¶ 93.

208. Despite knowing of the Relevant Period Misconduct since 2010, at the latest, the

---

[10] Opposition to Motion to Transfer Venue, Ex. 2 in *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:21-cv-00262-DRC (S.D. Ohio) (ECF No. 39-3) (the former employee served at the Bank between 2008 until resigning on/around September 20, 2010).

Defendants failed to take appropriate measures to prevent these acts/practices and to identify, communicate, and redress affected consumers and moreover, misrepresented the true state of the Company's risk exposure, internal controls, and compliance management systems.

## VI. FALSE AND MISLEADING STATEMENTS

### 2015 Form 10-K

209. On February 25, 2016, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC that reported the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 Form 10-K"). Defendants Carmichael, Tuzun, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, Heminger, Hoover and McCallister signed the 2015 Form 10-K, along with non-parties Hazel, Hackett, Bridgeman, Kabat, and Meijer. With respect to the Company's cross-sell strategy, the 2015 Form 10-K reported that the Company benefited from "cross-selling opportunities for [its] commercial products," and that the Company's various "business segments form synergies by taking advantage of cross-sell opportunities."

210. The 2015 Form 10-K also reported the Company's purported robust compliance risk management systems, emphasizing that (1) "Fifth Third focuses on managing regulatory compliance risk in accordance with [its] integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks"; (2) "[t]o mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies" and (3) "[a]dditionally, Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessments, key risk

indicators program, issues tracking, [and] regulatory compliance testing and monitoring[.]"

211. The 2015 Form 10-K also reported the aspects of the Company's compliance risk management systems, assuring the market/investors that the Company's highest levels of management were kept apprised of ongoing compliance issues identified within the Company and its subsidiaries. The 2015 Form 10-K reported that (1) "Fifth Third . . . focuses on reporting and escalation of compliance issues to senior management and the Board"; (2) "[t]he Management Compliance Committee addresses Fifth Third-wide compliance issues, industry best practices, legislative developments, regulatory concerns, and other leading indicators of compliance risk"; and (3) "[t]he Management Compliance Committee reports to the Enterprise Risk Management Committee, which reports to Risk and Compliance Committee of the Board of Directors."

212. Also, the 2015 Form 10-K contained generic, boilerplate representations regarding the risks it faced as an entity subject to CFPB oversight, reporting that (1) "the CFPB . . . ha[s] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary"; (2) "Fifth Third, as well as other financial institutions more generally, have recently been subjected to increased scrutiny from government authorities . . . stemming from broader systemic regulatory concerns, including with respect to [*inter alia*] . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management"; and (3) "[i]n this regard, government authorities, including the bank regulatory agencies, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters involving financial activities, which heightens the risks associated with actual and perceived compliance failures[.]" These risk warnings were generic "catch-all" provisions that were not tailored to the Company's actual known risks with respect to its ongoing violation of pertinent CFPB regulations.

213. The 2015 Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") wherein Defendants Carmichael and Tuzun certified that "[t]he [2015 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2015 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

**2016 Form 10-K**

214. On February 24, 2017, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2016 (the "2016 Form 10-K"). Defendants Carmichael, Tuzun, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, Heminger, Hoover, and Mallesch signed the 2016 Form 10-K, along with non-parties Hazel and Meijer.

215. The 2016 Form 10-K contained substantively the same statements referenced above pertaining to the Company's cross-sell strategy, purported robust compliance risk management systems, the reporting aspects of such systems to top-level management, generic representations about the Company's risks as an entity subject to CFPB oversight, and SOX certifications signed by Defendants Carmichael and Tuzun.

**2017 Form 10-K**

216. On February 28, 2018, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2017 (the "2017 Form 10-K"). Defendants Carmichael, Tuzun, Williams, Bayh, Benitez, Blackburn, Brumback, Heminger, Hoover, Mallesch and McCallister signed the 2017 Form 10-K, along with non-party Hazel.

217. The 2017 Form 10-K contained substantively the same statements referenced

above pertaining to the Company's cross-sell strategy, purported robust compliance risk management systems, the reporting aspects of such systems to top-level management, generic representations about the Company's risks as an entity subject to CFPB oversight, and SOX certifications signed by Defendants Carmichael and Tuzun.

**2018 Proxy Statement**

218. On March 6, 2018, the Defendants caused the Company to file its Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

219. With respect to the Company's Code of Business Conduct & Ethics ("Code of Conduct"), the 2018 Proxy Statement stated, "[t]he Board of Directors has also adopted the Fifth Third Bancorp Code of Business Conduct and Ethics which applies to our directors; Chief Executive Officer, Chief Financial Officer, and Controller; and our other employees."

220. The above statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the Relevant Period Misconduct, the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Defendants, and Defendants' failures to report violations of the Code of Conduct.

221. The 2018 Proxy Statement also described the Bank's Risk Management Practices:

> **Risk Management Oversight**. ***The role of the Board of Directors is to provide oversight to ensure an effective enterprise risk management program is in place, including an appropriate enterprise risk management framework and related governance structure. The Board sets our overall risk appetite, including the***

> ***establishment and monitoring of risk tolerances.*** The formulation of risk appetite considers our operating capacity, which is represented by its available financial resources, defined as Tier 1 Capital less our largest capital buffer (Common Equity Tier 1 Capital Policy Target less the Basel III Buffered Common Equity Tier 1 Minimum), that sets an absolute limit on risk assumption in our annual financial and strategic plans. Our risk appetite is limited by policy to a maximum of 95 percent of operating capacity. Tolerances are the maximum amount of risk applicable to each of the eight specific risk categories included in the enterprise risk management framework. ***Through their oversight role, directors ensure that the risk management processes designed and implemented under this framework and governance structure are aligned to the Board's corporate strategy and are functioning as directed.*** The Board also considers the optimal organizational structure at both the Board and management levels. This may include delegating responsibility through Board committees, management committees, the Chief Executive Officer, and the Chief Risk Officer.
>
> ***Risk management oversight and governance is provided primarily by the Risk and Compliance Committee of the Board of Directors and through the Enterprise Risk Management Committee, a management committee that reports to it.*** The Enterprise Risk Management Committee is supported by several management committees whose membership includes a broad cross-section of line of business and support representatives. The Risk and Compliance Committee of the Board of Directors currently consists of five outside directors and has responsibility for the oversight of our risk management, as well as ensuring that risks are properly controlled, quantified, and within our risk appetite.
>
> The primary purpose of the Risk and Compliance Committee is responsibility for the risk management policies of our global operation and oversight of its global risk management framework.

222. The 2018 Proxy Statement said the following about the Company's incentive compensation risk management system:

> **Compensation Risk Management.** ***We believe it is critical to bring a multi-faceted strategy toward mitigating risk in incentive plans.*** We incorporate formulaic and discretionary risk-balancing mechanisms, which include specific metrics for modifying payouts to discourage taking unnecessary or imprudent risks. Senior executive pay also includes a heavy focus on long-term incentives. This facilitates collaboration among business units, ownership in the Company, and a focus on shareholder goals. [Emphasis added in bold italics]
>
> * * *
>
> ***We believe it is critical that our people clearly understand how they are rewarded to ensure that pay facilitates the appropriate strategic and risk awareness***

> ***behaviors***. Because of this, we provide ongoing compensation communication and education to our employees through a robust network of Human Resources business partners staffed to each business segment, in addition to employee communications, and online trainings. [Emphasis added in bold italics]

223. The 2018 Proxy Statement also stated, with regard to executive compensation, that the Company purported to employ "pay-for-performance" elements, including linking incentive awards, that "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder capital is used efficiently to generate competitive returns, and assesse[d] the cost efficiency of the Company's operations[,]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

224. The above statements conveyed that the Board maintained sufficient and effective compliance, risk management controls, and reporting programs to identify and address misconduct, and that the Company's overall risk appetite was set by the Board. The above statements also conveyed that the Board had policies to deter unnecessary or excessive risk tasking, including compensation and ethics policies. These statements were false and/or misleading because they failed to disclose, *inter alia*, that: (1) Fifth Third's compensation structure actually encouraged and rewarded extreme risk taking and widespread illegal practices; (2) Defendants caused and/or turned a blind eye to the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Relevant Period Misconduct; (3) despite being aware of the Relevant Period Misconduct, the Defendants caused the Company to neglect to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Relevant Period Misconduct and ensure affected consumers were notified and made whole; (4) that, as a result, the Company's success, at least in part and reported by the Director Defendants,

was based on false, illegally generated cross-sell numbers; (5) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, including the three-year extensive CFPB investigation; (6) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (7) the Defendants caused the Company to fail to maintain and/or implement internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**2018 Form 10-K**

225. On March 1, 2019, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2018 (the "2018 Form 10-K"). Defendants Carmichael, Tuzun, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, Heminger, Hoover, Mallesch and McCallister signed the 2018 Form 10-K, along with non-party Hazel.

226. The 2018 Form 10-K contained substantively the same statements referenced above pertaining to Fifth Third's cross-sell strategy, purported robust compliance risk management systems, the reporting aspects of such systems to top-level management, generic representations about the Company's risks as an entity subject to CFPB oversight, and SOX certifications signed by Defendants Carmichael and Tuzun.

**2019 Proxy Statement**

227. On March 6, 2019, Defendants caused the Company to file its Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material

misstatements and omissions.

228. With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[d]irectors receive annual ethics training and directors must review and acknowledge the Code of Business Conduct and Ethics[]"; and that "[t]he Board of Directors has adopted the Fifth Third Bancorp Corporate Governance Guidelines and the Fifth Third Bancorp Code of Business Conduct and Ethics which applies to our directors; Chief Executive Officer, Chief Financial Officer, and Controller; and our other employees."

229. The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the Relevant Period Misconduct, the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Defendants, and Defendants' failures to report violations of the Code of Conduct.

230. The 2019 Proxy Statement also omitted the fact that the Company's success, at least in part and reported by the Director Defendants, was based on false, illegally generated cross-sell numbers.

231. The Director Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive awards, that "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder capital is used efficiently to generate competitive returns, and assesse[d] the cost efficiency of the Company's operations[,]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

232. The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) Defendants

permitted and/or caused the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, thus causing employees to engage in the Relevant Period Misconduct; (2) Defendants were aware of the Relevant Period Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, Defendants caused the Company to neglect to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Relevant Period Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) Defendants caused the Company to fail to implement and/or maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**Risk and Compliance Changes at Fifth Third Prior to the 2020 CFPB Action - January 30, 2020 Press Release and Form 8-K**

233. On January 30, 2020, Defendants caused Fifth Third to file a Current Report on Form 8-K with the SEC (the "January 2020 Form 8-K"). The January 2020 Form 8-K noted that Fifth Third:

> Promoted James C. Leonard to Executive Vice President and Chief Risk Officer, …Frank R. Forrest has been appointed to the role of Executive Vice President and Special Advisor for Risk Management and Regulatory Matters of the Company, to serve until December 31, 2020, at which time he will retire from the Company.

234. On the same day, Fifth Third issued a press release announcing the leadership change (the "January 2020 PR"). The January 2020 PR notes that "Frank Forrest . . . has served as executive vice president and chief risk officer since 2014." The January 2020 PR continues to

state that in Frank Forrest's new "role he will continue reporting to Greg Carmichael, Fifth Third chairman, president and CEO."

235. Neither the January 2020 Form 8-K nor the January 2020 PR provide any indication as to why the transition of the Company's Chief Risk Officer was necessary or whether it was based on actual or perceived misconduct. Instead, the January 2020 PR states that "changes to certain senior leadership roles [were made] in order to position the Company for continued success in executing its key strategic priorities."

236. Beyond stating that Forrest's transition would occur, among other executive moves, the January 2020 PR simply includes the following quote from Defendant Carmichael:

> Frank has successfully led our risk management transformation and conversion to a national charter, and we look forward to his continued counsel and contributions as we move through 2020.

237. The January 2020 PR also stated the following about James C. Leonard,

> Jamie Leonard, who has worked at the Company for more than 20 years, succeeds Forrest as chief risk officer. Leonard most recently served as executive vice president and treasurer for the past six years. During his tenure as treasurer, he managed capital, liquidity and interest rate risk. Leonard also served on the corporate credit committee. In his role he will report to Carmichael.

238. The statements in ¶¶ 225–37 were materially false and misleading. Specifically, Defendants made false and/or misleading statements and/or failed to disclose, *inter alia*, that: (1) as a result of Fifth Third Bank's aggressive incentive policies to promote its cross-sell strategy permitted by Defendants, Fifth Third Bank employees engaged in unauthorized conduct with customer accounts; (2) since at least 2008, Defendants were aware of such unauthorized conduct and, thus, that the Bank was violating relevant regulations and laws aimed at protecting its consumers; (3) Defendants permitted Fifth Third to fail to properly implement and monitor its cross-sell program, detect and stop misconduct, and identify and remediate harmed consumers;

(4) the foregoing subjected the Company to a foreseeable risk of heightened regulatory scrutiny or investigation; (5) Fifth Third's revenues were in part the product of unlawful conduct and thus unsustainable; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

## VII. THE TRUTH BEGINS TO EMERGE WHILE FALSE AND MISLEADING STATEMENTS CONTINUE

### 2019 Form 10-K

239. On March 2, 2020, Defendants caused the Company to file the 2019 Form 10-K, which was signed by Defendants Carmichael, Tuzun, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Heminger, Hoover, Mallesch and McCallister, along with non-party Hazel, wherein Defendants disclosed, for the first time, that the CFPB "notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings." Other than broad boilerplate language in prior periodic reports notifying investors that the Company and its affiliates are involved in certain regulatory investigations/actions by government agencies, Company investors had no knowledge that the CFPB had been actively investigating the Company's sales practices for more than three years.

240. The Company's stock price dropped $0.72 per share, or 2.95%, to close at $23.68 per share on March 5, 2020. However, the true scope of the Company's alleged wrongdoing, and potential liability with respect to unauthorized account openings, was left undisclosed in the 2019 Form 10-K, and was downplayed, causing the Company's stock price to continue to trade at artificially inflated prices.

241. For instance, in the sentence following the disclosure regarding the CFPB's impending potential lawsuit, Defendants reassured the markets/investors that "Fifth Third believes that the facts do not warrant an enforcement proceeding and intends to defend itself

vigorously if such an action should be filed," and that "[t]he impact of this potential enforcement action has been reflected in our reasonably possible losses."

242. Moreover, the 2019 Form 10-K contained the same statements referenced above, pertaining to the Company's cross-sell strategy, purported robust compliance risk management systems, the reporting aspects of such systems to top-level management, generic representations about the Company's risks as an entity subject to CFPB oversight, and SOX certifications signed by Defendants Carmichael and Tuzun.

243. The statements in ¶¶ 239-42 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Defendants made false and/or misleading statements and/or failed to disclose, *inter alia*, that: (1) as a result of Fifth Third Bank's aggressive incentive policies to promote its cross-sell strategy permitted by Defendants, Fifth Third Bank employees engaged in unauthorized conduct with customer accounts; (2) since at least 2008, Defendants were aware of such unauthorized conduct and, thus, that the Bank was violating relevant regulations and laws aimed at protecting its consumers; (3) Defendants permitted Fifth Third to fail to properly implement and monitor its cross-sell program, detect and stop misconduct, and identify and remediate harmed consumers; (4) the foregoing subjected the Company to a foreseeable risk of heightened regulatory scrutiny or investigation; (5) Fifth Third's revenues were in part the product of unlawful conduct and thus unsustainable; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

**2020 Proxy Statement**

244. On March 4, 2020, Defendants caused the Company to file the 2020 Proxy Statement. Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Burris, Daniels,

Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

245. With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated, in relevant part that, "[d]irectors receive annual ethics training and directors must review and acknowledge the Code of Business Conduct and Ethics[]"; Fifth Third's compensation program was supported by certain "best practices" such as a "[r]obust code of business conduct and ethics"; and that, "[t]he Board of Directors has adopted the Fifth Third Bancorp Corporate Governance Guidelines and the Fifth Third Bancorp Code of Business Conduct and Ethics which applies to our directors; Chief Executive Officer, Chief Financial Officer, and Controller; and our other employees."

246. The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the Relevant Period Misconduct, the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Defendants, and Defendants' failures to report violations of the Code of Conduct.

247. The 2020 Proxy Statement also omitted the fact that the Company's success, at least in part and reported by the Director Defendants, was based on false, illegally generated cross-sell numbers.

248. The Director Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive awards, that "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder

capital is used efficiently to generate competitive returns, and assesse[d] the cost efficiency of the Company's operations[,]"while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

249. The 2020 Proxy Statement also failed to disclose, inter alia, that: (1) Defendants permitted and/or caused the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Relevant Period Misconduct; (2) Defendants were aware of the Relevant Period Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, Defendants caused the Company to neglect to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Relevant Period Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) Defendants caused the Company to fail to maintain and/or implement internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times

## VIII. <u>THE TRUTH FULLY EMERGES</u>

250. On March 9, 2020, the CFPB announced that it had filed the 2020 CFPB Action alleging that Fifth Third Bank had violated the CFPA's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations. The CFPB's press release addressing this complaint stated:

> The [CFPB] today filed a lawsuit in federal district court in the Northern District of Illinois against Fifth Third Bank, National Association (Fifth Third). The

> Bureau alleges that for several years Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts. The Bureau alleges that Fifth Third violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations.
>
> The Bureau specifically alleges that for years and continuing through at least 2016, Fifth Third used a "cross-sell" strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; and conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals. The Bureau further alleges that, despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers.

251. On this news, the Company's stock price dropped $0.64 per share, or approximately 3.5%, to close at $17.66 per share on March 11, 2020, and dropped an additional $1.76 per share the following trading day to close at $15.90 per share on March 12, 2020.

**<u>Fifth Third's Response to the 2020 CFPB Action</u>**

252. In response to the 2020 CFPB Action, on March 9, 2020, Defendants caused Fifth Third to file a Current Report on Form 8-K with the SEC (the "March 9, 2020 Form 8-K") along with an attached press release entitled "Fifth Third Bancorp Rejects Charges in CFPB's Civil Lawsuit, Points to Its Customer Commitment and Proven Track Record of Aligning Employee Incentives with Customer-Focused Best Practices" (the "March 2020 PR"), a fact sheet (the "March 2020 Fact Sheet") and a list of frequently asked questions (the "March 2020 FAQ") (collectively referred to as the "March 2020 Responses").

253. The March 9, 2020 Form 8-K stated the following, in relevant part, "[o]n March 9, 2020, Fifth Third Bancorp issued a press release regarding its litigation with the Consumer Financial Protection Bureau. Fifth Third is also furnishing a fact sheet and answers to frequently

asked questions relating to this matter."

254. The March 2020 PR stated that, "Fifth Third Bancorp (Nasdaq: FITB) today rejected the allegations made by the Consumer Financial Protection Bureau ("CFPB") in a civil lawsuit."

255. Similarly, the March 2020 Fact Sheet again stated "Fifth Third Bank Rejects CFPB Allegations" in prominent, bold face across the document's header. Additionally, the March 2020 Fact Sheet states, in relevant part:

> While Fifth Third Bank respects and values the important role that the Consumer Financial Protection Bureau (CFPB) plays in protecting consumers, the allegations in the civil lawsuit brought by the CFPB against Fifth Third are unsubstantiated, based on limited, non-systemic, and remediated events, and reflect misunderstandings of our products, services, and work culture.
>
> When a federal court examines the evidence, we believe it will agree with Fifth Third that the civil suit filed today is unnecessary and unwarranted.

256. Yet, the March 2020 Fact Sheet admits, "Fifth Third identified . . . 1,100 unauthorized accounts . . . opened between 2010 and 2016." But attempts to downplay the extent of the harm (including, importantly, reputational harm) under the guise that the number of Unauthorized Accounts equates to "just 0.01%" and that "[t]here is no evidence of systemic misconduct." Moreover, it was also admitted that the Company had received "424 complaints regarding unauthorized accounts" from the same subset of accounts analyzed.

257. The March 2020 Fact Sheet continued to address each and every allegation of the 2020 CFPB Action and attempted to portray the Company in a positive light. Many of the responsive statements contained within the March 2020 Fact Sheet downplayed the allegations contained in the 2020 CFPB Action and suggested that "[i]ncentives have always been modest" and that the Company's "retail employee compensation structure is designed to deter the opening of unauthorized accounts."

258. Similarly, the March 2020 FAQ admits to "[l]imited instances of employee misconduct." Further, the March 2020 FAQ attempts to downplay the incentives available to retail bank employees by stating "only a small percentage [of compensation] is based on sales performance."

259. The statements in the March 2020 Fact Sheet were materially false and misleading and/or omitted material information regarding Fifth Third and the Company's business practices, operations, incentive programs, as well as predatory Cross-Selling permitted to occur at Fifth Third. Specifically, Defendants failed to disclose and/or made false and/or misleading statements with regards to: (i) Company employees fraudulently opening unauthorized accounts; (ii) the incentivizing and rewarding of employees and management for the establishment of unauthorized accounts; (iii) Defendants being aware of the unethical and fraudulent activity surrounding the unauthorized accounts since at least 2008; (iv) the knowledge of Defendants that they had permitted the Company to be in violation of federal and state laws and regulations designed to protect clients from instances such as unauthorized accounts; (v) Defendants' failure to implement, maintain, and oversee the Company's Cross-Selling; (vi) Defendants' failure to identify and mitigate misconduct associated with Cross-Selling, and failure to remediate the harm caused to consumers who were subjected to unauthorized accounts; (vii) as a result of (i) – (vi), the Company being subject to a heightened level of risk and enforcement action that was not accurately or fully captured in the 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K, or 2019 Form 10-K; (viii) Fifth Third's revenue, net income, customer retention, new accounts, *inter alia*, provided a false and misleading picture of the Company's true financial status as the figures reported contained results based on unlawful and unethical conduct that is unsustainable; and (ix) as a result of (i) – (viii), Fifth Third's public

statements were materially false and misleading.

260. Furthermore, the timing of Defendant Forrest's transition and impending retirement suggests that the Defendants were well aware of the impending 2020 CFPB Action months prior to the Company's initial disclosure of the CFPB's investigation in the 2019 Form 10-K. Additionally, the timing of Forrest's transition suggests the existence of officer misconduct and/or that Forrest was responsible for, an integral part of, or possessed substantial knowledge regarding the CFPB's allegations.

261. On March 24, 2020, fifteen (15) days after the filing of 2020 CFPB Action, Defendants caused Fifth Third to file a Current Report on Form 8-K with the SEC (the "March 24, 2020 Form 8-K"). The March 24, 2020 Form 8-K indicates that the Company made "Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year." Specifically, the March 24, 2020 Form 8-K states, in relevant part:

> Section 17 of Article III of the Regulations was also revised to allow indemnification of employees to the fullest extent permitted by Ohio law. Lastly, a new Section 18 of Article III was added to the Regulations in order to expressly allow, with certain exceptions, the advancement of expenses (including attorney's fees) to anyone defending an action pursuant to the indemnification provisions of the Regulations.

262. Notably, Article III of the Code of Regulations of Fifth Third Bancorp as Amended (the "Amended Regulations") is entitled "Board of Directors." Section 17 of Article III, as amended, states:

> Indemnification. The Corporation shall indemnify, to the full extent permitted or authorized by applicable law, as it may from time to time be amended, any person made or threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that he or she is or was a director, officer, or employee of the Corporation, or is or was serving at the request of the Corporation as a director, trustee, officer, or employee of a bank, other corporation, partnership, joint venture, trust, or other enterprise. In the case of a merger into the Corporation of a constituent corporation which, if its separate existence had continued, would

> have been required to indemnify directors, officers, or employees in specified situations prior to the merger, any person who served as a director, officer, or employee of the constituent corporation, or served at the request of the constituent corporation as a director, trustee, officer, or employee of a bank, other corporation, partnership, joint venture, trust, or other enterprise, shall be entitled to indemnification by the Corporation (as the surviving corporation) for acts, omissions, or other events or occurrences prior to the merger to the same extent as such person would have been entitled to indemnification by the constituent corporation if its separate existence had continued. The indemnification provided by this Section shall not be deemed exclusive of any other rights to which any person seeking indemnification may be entitled under the Articles of Incorporation or this Code of Regulations, or any agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, trustee, officer, or employee and shall inure to the benefit of the heirs, executors, and administrators of such a person.

263. Moreover, Section 18 of Article III, as amended, states:

> Advancement of Expenses. To the extent permitted by applicable law, expenses (including attorneys' fees) incurred by a director subject to Section 17 in defending any action, suit or proceeding referred to in Section 17 shall be paid by the Corporation as incurred, in advance of the final disposition of such action, suit or proceeding, upon receipt by the Corporation of an undertaking by or on behalf of such director that satisfies the conditions for such advancement under Ohio law. To the extent permitted by applicable law, liabilities and expenses (including attorneys' fees) incurred by any person subject to Section 17 other than a director in defending any action, suit or proceeding referred to in Section 17 may be paid by the Corporation as incurred, in advance of the final disposition of such action, suit or proceeding, if and to the extent so determined by the Board of Directors (including pursuant to policies adopted from time to time by the Board of Directors), subject to compliance by such person with the applicable conditions for such advancement under Ohio law and any other conditions determined by the Board of Directors.

264. The Amended Regulations, which were established a mere fourteen (14) days after the filing of 2020 CFPB Action, creates a reasonable inference that the Director Defendants are acting in a manner to further and protect their own personal and financial interests.

265. While the Director Defendants were securing their personal and financial protection with regard to indemnity and attorney's fees, Defendants caused Fifth Third to file a

Current Report on Form 8-K with the SEC on April 14, 2020 which contained the presentation to "be made during the 2020 Annual Meeting of Shareholders of Fifth Third Bancorp" (the "April 2020 Form 8-K").

266. The attached presentation to the April 2020 Form 8-K makes no mention of the 2020 CFPB Action or the Securities Class Action, even though the agenda indicates that a business update would be provided. Instead, the presentation touts the Company's resilient balance sheet, proactive management, and diversified revenue mix.

267. Similar to the April 2020 Form 8-K, Fifth Third's First Quarter 2020 Earnings Presentation filed with the SEC on April 21, 2020 failed to mention the 2020 CFPB Action or the Securities Class Action. Instead, once again, the presentation touts the Company's resilient balance sheet, proactive management, and diversified revenue mix.

268. On May 8, 2020, Defendants caused Fifth Third to file a Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2020 (the "1Q 2020 Form 10-Q"). The 1Q 2020 Form 10-Q states the following about the 2020 CFPB Action:

> On March 9, 2020, the CFPB filed a lawsuit against Fifth Third in the United States District Court for the Northern District of Illinois entitled CFPB v. Fifth Third Bank, National Association, Case No. 1:20-CV-01683 (N.D. Ill.) (ABW), alleging violations of the Consumer Financial Protection Act, TILA, and Truth in Savings Act related to Fifth Third's alleged opening of unspecified numbers of allegedly unauthorized credit card, savings, checking, online banking and early access accounts from 2010 through 2016. The CFPB seeks unspecified amounts of civil monetary penalties as well as unspecified customer remediation. Fifth Third believes that the facts do not warrant an enforcement proceeding and intends to defend itself vigorously in this matter.

269. The 1Q 2020 Form 10-Q also contained the following statements with respect to the Securities Class Action:

> On April 7, 2020, Plaintiff Lee Christakis filed a putative class action against Fifth Third Bancorp, Fifth Third President and Chief Executive Officer Greg D. Carmichael, and Fifth Third Chief Financial Officer Tayfun Tuzun in the U.S.

> District Court for the Northern District of Illinois entitled Lee Christakis, individually and on behalf of all others similarly situated v. Fifth Third Bancorp, et al., Case No. 1:20-cv-02176 (N.D. Ill). The case brings two claims for violation of Sections 10(b) and 20(a) of the Securities Exchange Act, alleging that the Defendants made material misstatements and omissions in connection with the alleged unauthorized opening of credit card, savings, checking, online banking and early access accounts from 2010 through 2016. The plaintiff seeks certification of a class, unspecified damages, attorney fees and costs. Fifth Third believes that the facts do not warrant litigation and intends to vigorously defend itself in this matter.

270. The Company is now also subject to putative consumer class actions based on similar facts as the 2020 CFPB Action, including *Hartt v. Fifth Third Bancorp*, Docket No. 1:20-cv-00547 (S.D. Ohio Jul 14, 2020) and *Zanni v. Fifth Third Bancorp et al.*, Docket No. 1:20-cv-03407 (N.D. Ill. Jun 10, 2020)[11] (collectively, the "Consumer Class Actions").

271. The Consumer Class Actions allege that the misconduct described herein resulted in the Company violating the Ohio Consumers Sales Practices Act, the Truth in Lending Act, the Fair Credit Reporting Act, and the Electronic Funds Transfer Act

## IX. FIDUCIARY DUTIES OF DEFENDANTS

272. By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

273. Each director and officer of the Company owes to Fifth Third and its shareholders

[11] This case was originally filed in the Circuit Court for Cook County on April 29, 2020, styled as *Joanne Zanni, on behalf of herself and all other persons similarly situated, known and unknown v. Fifth Third Bancorp and Fifth Third Bank, National Association*, Cook County Case No. 2020CH04022.

the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

274. Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

275. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

276. Defendants, by virtue of their positions as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of Defendants who were also officers and directors of the Company has been ratified by the remaining Defendants who collectively comprised the Board at all relevant times.

277. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and

present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

278. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with applicable laws and pursuant to Fifth Third's own Code of Conduct

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Fifth Third conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Fifth Third and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Fifth Third's operations would comply with all applicable laws and Fifth Third's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

279. Each of the Defendants further owed to Fifth Third and its shareholders the duty of loyalty requiring that each Defendant favor Fifth Third's interest and that of its shareholders over his or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

280. Because of their advisory, executive, managerial, and directorial positions with Fifth Third, each of the Defendants had access to adverse, non-public information about the Company.

281. Defendants, because of their positions of control and authority were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by Fifth Third.

## X. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

282. In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. Defendants caused the Company to conceal the true facts as alleged herein. Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

283. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

284. Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each Defendant, who are directors of Fifth Third, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

285. Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

286. At all times relevant hereto, each Defendant was the agent of each of the other

Defendants and of Fifth Third and was at all times acting within the course and scope of such agency.

## XI. THE COMPANY'S CORPORATE GOVERNANCE

### Code of Business Conduct and Ethics

287. Fifth Third has a Code of Conduct which it has revised in at least March 2014, October 2018, and October 2020. The allegations herein rely on the October 2020 version of the Code of Conduct.

288. The Company's Code of Conduct "applies to all officers, directors, employees and contractors of Fifth Third Bancorp, our subsidiaries and our affiliates." The Code of Conduct provides that "[k]eeping the customer at the center of everything we do and delivering a world-class customer experience every time are paramount to our success." According to the Code of Conduct, "every employee plays a part in building and maintaining a strong culture at Fifth Third, a culture in which ethics and compliance are the standard."

289. In addition to adhering with the Code of Conduct: "[e]very employee has a responsibility to . . . raise issues when you become aware of misconduct or other violations of our Code."

290. In a section entitled "A Safe and Healthy Work Environment," the Code of Conduct states:

> Fifth Third is committed to providing a workplace where employees and visitors feel safe. It is the responsibility of our managers and all of our employees to maintain a workplace free from threats and acts of violence. Fifth Third prohibits the use of violence or threats of violence in the workplace and takes such actions very seriously. We do not tolerate threatening, intimidating or physically harmful behavior by employees, customers, contractors, vendors, suppliers, partners or anyone else.

291. The Code of Conduct further provides in a section entitled "Fair and Honest

Business Practices":

> Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to:
>
> - Incentive gaming.
> - Falsifying documents or inflating performance results.
> - Manipulating records.
> - Opening bogus or fake accounts.
> - Opening accounts or selling products without customer authorization.
> - Offering customers unnecessary products.
> - Falsifying records or applications in order to benefit yourself or other Fifth Third employees.

292. The Code of Conduct also provides that "Fifth Third is committed to providing customers with financial products and services in ways that avoid any practices that could be deemed predatory, unfair, deceptive or abusive."

293. The Code of Conduct also includes a section entitled "Reporting Concerns", which provides:

> Every employee has a responsibility not only to adhere to the Code of Business Conduct and Ethics, but also to raise issues when you become aware of misconduct or other violations of our Code.
>
> Whenever possible, you are encouraged to raise questions and concerns directly with your manager, or someone in your division's reporting line with whom you feel comfortable talking. In many cases, your manager can resolve issues, or help guide you through the appropriate process. If you are not comfortable doing so, the following resources are also available to you:
>
> - Your HR business partner.
> - The Employee Relations Resource Group at 513-358-7191.
> - The Ethics Office directly at EthicsOffice@53.com.
> - The Bancorp Security Operations Center at 800-436-4400.
> - ***The Fifth Third EthicsLine. You can make a report 24 hours a day, seven days a week, and you may choose to remain anonymous***.
>   - Online: https://53.alertline.com.
>   - By phone: 877-FOR-5353

[Emphasis added].

294. The Code of Conduct further provides that the Company is committed to

"minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do his or her part to protect Fifth Third and our customers from fraudulent activity." In addition, the Code of Conduct states that there "is zero tolerance for internal fraud within Fifth Third's organization and internal fraudulent activity must be referred to Bank Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

295. The Code of Conduct also provides that "[y]ou may not buy, sell or recommend the securities (or derivatives in respect thereof) of any issuer (including Fifth Third) for any proprietary, customer, employee, or other account while in possession of material, non-public information (MNPI)."

296. The Code of Conduct contains an entire chapter dedicated to "Protecting Fifth Third and Our Customers." In a section entitled "Maintaining Accurate Records and Accounts," the Code of Conduct provides:

> Business and financial records are critical to Fifth Third Bancorp's operations. We rely on the integrity and accuracy of those records for both internal decision-making and for the benefit of our investors, government agencies, regulators and others to whom we report. It is imperative that all records and public communications, including, but not limited to, those fled or produced with the Securities Exchange Commission, are complete, fair, accurate, timely, clear and transparent.

297. In violation of the Code of Conduct, Defendants conducted little, if any, oversight over the Company's internal controls over public reporting and of the Company's engagement in the Relevant Period Misconduct and Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the

Exchange Act. Moreover, three Defendants (namely, Defendants Carmichael, Brumback, and Hoover) violated the Code of Conduct by engaging in insider trading.

**Corporate Governance Guidelines**

298. Fifth Third has Corporate Governance Guidelines which it has revised in at least January 2009, March 2014, and September 2019. The allegations herein rely on the September 2019 version of the Corporate Governance Guidelines.

299. The Corporate Governance Guidelines provide in relevant part:

> In addition to monitoring Fifth Third's Chief Executive Officer and senior executives, the Board is responsible for the following matters, among other things:
>
> ***
>
> - enhancing Fifth Third's integrity and reputation by ensuring that the corporation establishes, implements and maintains policies, practices and procedures for full compliance with all applicable laws and for meeting the high ethical standards that the Board and the public expect of a leading financial institution.
>
> ***
>
> ***Lead Independent Director.*** When the position of Chairman of the Board is not held by an independent director, or any other time designated by the Board, the Board will elect a Lead Independent Director upon the recommendation of the Nominating and Corporate Governance Committee. The purpose of the Lead Independent Director is to represent the interests of the shareholders….
>
> ***Dual Committees***. When deemed appropriate or necessary, a Board committee of Fifth Third Bancorp may perform the same services within the scope of its authority for any of Fifth Third's chartered bank subsidiaries or other subsidiaries that do not then have such a committee of its own. Committees acting in such dual capacities may meet simultaneously as committees of Fifth Third Bancorp and of the relevant subsidiary, though they should hold separate sessions if necessary to address issues that are relevant to one entity but not the other or to consider transactions or other matters where Fifth Third Bancorp and the relevant subsidiary may have different interests. In addition, any such committee should consult with internal or outside counsel if, in the opinion of the committee, any matter under consideration by the committee has the potential for any conflict between the interests of Fifth Third Bancorp and those of the subsidiary in order to ensure that appropriate procedures are established for addressing any such

> potential conflict and for ensuring compliance with Fifth Third's policies regarding Sections 23A and 23B of the Federal Reserve Act.
>
> ***
>
> **Other Applicable Policies**
>
> Directors are subject to the provisions of various policies, other than these Guidelines, which have been adopted by the Board of Directors, including, but not limited to, the Code of Business Conduct and Ethics, Director Air Travel Guidelines, the Enterprise Insider Trading and Ethical Investing Policy, the Information Disclosure Policy, the Transactions with Insiders Policy, the Non-Retaliation Policy for Employees who Report Potential Violations, and the Social Media Use Policy. These policies are approved annually by the Board and available to all Board members in the Diligent Boards portal.

**Risk and Compliance Committee**

300. Fifth Third has a Board level Risk and Compliance Committee which was formed in March 2003 and replaced the Board's Compliance Committee. The Risk and Compliance Committee has a charter which has been revised in at least March 2014, June 2018, and June 2020. The allegations herein rely on the June 2020 version of the Risk and Compliance Committee charter.

301. The Regulatory Oversight Joint Committee (discussed below) was eliminated in December 2016 "upon completion of regulatory alignment, which occurred in the first quarter of 2017." Upon dissolution of the Regulatory Oversight Committee, the charter of the Risk and Compliance Committee was amended to include certain responsibilities previously held by the Regulatory Oversight Joint Committee.

302. As stated in its Proxy Statements filed with the SEC on forms DEF 14A from 2008 through 2020, the Risk and Compliance Committee serves in a dual capacity of Fifth Third and Fifth Third Bank

303. The Risk and Compliance Committee charter provides in relevant part:

***The Committee's sole and exclusive function is responsibility for the risk management policies of the Corporation's and the Bank's global operation and oversight of its global risk management framework.*** In furtherance of this function, the Committee shall:

- **Oversee management's compliance with all of the Corporation's and the Bank's regulatory obligations arising under applicable federal and state banking laws, rules and regulations**;

- Oversee management's development and implementation of the global Risk Management Framework ("Framework"), inclusive of the risk appetite, with an enterprise view of risk capacity, risk tolerances, risk limits, and key risk indicators that are integral components of the Framework, as well as monitoring compliance with the Framework. In addition, the Framework includes consistent processes for identifying, assessing, managing, monitoring and reporting risks of all types, including the categories of credit risk, price risk, interest rate risk, liquidity risk, operational risk, legal and regulatory compliance risk, reputation risk and strategic risk;

- ***Oversee the fiduciary activities and fiduciary policies of the Corporation and its bank subsidiaries***; and

- Ensure that risk processes are supported by a risk governance structure that includes oversight by the Boards of Directors of the Corporation and the Bank, policies, risk limits, and risk committees, and further by a safe and sound culture that supports risk management objectives and reflects appropriate accountability by all lines of defense.

- Oversee the Company's supervisory issues and enforcement actions and the Corporation's efforts to remediate them…

***

5. <u>Operational Risk</u>

- Develop and maintain an Operational Risk Management Policy (the "OR Policy"), which shall be discussed by the Committee with management. Following such discussion, and after taking into consideration any matters as the Committee may deem advisable and appropriate, including management's recommendation, the Committee shall annually recommend the OR Policy to the Boards of Directors of the Corporation and the Bank for approval. In addition, the Committee may authorize management to develop and implement any additional detailed policies and procedures relating to operational risk as may be consistent with the OR Policy.

- ***Review management reports relating to operational risk issues in areas including but not limited to: fraud; development of material products and services; execution, delivery and process management***; acquisition integration issues; technology risks and technology strategies; cybersecurity incidents and privacy breaches; business disruption and system failures; and business practices generally.

6. <u>Legal and Regulatory Compliance Risk</u>

- Management shall develop and maintain a Regulatory Compliance Risk Management Policy (the "RC Policy"), which policy shall be discussed by the Committee with management. Following such discussion, and after taking into consideration any matters as the Committee may deem advisable and appropriate, including management's recommendation, the Committee shall annually recommend the RC Policy to the Boards of Directors of the Corporation and the Bank for approval. In addition, the Committee may authorize management to develop and implement any additional detailed policies and procedures relating to regulatory compliance risk as may be consistent with the RC Policy.

- Ensure that the Corporation is taking appropriate measures to address all existing regulatory requirements, and new requirements that may be enacted hereafter, including those under the Bank Holding Company Act, the Patriot Act, the Bank Secrecy Act, other applicable federal, state and local laws and all similar laws, rules and regulations.

- ***Review management reports relating to legal and regulatory compliance risk issues in areas including but not limited to: material litigation, legal settlements and defense complaints, new regulations and their impact, information safeguarding, anti-money laundering, and fair lending, as well as information regarding the adequacy of the Corporation's compliance risk management program and significant compliance issues and/or findings.***

10. <u>Fiduciary Activities</u>

- Exercise general supervision over the exercise of the trust and other fiduciary powers of the Corporation, the Bank and their subsidiaries. In this capacity, the Committee will review and approve new trust accounts identified under the Corporation's policies as high-risk accounts and business initiatives by the wealth and asset management division. In discharging their responsibilities, the Committee shall review periodic reports from designated management committees regarding the fiduciary activities of the Bank and other subsidiaries.

- Oversee of the fiduciary structure of the Corporation. In this regard, the Committee shall review and approve the policies and controls for each subsidiary including the Bank. The Committee shall review the reports from the management committees identifying significant trust and other fiduciary issues including internal audit results, internal compliance reports, internal investment reviews, regulatory exam results and material litigation.

Regulatory Oversight

- Oversee the Corporation's and/or the Bank's efforts to comply with or correct regulatory findings or supervisory issues, including those issues labeled as "Matters Requiring Attention" or "Matters Requiring Immediate Attention," included in examination or inspection reports issued by a regulatory authority ("Supervisory Issues").

- ***Discuss with management, the Audit Committee of the Corporation's Board of Directors and the internal auditors the Bank's compliance with applicable laws and regulations and from time to time advise the Bank's Board of Directors with respect to the same***.

- Work with the Audit Committee of the Corporation's Board of Directors to ensure that any and all audit related deficiencies identified in any audit, Supervisory Issue or Order are properly addressed and that the Audit Committee is informed of management's progress in responding to any audit, Supervisory Issue or Order.

- Oversee the Corporation and/or the Bank's efforts to comply with any Memoranda of Understanding, Written Agreement, Consent Order, Stipulation or other agreement, supervisory letter or similar action of any regulatory authority ("Order").

[Emphasis added].

**Regulatory Oversight Joint Committee**

304. As a requirement of the Consent Orders relating to the 2015 CFPB Credit Card Action and the 2015 CFPB Auto Lending Enforcement Action, Fifth Third was required to and did create the Regulatory Oversight Joint Committee in 2015.

305. The Regulatory Oversight Joint Committee was eliminated in December 2016 "upon completion of regulatory alignment, which occurred in the first quarter of 2017." Upon

dissolution of the Regulatory Oversight Committee, the charter of the Risk and Compliance Committee was amended to include certain responsibilities previously held by the Regulatory Oversight Joint Committee.

306. As stated in its Proxy Statements filed with the SEC on forms DEF 14A from 2008 through 2020, the Regulatory Oversight Joint Committee served in a dual capacity of Fifth Third and Fifth Third Bank.

307. The Regulatory Oversight Joint Committee charter provides in relevant part:

> **II. PURPOSE OF THE COMMITTEE**
>
> The Committee's primary purpose is to oversee the Company's supervisory issues and enforcement actions and the Corporation's efforts to remediate them as well as to oversee the development and implementation of the Transforming Fifth Third initiative. It is intended that this Committee shall cease to exist upon the determination by the Board that a dedicated regulatory oversight committee is no longer necessary.
>
> **III. RESPONSIBILITIES OF THE COMMITTEE**
>
> ***
>
> B. Regulatory Oversight
>
> - Oversee the Corporation's and/or the Bank's efforts to comply with or correct regulatory findings or supervisory issues, including those issues labeled as "Matters Requiring Attention" or "Matters Requiring Immediate Attention," included in examination or inspection reports issued by a regulatory authority ("Supervisory Issues").
>
> - Work with the Audit Committee of the Corporation's Board of Directors to ensure that any and all audit related deficiencies identified in any audit, Supervisory Issue or Order are properly addressed and that the Audit Committee is informed of management's progress in responding to any audit, Supervisory Issue or Order.
>
> - Oversee the Corporation and/or the Bank's efforts to comply with any Memoranda of Understanding, Written Agreement, Consent Order, Stipulation or other agreement, supervisory letter or similar action of any regulatory authority ("Order").

C. General

- Meet as often as the Committee or the Committee Chairman determines, but not less than every other month.

- As appropriate, meet separately without management or with particular members of management only in executive session.

- Report to the full Board of Directors on the Committee's activities at each meeting of the Board of Directors of the Corporation and the Bank.

- Maintain minutes or other records of the Committee's meetings and activities.

***

**Audit Committee**

308. Fifth Third has an Audit Committee charter which it revised in at least June 2018, June 2019, and June 2020. The allegations herein rely on the June 2020 version of the Audit Committee charter.

309. As stated in its Proxy Statements filed with the SEC on forms DEF 14A from 2008 through 2020, the Audit Committee serves in a dual capacity of Fifth Third and Fifth Third Bank.

310. The Audit Committee charter provides in relevant part:

***The Committee's primary purposes are to***:

- Oversee the accounting and financial reporting processes of the Corporation and the audits of the financial statements of the Corporation.

- ***Provide assistance to the Corporation's Board by monitoring***:

  1. the integrity of the financial statements of the Corporation,
  2. the independent auditors' qualifications and independence,
  3. the performance of the Corporation's and its subsidiaries' internal audit function and independent auditors,
  4. ***the Corporation's system of internal controls***,

5. the Corporation's financial reporting and system of disclosure controls, and
6. ***the compliance by the Corporation with applicable legal and regulatory requirements***.

- ***Provide assistance to the Bank's Board by monitoring***:

1. the integrity of the financial statements of the Bank,
2. ***the Bank's system of internal controls***,
3. the Bank's financial reporting, and
4. ***the compliance by the Bank with applicable legal and regulatory requirements.***

- Prepare the Committee report required by the rules of the SEC to be included in the Corporation's annual proxy statement.

***

D. Bank Financial Reporting / Internal Controls

- Review, discuss with management (and, if deemed necessary, the internal and external auditors) and approve the Bank's financial statements, any reports required by the Bank's State of incorporation, and the Bank's representations made to the Corporation regarding the same.

- Discuss with management (and, if deemed necessary, the internal and external auditors) significant financial reporting issues and significant accounting policies and judgments made in connection with the preparation of the Bank's financial statements and call reports, including any significant changes in the Bank's selection or application of accounting principles.

- Discuss with management and the internal auditors the effect of regulatory and accounting initiatives and off-balance sheet transactions on the Bank's financial statements and any necessary disclosures related thereto.

- Review all material written communication between the independent auditors and Bank management.

- ***Discuss with the Bank's internal auditors and management (including its Chief Executive Officer and Chief Financial Officer) their assessments of the adequacy of the Bank's internal controls, including an assessment of whether management is diligently resolving any internal control weaknesses. The review of internal controls over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal controls which are reasonably likely to affect the Bank's ability to record, process, summarize and report financial information and any fraud***

***involving management or other employees with a significant role in such internal control.***

- Review with management and the independent auditors the basis for the reports, if any, required to be filed by management and by the independent auditors with the FDIC pursuant to 12 C.F.R. Sections 363.2 (a) and (b) and Sections 363.3 (a) and (b), respectively.

- ***Discuss with the Bank's internal auditors and management any weaknesses or deficiencies that any of the foregoing have identified relating to financial reporting, internal controls or other related matters and management's proposals for rectifying such weaknesses or deficiencies, including the prevention or detection of management override or compromise of the internal control system.***

- ***Monitor the Bank's progress in promptly addressing and correcting any and all identified weaknesses or deficiencies in financial reporting, internal controls or related matters***.

- ***Discuss with management, the Risk and Compliance Joint Committee and the internal auditors the Bank's compliance with applicable laws and regulations and from time to time advise the Bank's Board of Directors with respect to the same***.

- Work with the Risk and Compliance Joint Committee to ensure that any and all audit related deficiencies identified in any audit, Supervisory Issue or Order are properly addressed and that the Audit Committee is informed of management's progress in responding to any audit, Supervisory Issue or Order.

***

H. <u>Compliance Oversight</u>

- Review procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure.

- Establish procedures and require the Corporation to obtain or provide the necessary resources and mechanisms for (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

- ***Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports which raise material issues regarding the Corporation's***

***financial statements or accounting policies.***

- Discuss with the Corporation's General Counsel and Chief Risk Officer legal matters that may have a material impact on the financial statements and that may have an impact on the Corporation's compliance policies.

- ***Oversee the administration of the Corporation's Code of Business Conduct and establish an enforcement mechanism for the Corporation's Code of Business Conduct and Ethics, including coordinating, as necessary, with the Nominating and Corporate Governance Committee in connection with oversight, enforcement and consideration/recommendation of waivers thereof.***

- Consider any material waivers of the Corporation's Code of Business Conduct and recommend to the Board of Directors of the Corporation whether or not to grant such waiver.

- ***Receive and review reporting regarding calls to the Corporation's Ethics Line.***

[Emphasis added].

**Human Capital and Compensation Committee**

311. Fifth Third has a Human Capital and Compensation Committee charter which it revised in at least June 2019 and June 2020. The allegations herein rely on the June 2020 version of the Human Capital and Compensation Committee charter.

312. The Human Capital and Compensation Committee Charter provides in relevant part:

The Committee's primary purposes are to:

- Discharge the Corporation's responsibilities relating to the compensation of the Corporation's Executive Officers. The Committee has overall responsibility for overseeing the benefit, bonus, incentive compensation, severance, equity-based or other compensation plans, policies and programs of the Corporation and its subsidiaries.

- Oversee management's development and implementation of the incentive compensation strategy for the Corporation.

- Oversee the incentive compensation plans, policies and programs encompassing those employees of the Corporation and its subsidiaries who, either individually or as part of a group, have the ability to expose the

Corporation to material risk ("Covered Employees").

- Oversee, including making recommendations to the Board of Directors regarding Chief Executive Officer ("CEO") succession planning

- Make recommendations regarding director compensation to the Board of Directors.

- Prepare the annual report on executive compensation for inclusion in the Corporation's proxy statement, including review and discussion of (i) the Compensation Discussion & Analysis ("CD&A), as required by SEC rules, with Management and (ii) disclosure of whether the Committee has retained or obtained the advice of a compensation consultant and if the work of the compensation consultant has raised any conflict of interest and, if so, the nature of the conflict and how it is being addressed.

**<u>Nominating and Corporate Governance Committee</u>**

313. Fifth Third has a Nominating and Corporate Governance Committee charter which it revised in at least June 2019 and September 2020. The allegations herein rely on the September 2020 version of the Nominating and Corporate Governance Committee charter.

314. The Nominating and Corporate Governance Committee charter provides in relevant part:

The Committee's primary purposes are to:

- Review and evaluate the size, composition, function, and duties of the Board of Directors consistent with its needs;

- ***Develop and recommend to the Board of Directors corporate governance policies and guidelines for the Corporation***, including criteria for the selection of candidates to the Board of Directors and its committees and identify individuals qualified to become director and committee member candidates consistent with such criteria;

- Nominate directors for election to the Board of Directors and recommend appointment to committee membership;

- Make recommendations to the Board of Directors as to determinations of director independence;

- ***Review the Corporation's actions in furtherance of its corporate social***

***responsibility, including the impact of Corporation procedures and processes on employees, citizens, and committees***; and

- ***Develop and recommend to the Board of Directors the Corporate Governance Guidelines and Code of Business Conduct and Ethics***.

[Emphasis added].

## XII. REPURCHASES OF COMPANY STOCK DURING THE RELEVANT PERIOD

315. During the Relevant Period, the Director Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. The Company spent an aggregate amount of over $5.6 billion to repurchase approximately 216,504,051 shares of its own common stock at artificially inflated prices from March 2016 through the end of February 2020.

316. As the Company's stock was artificially inflated during the Relevant Period, Director Defendants caused the Company to overpay for its purchases of its own stock by approximately $2 billion, all in any amount to be proven at trial.

317. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 6, 2016, during the month of March 2016, the Company purchased 12,721,622 shares of its common stock for approximately $205.8 million at an average price of $16.18 per share.

318. According to the Company's quarterly report on Form 10-Q filed with the SEC on August 5, 2016, during the three-month period ended June 30, 2016, the Company purchased 4,496,881 shares of its common stock for approximately $78.2 million, at an average price of $17.41 per share.

319. According to the Company's quarterly report on Form 10-Q filed with the SEC on November 9, 2016, during the three-month period ended September 30, 2016, the Company purchased 11,269,837 shares of its common stock for approximately $209.6 million, at an average

price of $18.60 per share.

320. According to the 2016 Form 10-K, during the three-month period ended December 31, 2016, the Company purchased 6,554,479 shares of its common stock for approximately $167.9 million, at an average price of $25.63 per share.

321. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 5, 2017, during the three-month period ended March 31, 2017, the Company purchased 1,630,221 shares of its common stock for approximately $42.8 million at an average price of $26.26 per share.

322. According to the Company's quarterly report on Form 10-Q filed with the SEC on August 8, 2017, during the three-month period ended June 30, 2017, the Company purchased 12,889,657 shares of its common stock for approximately $321.9 million, at an average price of $24.98 per share.

323. According to the Company's quarterly report on Form 10-Q filed with the SEC on November 6, 2017, during the three-month period ended September 30, 2017, the Company purchased 34,061,844 shares of its common stock for approximately $915.5 million, at an average price of $26.88 per share.

324. According to the 2017 10-K, during the three-month period ended December 31, 2017, the Company purchased 12,309,373 shares of its common stock for approximately $358.8 million, at an average price of $29.15 per share.

325. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 4, 2018, during the three-month period ended March 31, 2018, the Company purchased 11,551,101 shares of its common stock for approximately $368.3 million at an average price of $31.89 per share.

326. According to the Company's quarterly report on Form 10-Q filed with the SEC on August 8, 2018, during the three-month period ended June 30, 2018, the Company purchased 8,424,794 shares of its common stock for approximately $261.7 million, at an average price of $31.07 per share.

327. According to the Company's quarterly report on Form 10-Q filed with the SEC on November 6, 2018, during the three-month period ended September 30, 2018, the Company purchased 17,071,551 shares of its common stock for approximately $503.6 million, at an average price of $29.50 per share.

328. According to the 2018 Form 10-K, during the three-month period ended December 31, 2018, the Company purchased 15,074,877 shares of its common stock for approximately $404.3 million, at an average price of $26.82 per share.

329. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 10, 2019, during the three-month period ended March 31, 2019, the Company purchased 32,850,392 shares of its common stock for approximately $807 million at an average price of $24.57 per share.

330. According to the Company's quarterly report on Form 10-Q filed with the SEC on August 8, 2019, during the three-month period ended June 30, 2016, the Company purchased 10,149,506 shares of its common stock for approximately $279.6 million, at an average price of $27.55 per share.

331. According to the Company's quarterly report on Form 10-Q filed with the SEC on November 8, 2019, during the three-month period ended September 30, 2019, the Company purchased 13,680,801 shares of its common stock for approximately $358.1 million, at an average price of $26.18 per share.

332. According to the 2019 Form 10-K, during the three-month period ended December 31, 2019, the Company purchased 10,614,510 shares of its common stock for approximately $312.8 million, at an average price of $29.47 per share.

333. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 8, 2020, during the month of January 2020, the Company purchased 333,737 shares of its common stock for approximately $9.7 million at an average price of $29.10 per share.

334. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 8, 2020, during the month of February 2020, the Company purchased 818,868 shares of its common stock for approximately $23.7 million at an average price of $28.98 per share.

## XIII. LOSS CAUSATION

335. During the Relevant Period, Defendants engaged in a scheme to deceive the market and in a course of conduct that artificially inflated the price of the Company's securities and operated as a fraud or deceit on Relevant Period purchasers of the Company's securities by failing to disclose and misrepresenting the adverse facts and risks detailed herein. Later, when Defendants' prior misrepresentations and fraudulent course of conduct, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to the market, the price of the Company's securities declined significantly as the prior artificial inflation was released from the Company's share price.

336. As a result of the Defendants' action in causing the Company to purchase the Company's securities during the Relevant Period, the Company suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements, half-truths, and omissions had the intended effect and caused the Company's securities to trade at artificially inflated levels throughout the Relevant Period.

337. By concealing the adverse facts, Defendants presented a misleading picture of the Company's business and prospects. When the information and/or underlying conditions, and/or effects thereof were revealed to the market through corrective disclosure and/or a materialization of the concealed risk, the price of the Company's securities fell dramatically. This decline removed the artificial inflation from the price of the Company's securities resulting in economic loss to the Company which Defendants caused by directing the Company to purchase its own securities during the Relevant Period.

338. The decline in the price of the Company's securities following the corrective disclosure and/or materialization of the concealed risk was a direct result of the nature and extent of Defendants' fraudulent misrepresentations, half-truths, and omissions being revealed to the market. The timing and magnitude of the price declines in the Company's securities, Defendants' post-Relevant Period revelations, and analyst reactions to the news negate any inference that the loss suffered by the Company was caused by changed market conditions, macroeconomic or industry factors, unrelated to Defendants fraudulent conduct.

339. The economic loss, *i.e.*, damages, suffered by the Company was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of the Company's securities and the subsequent material decline in the value of the Company's securities when Defendants' prior misrepresentations, misleading omissions and half-truths, and other fraudulent conduct were revealed.

## XIV. <u>APPLICATION OF PRESUMPTION OF RELIANCE</u>

340. The Company is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a) Fifth Third's securities were actively traded on the NASDAQ throughout

the Relevant Period;

(b) Fifth Third's securities traded at high weekly volumes during the Relevant Period;

(c) Defendants filed periodic public reports with the SEC;

(d) Defendants regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e) the market reacted promptly to public information disseminated by Defendants;

(f) Fifth Third's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(g) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Fifth Third's securities; and

(h) without knowledge of the misrepresented or omitted material facts alleged herein, the Company purchased shares of Fifth Third's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were revealed.

341. In the alternative, the Company is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted

herein against the Defendants are primarily predicated upon omissions of material facts which there was a duty to disclose.

## XV. NO SAFE HARBOR

342. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

343. First, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor. Defendants' false and misleading statements and omissions alleged herein are not forward-looking because such statements: (1) relate to historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objective. To the extent that any of the alleged false and misleading statements and omissions might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

344. Second, any purported forward-looking statements were not accompanied by meaningful cautionary language because any risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. Additionally, to the extent Defendants included any cautionary language, such language was not meaningful because any potential risks identified by Defendants had already manifested. To the extent Defendants included any cautionary language, it was not precise, not meaningful, and did not relate directly to any forward-looking statements at issue. The cautionary language was boilerplate and did not meaningfully change during the Relevant

Period, despite the fact that conditions had materially changed.

345. Third, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements were made, the speaker knew the statement was false when made.

## XVI. KNOWLEDGE OF WIDESPREAD IMPROPER SALES CONDUCT

346. Where a complaint contains particularized allegations that the Board of Directors continued to monitor the area where the illegal activity occurred, a court can reasonably infer that the Board of Directors' discussion of these matters gave its members a view of the company's illegal conduct.

347. Here, from at least 2010 until at least 2017, Fifth Third set a cross-selling goal of at least four products per customer. *See* CFPB AC ¶¶ 32, 33. Fifth Third's cross-selling goal of four products per customer was not based on an analysis of individual consumers' needs but was instead based on Fifth Third's goals to increase customer retention and bank revenue. *See id.* Fifth Third tracked cross-selling effectiveness and, from at least 2010 to at least 2017, promoted an aggressive sales culture that pressured employees to meet cross-selling goals. *See* CFPB AC ¶ 37. For example, as described in an internal email, Fifth Third' head of retail banking acknowledged that "[b]ullying and threats are often used to achieve results" in one of the Bank's largest markets, Chicago. CFPB AC ¶ 38.

348. The cross-selling incentive structure and aggressive sales culture resulted in a predictable outbreak of illegal and predatory consumer practices at the Bank throughout the Relevant Period.

349. Defendants became aware of abusive sales-management when Fifth Third's head of retail banking wrote that the bank's Chicago "leadership team [has] a reputation of less than

desirable sales management practices," and that "[b]ullying and threats are often used to achieve results." *See* CFPB AC ¶ 38.

350. Although Fifth Third received hundreds of customer complaints about illegal sales practices between 2010 and 2016, the Company's detection efforts were severely inadequate and significantly understated the real number of unauthorized account openings and other improper sales misconduct. Fifth Third's detection efforts "relied on consumers to self-identify as victims or employees to allege improper activity," however, Fifth Third knew that many customers did not detect the improper activity and Fifth Third employees did not report improper activity for fear of retribution. CFPB AC, ¶¶ 102-04. Moreover, even when a customer or employee actually alleged improper activity, Fifth Third "only record[ed] the conduct as improper if the allegation was (a) escalated above the bank branch; (b) internally investigated, and (c) determined to the satisfaction of a bank investigator to be 'substantiated.'" *See* CFPB AC ¶ 105. Fifth Third knew that many allegations were not escalated or report. CFPB AC ¶ 106. In fact, in March 2015, a senior vice president wrote that 568 branches did not escalate or report a single complaint, despite a "systemic issue as a company around card issuance." CFPB AC ¶ 109.

351. Indeed, unauthorized credit card usage was so widespread at the Company, and the violations of law so internally obvious, that Fifth Third provided written communications to the CFPB during a 2015 Bureau examination disclosing the violations. The Company has now stated that these communications provided the CFPB "actual – not just constructive – notice of its claim for unauthorized credit card accounts," such that they triggered the statute of limitations under the TILA, the FCRA and the CFPA. *See* Defendant Fifth Third Bank's Motion for Judgment on the Pleadings in *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:21-cv-00262-DRC (S.D. Ohio) (D.E. 86) at 1.

352. Moreover, in responding to the CFPB's investigation, Fifth Third Bank admitted in 2017 that it had opened consumer financial products without authorization ***every year from 2010 to 2017*** (CFPB AC ¶ 5).

353. Fifth Third Bank also admitted to the CFPB: (i) that it received hundreds of customer complaints regarding illicit sales practices by its employees; (ii) that it knew contemporaneously that its employees opened more than 1,000 unauthorized accounts (a number the CFPB's investigation found Fifth Third substantially understated) during the 2010 to 2016 time period; (iii) that it knew of more than 400 instances of illicit practices such as creating email addresses or using inaccurate email addresses in order to facilitate unauthorized enrollment of consumers in Fifth Third products; and (iv) that it enrolled consumers in overdraft protection without their consent in 2015 and 2016. CFPB AC ¶ 96. The CFPB found these allegations so overwhelming in establishing that violations of law occurred at Fifth Third that the CFPB moved on August 13, 2021 for partial judgment on the pleadings.

354. Despite knowledge of the above misconduct, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed customers. Instead, the Individual Defendants took an ignorance-is-bliss approach and ***chose*** not to attempt to identify the illegal sales practices because greater identification might cause Fifth Third reputational and financial harm.

355. The following facts also demonstrate continued knowledge by the Board, the Audit Committee and the Risk and Compliance Committee of the illegal activity being investigated by the CFPB after the 2015 Consent Orders:

- CFPB issued a Civil Investigative Demand ("CID") to Fifth Third **in November 2016**. Addressed directly to Defendant Carmichael, the CID spotlighted "Specific Sales

Practices" that resulted in unauthorized account openings. At that point, Defendants Carmichael and Tuzun knew not only that the Bank was under investigation, but that it was being investigated for the very unauthorized-account problem about which alarms had been ringing since 2010, which had necessitated the personal and direct involvement of the Individual Defendants.

- Between 2017 and 2019, Fifth Third received ***five (5) additional CIDs*** from CFPB regarding predatory consumer practices at Fifth Third. In 2017 Fifth Third admitted that it had opened unauthorized consumer financial products every year from 2010 to 2017. *See* CFPB AC at ¶ 5.

- The CFPB has detailed in an amended pleading the massive scope and duration of Fifth Third's misconduct and intentional failure to reform systemic abuses at Fifth Third. For example, the CFPB has alleged that "Fifth Third knows or consciously disregards that its admissions and claims understate the real number of unauthorized account openings and other improper sales conduct" (CFPB AC at ¶ 98) and that there are in fact "hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization," (CFPB AC at ¶ 99) with misconduct by Fifth Third employees and deficient Fifth Third practices stretching back to 2008 and continuing until at least 2020. *See* CFPB AC at ¶ 64.

- The CFPB concluded that Fifth Third had "known for more than a decade that [the Bank's] acts or practices have led to the opening of products in consumers' names without consumers' knowledge or consent." CFPB AC ¶ 4.

- From at least 2010 through at least 2019, Fifth Third also used a "cross-sell" strategy to increase the total number of products it provided to new and existing customers. *See* CFPB AC ¶ 29.

- Fifth Third tracked cross-selling effectiveness and, from at least 2010 to at least 2017, pressured employees to meet cross-selling goals. *See* CFPB AC ¶ 29.
- Fifth Third credit cards were susceptible to unauthorized applications and issuance in part because Fifth Third bank branches accepted applications over the phone at least until 2017. *See* CFPB AC ¶ 68.
- Since 2010, more than 218,000 Fifth Third consumer credit cards have been issued but never activated or used for consumer-initiated transactions. *See* CFPB AC ¶ 75.
- Since 2010, more than 4,000 Fifth Third consumer credit-card accounts have been opened but have had no consumer-initiated purchases and have been associated with a Fifth Third email address where the consumer was not a Fifth Third employee. *See* CFPB AC ¶ 76.
- Fifth Third admits to enrolling more than 125 consumers in overdraft protection without their consent in 2015 and 2016. *See* CFPB AC ¶ 96.
- There are hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization. *See* CFPB AC ¶ 99.
- In March 2015, a senior vice president wrote that 568 Fifth Third branches "did not submit a single escalated complaint" in the prior month, despite a "systemic issue as a company around card issuance" during that same time. *See* CFPB AC ¶ 109.
- Fifth Third has, and members of Fifth Third's senior management (which included the Board, the Risk and Compliance Committee and the Audit Committee) are and have been familiar with data and other information that would be useful in implementing available unauthorized-account-identification methods ***for at least years 2010 to 2021***. *See* CFPB AC ¶ 119.

- Fifth Third has conceded in its Amended Answer in the CFPB Action that at least some unauthorized credit-card openings occurred in 2016. *See* Fifth Third's Amended Answer to the CFPB's Amended Complaint, D.E. 82 in *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:21-cv-00262-DRC (S.D. Ohio) ("Amended Answer"), at ¶ 74 (admitting that the bank had opened "fewer than 800 potentially unauthorized accounts . . . in branches between 2010 and 2016").

- Fifth Third claims that its contemporaneous detection efforts, comprising manual document-testing processes, consumer-complaint channels, a "speak-up culture," and investigations of the cases arising from those channels, have allowed it to identify aggrieved consumers. Amended Answer (D.E. 82) at p. 8. Fifth Third describes these manual processes as "controls in place to detect [and] investigate" unauthorized accounts. *Id.* at ¶¶ 8, 64, 67, 74. Fifth Third also touts its "conduct risk dashboard" as an automated system capable of serving the same purpose. But Fifth Third's dashboard is not designed to detect unauthorized accounts; instead, as the Amended Answer explains, it is designed to alert the Bank to "areas of potential concern" that would be applicable to financial institutions generally through analysis of data across the bank. Amended Answer (D.E. 82) at p. 119. When Fifth Third decided to go beyond general areas of concern and to identify accounts "at the greatest risk of having been unauthorized," it did not rely on its dashboard; instead, it hired a "globally recognized consulting firm" to analyze other data to determine whether accounts had been improperly opened. Amended Answer (D.E. 82) at p. 121.

- On March 9, 2020, Fifth Third issued a "fact sheet" in which it insisted that it had opened fewer than 1,100 unauthorized accounts between 2010 and 2016. Amended

Answer (D.E. 82) at p. 50. Years later, after March 2020, Fifth Third made its first and only effort to use its proprietary information to conduct a lookback into "suspicious" accounts opened from 2010 to 2016 that it had not already caught by manual processes, defining these as "red flag" accounts. *See* Amended Answer (D.E. 82) at p. 50, 51. That "red flag" lookback led Fifth Third to upwardly revise its own estimate of unauthorized accounts ***by at least 72%***. Upon completing its lookback, Fifth Third finally remediated an additional 800 consumers.

356. These allegations plausibly suggest that a majority of the Individual Defendants herein knew or should have known about the continued widespread illegal activity after the 2015 Consent Orders, but nonetheless failed to take action, thereby consciously disregarding their fiduciary duty to monitor and oversee the business.

357. Further, Plaintiffs also point to the following minutes of the Board, Audit Committee and Risk & Compliance Committee regarding the Board and these committees continued awareness of the illegal activity, but their collective failure to act even though the CFPB notified the Company in November 2016 that it was actively investigating Fifth Third. In the course of this investigation by the CFPB, Fifth Third provided nearly a half-billion data points, thousands of Company documents and extensive testimony to regulators – an immense effort that likely necessitated the active involvement of the Board, the Audit Committee and Risk & Compliance Committee.

**Fifth Third Bancorp Minutes of the**
**Audit Committee, November 7, 2016**

358. The following Committee Members were present at the November 7, 2016 Audit Committee meeting:

[redacted]

[redacted]

359. [redacted]

360. Thus, committee members were aware of information that would be useful in implementing better sales practices and for identifying unauthorized account activity, yet ignored this information and failed to implement any systematic or technological method to identify the unauthorized activity.

**Fifth Third Bancorp Minutes of the**
**Audit Committee, March 16, 2017**

361. The following Committee members were present by teleconference at the March 16, 2017 Audit Committee meeting:

[redacted]

362. [redacted]

[redacted]

363. Thus, committee members were aware that the Company's fraud detection and prevention systems still needed improvement in 2017, and thus that their internal controls were still deficient, yet they chose not to improve or implement any new technology, system, or other reasonable means to identify and prevent the unauthorized account activity.

**Fifth Third Bancorp, Minutes of Meeting of**
**<u>the Board of Directors, June 19, 2017</u>**

364. The following participants were presented at the June 19, 2017 Board meeting:

[redacted]

365. [redacted]

366. The fact that there were "opportunities for enhancement" means that there were control weaknesses that the Board knew had not been fixed and yet they allowed the illegal sales practices to continue.

**Fifth Third Bancorp Minutes of Joint Meeting of the**
**<u>Risk and Compliance Committee and the Audit Committee, June 19, 2017</u>**

367. The following Committee members were present at the June 19, 2017 Joint

Meeting of the Risk and Compliance Committee and the Audit Committee ("Joint Meeting"):

[redacted]

368. The following was stated at the meeting:

[redacted]

369. [redacted]

[redacted]

370. Thus, the committee members were aware of the litigation risks relating to improper sales practices. Nonetheless, the Board failed to oversee and manage the Company's risks, as they are charged to do, by failing to improve or implement any new technology, system, or other reasonable means to identify and prevent the improper sales activity, which, predictably, led to lengthy and costly litigation.

**Fifth Third Bank, Minutes of Meeting of**
**<u>the Board of Directors, June 19, 2017</u>**

371. The following participants were present at the June 19, 2017 Board meeting:

[redacted]

372. The following was stated at the meeting:

[redacted]

373. The fact that there were "opportunities for enhancement" means that there were control weaknesses that the Board knew had not been fixed and yet they allowed sales practices to continue.

**Fifth Third Bancorp Minutes of Joint Meeting of the Risk**
**<u>and Compliance Committee and the Audit Committee, December 18, 2017</u>**

374. The following committee members were present at the December 18, 2017 Joint Meeting of the Risk and Compliance Committee and the Audit Committee:

[redacted]

375. [redacted]

376. Thus, the committee members were aware of an increase in EthicsLine calls, which in turn meant they knew, or should have known, of an increase in potential allegations regarding improper sales practices.

**Fifth Third Bancorp Minutes of Joint Meeting**
**of the Board of Directors, December 19, 2017**

377. The following participants were present at the December 19 2017 Board meeting:

[redacted]

378. [redacted]

379. [redacted]

**Fifth Third Bancorp, Minutes of Joint Meeting**
**<u>of the Audit Committee, March 15, 2018</u>**

380. The following Committee members were present by teleconference at the March 15, 2018 Joint Meeting of the Audit Committee:

[redacted]

381. The following was stated at the meeting:

[redacted]

382. Thus, as recently as 2018, the Company was still suffering from unremedied issues relating to its consumer banking practices.

**Fifth Third Bancorp Minutes of the Joint Meeting of the**
**<u>Risk and Compliance Committee and the Audit Committee, June 18, 2018</u>**

383. The following committee members were present at the June 18, 2018 Joint Meeting of the Risk and Compliance Committee and the Audit Committee:

[redacted]

384. [redacted]

385. Thus, the Board was aware of the rise in internal complaints but had done nothing to determine the "root cause" of the increased complaints.

**Fifth Third Bancorp Minutes of the Joint Meeting of**
**the Risk and Compliance Committee, October 16, 2018**

386. The following were present at the October 16, 2018 Joint Meeting of the Risk and Compliance Committee:

[redacted]

387. [redacted]

388. Thus, the Board was aware that seventy-seven (77) action items to prevent the consumer abuses had still not been implemented, and the Company's sales practices continued unabated.

**The 2016 CFPB Investigation**

389. The CFPB notified Fifth Third of its newest investigation on November 3, 2016.

390. The CFPB entered into tolling agreements with Fifth Third on April 17, 2018,

November 6, 2018, June 5, 2019, August 4, 2019, November 27, 2019, December 17, 2019, June 28, 2020, and February 26, 2020 (a total of eight tolling agreements). These tolling agreements were based on the CFPB's investigation of Fifth Third Bancorp to determine whether Fifth Third violated §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536; the Truth In Savings Act, 12 U.S.C. § 4301 *et seq.*; the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*; the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.*; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*; Fifth Third's implementing regulations; or any other laws enforceable by the Bureau.

391. The following are the eight tolling agreements:

**Tolling Agreement**

This Agreement is entered into effective ***April 17, 2018***, by the Consumer Financial Protection Bureau ("the Bureau") and Fifth Third Bancorp (jointly referred to hereinafter as the "Parties").

***On November 3, 2016, the Bureau notified Fifth Third Bancorp that the Bureau was conducting an investigation of Fifth Third Bancorp to determine whether, in connection with unauthorized consumer bank, credit card, and other accounts, there were violations of §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536; the Truth In Savings Act, 12 U.S.C. § 4301 et seq.; the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.; the Truth in Lending Act, 15 U.S.C. § 1601 et seq.; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.; their implementing regulations; or any other laws enforceable by the Bureau.***

NOW THEREFORE, the Parties, through their authorized representatives, stipulate and agree as follows:

1. The running of any applicable unexpired statute of limitations for any cause of action or related claim or remedy that could be brought against Fifth Third Bancorp by the Bureau arising from the above-described investigation under §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536; the Truth In Savings Act, 12 U.S.C. § 4301 *et seq.*; the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*; the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*; their implementing regulations; and any other laws enforceable by the Bureau, shall be

suspended from April 17, 2018 to July 17, 2018 (the "Tolling Period"). In the event Fifth Third Bancorp raises or asserts a statute of limitations defense, or any other defense based on delay or the passage of time, the parties hereby expressly agree that the Tolling Period is excluded for purposes of calculating the statute of limitations or delay period.

2. This Agreement is not intended to and shall not be construed as an admission of liability by any party, and all Parties continue to reserve all rights and defenses available to them, except as provided by this Agreement.

3. This Agreement may be modified, amended, or supplemented only by a written instrument signed by all Parties. This Agreement may be executed in counterparts. Facsimile and pdf signatures are acceptable.

4. This Agreement is binding on all Parties and their respective successors in interest and assigns.

(Emphasis added in bold and italics).

* * *

**Tolling Agreement**

This Agreement is entered into effective ***November 6, 2018*** (the "Effective Date"), by the Bureau of Consumer Financial Protection ("Bureau") and Fifth Third Bancorp ("Fifth Third"). The Bureau and Fifth Third are sometimes referred to individually as a "Party" and jointly as the "Parties").

***On November 3, 2016, the Bureau notified Fifth Third that the Bureau was conducting an investigation ("the Investigation") of Fifth Third to determine whether, in connection with unauthorized consumer bank, credit card, and other accounts, there were violations of§§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536; the Truth In Savings Act, 12 U.S.C. § 4301 et seq.; the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.; the Truth in Lending Act, 15 U.S.C. § 1601 et seq.; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.; their implementing regulations; or any other laws enforceable by the Bureau.***

NOW THEREFORE, the Parties, through their authorized representatives, stipulate and agree as follows:

1. The running of any applicable unexpired statute of limitations for any cause of action or related claim or remedy that could be brought against Fifth Third by the Bureau arising from the Investigation shall be suspended from November 6, 2018 to April 6, 2019 (the "Tolling Period"). In the event

Fifth Third raises or asserts a statute of limitations defense, or any other defense based on delay or passage of time, the Parties hereby expressly agree that the Tolling Period is excluded for purposes of calculating the statute of limitations or delay period.

2. This Agreement is not intended and shall not be construed as an admission of liability by any Party, and the Parties continue to reserve all rights and defenses available to them, except as provided by this Agreement.

3. This Agreement may be modified, amended, or supplemented only by a written instrument signed by both Parties. This Agreement may be executed in counterparts. Facsimile and pdf signatures are acceptable.

4. This Agreement is binding on both Parties and their respective successors in interest and assigns.

(Emphasis added in bold and italics).

* * *

**Tolling Agreement**

This Agreement is entered into effective ***June 5, 2019*** (the "Effective Date"), by the Bureau of Consumer Financial Protection ("Bureau") and Fifth Third Bancorp ("Fifth Third"). The Bureau and Fifth Third are sometimes referred to individually as a "Party" and jointly as the "Parties").

***On November 3, 2016, the Bureau notified Fifth Third that the Bureau was conducting an investigation ("the Investigation" ) of Fifth Third to determine whether, in connection with unauthorized consumer bank, credit card, and other accounts, there were violations of §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531 , 5536; the Truth In Savings Act, 12 U.S.C. § 4301 et seq.; the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.; the Truth in Lending Act , 15 U.S .C. § 1601 et seq.; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.; their implementing regulations; or any other laws enforceable by the Bureau.***

NOW THEREFORE, the Parties, through their authorized representatives, stipulate and agree as follows:

1. The running of any applicable unexpired statute of limitations for any cause of action or related claim or remedy that could be brought against Fifth Third by the Bureau arising from the Investigation shall be suspended from June 5, 2019 to August 4, 2019 (the "Tolling Period"). In the event Fifth Third raises or asserts a statute of limitations defense or any other defense based on delay or passage of time, the Parties hereby expressly agree that

the Tolling Period is excluded for purposes of calculating the statute of limitations or delay period.

2. This Agreement is not intended and shall not be construed as an admission of liability by any Party, and the Parties continue to reserve all rights and defenses available to them, except as provided by this Agreement.

3. This Agreement may be modified, amended, or supplemented only by a written instrument signed by both Parties. This Agreement may be executed in counterparts. Facsimile and pdf signatures are acceptable.

4. This Agreement is binding on both Parties and their respective successors in interest and assigns.

(Emphasis added in bold and italics).

* * *

**Tolling Agreement**

This Agreement is entered into effective ***August 4, 2019*** (the "Effective Date"), by the Bureau of Consumer Financial Protection ("Bureau") and Fifth Third Bancorp ("Fifth Third"). The Bureau and Fifth Third are sometimes referred to individually as a "Party" and jointly as the "Parties").

***On November 3, 2016, the Bureau notified Fifth Third that the Bureau was conducting an investigation ("the Investigation") of Fifth Third to determine whether, in connection with unauthorized consumer bank, credit card, and other accounts, there were violations of §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536; the Truth In Savings Act, 12 U.S.C. § 4301 et seq.; the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.; the Truth in Lending Act, 15 U.S.C. § 1601 et seq.; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.; their implementing regulations; or any other laws enforceable by the Bureau.***

NOW THEREFORE, the Parties, through their authorized representatives, stipulate and agree as follows:

1. The running of any applicable unexpired statute of limitations for any cause of action or related claim or remedy that could be brought against Fifth Third by the Bureau arising from the Investigation shall be suspended from August 4, 2019 to November 30, 2019 (the "Tolling Period"). In the event Fifth Third raises or asserts a statute of limitations defense, or any other defense based on delay or passage of time, the Parties hereby expressly agree that the Tolling Period is excluded for purposes of calculating the statute of limitations or delay period.

2. This Agreement is not intended and shall not be construed as an admission of liability by any Party, and the Parties continue to reserve all rights and defenses available to them, except as provided by this Agreement.

3. This Agreement may be modified, amended, or supplemented only by a written instrument signed by both Parties. This Agreement may be executed in counterparts. Facsimile and pdf signatures are acceptable.

4. This Agreement is binding on both Parties and their respective successors in interest and assigns.

(Emphasis added in bold and italics).

* * *

**Tolling Agreement**

This Agreement is entered into effective ***November 27, 2019*** (the "Effective Date"). by the Bureau of Consumer Financial Protection ("Bureau") and Fifth Third Bancorp ("Fifth Third"). The Bureau and Fifth Third are sometimes referred to hereinafter individually as a "Party" and jointly as the "Parties."

***On November 3, 2016, the Bureau notified Fifth Third that the Bureau was conducting an investigation ("the Investigation") of Fifth Third to determine whether, in connection with unauthorized consumer bank, credit card, and other accounts, there were violations of §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536; the Truth In Savings Act, 12 U.S.C. § 4301 et seq.; the Fair Credit Reporting Act, 15 U. S.C. § 1681 et seq.; the Truth in Lending Act, 15 U.S.C. § 1601 et seq.; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.; their implementing regulations; or any other laws enforceable by the Bureau.***

NOW THEREFORE, the Parties, through their authorized representatives. stipulate and agree as follows:

1. The running of any applicable unexpired statute of limitations for any cause of action or related claim or remedy that could be brought against Fifth Third by the Bureau arising from the Investigation shall be suspended from November 27, 2019 to December 31, 2019 (the "Tolling Period"). In the event Fifth Third raises or asserts a statute of limitations defense or any other defense based on delay or passage of time, the Parties hereby expressly agree that the Tolling Period is excluded for purposes of calculating the statute of limitations or delay period.

2. This Agreement is not intended and shall not be construed as an admission of liability by any Party, and the Parties continue to reserve all rights and defenses available to them, except as provided by this Agreement.

3. This Agreement may be modified, amended, or supplemented only by a written instrument signed by both Parties. This Agreement may be executed in counterparts. Facsimile and pdf signatures are acceptable.

4. This Agreement is binding on both Parties and their respective successors in interest and assigns.

(Emphasis added in bold and italics).

* * *

**Tolling Agreement**

This Agreement is entered into effective ***December 17, 2019*** (the "Effective Date"), by the Bureau of Consumer Financial Protection ("Bureau") and Fifth Third Bancorp ("Fifth Third"). The Bureau and Fifth Third are sometimes referred to hereinafter individually as a "Party" and jointly as the "Parties.

***On November 3, 2016, the Bureau notified Fifth Third that the Bureau was conducting an investigation ("the Investigation") of Fifth Third to determine whether, in connection with unauthorized consumer bank, credit card, and other accounts, there were violations of §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536; the Truth In Savings Act, 12 U.S.C. § 4301 et seq.; the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.; the Truth in Lending Act, 15 U.S.C. § 1601 et seq.; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.; their implementing regulations or, any other laws enforceable by the Bureau***.

NOW THEREFORE, the Parties, through their authorized representatives, stipulate and agree as follows:

1. The running of any applicable unexpired statute of limitations for any cause of action or related claim or remedy that could be brought against Fifth Third by the Bureau arising from the Investigation shall be suspended from December 17, 2019 to January 30, 2020 (the "Tolling Period"). In the event Fifth Third raises or asserts a statute of limitations defense, or any other defense based on delay or passage of time, the Parties hereby expressly agree that the Tolling Period is excluded for purposes of calculating the statute of limitations or delay period.

2. This Agreement is not intended and shall not be construed as an admission of liability by any Party, and the Parties continue to reserve all rights and defenses available to them, except as provided by this Agreement.

3. This Agreement may be modified, amended, or supplemented only by a written instrument signed by both Parties. This Agreement may be executed in counterparts. Facsimile and pdf signatures are acceptable.

4. This Agreement is binding on both Parties and their respective successors in interest and assigns.

(Emphasis added in bold and italics).

* * *

**Tolling Agreement**

This Agreement is entered into effective ***January 28, 2020*** (the "Effective Date"), by the Bureau of Consumer Financial Protection ("Bureau") and Fifth Third Bancorp ("Fifth Third"). The Bureau and Fifth Third are sometimes referred to hereinafter individually as a "Party" and jointly as the "Parties."

***On November 3, 2016, the Bureau notified Fifth Third that the Bureau was conducting an investigation ("the Investigation") of Fifth Third to determine whether, in connection with unauthorized consumer bank, credit card, and other accounts, there were violations of §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536; the Truth In Savings Act, 12 U.S.C. § 4301 et seq.; the Fair Credit Reporting Act , 15 U.S.C. § 1681 et seq.; the Truth in Lending Act, I 5 U.S.C. § 1601 et seq.; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.; their implementing regulations; or any other laws enforceable by the Bureau.***

NOW THEREFORE, the Parties, through their authorized representatives, stipulate and agree as follows:

1. The running of any applicable unexpired statute of limitations for any cause of action or related claim or remedy that could be brought against Fifth Third by the Bureau arising from the Investigation shall be suspended from January 28, 2020 to March 2, 2020 (the "Tolling Period"). In the event Fifth Third raises or asserts a statute of limitations defense, or any other defense based on delay or passage of time, the Parties hereby expressly agree that the Tolling Period is excluded for purposes of calculating the statute of limitations or delay period.

2. This Agreement is not intended and shall not be construed as an admission of liability by any Party, and the Parties continue to reserve all rights and defenses available to them, except as provided by this Agreement.

3. This Agreement may be modified, amended, or supplemented only by a written instrument signed by both Parties. This Agreement may be executed in counterparts. Facsimile and pdf signatures are acceptable.

4. Th is Agreement is binding on both Parties and their respective successors in interest and assigns.

(Emphasis added in bold and italics).

* * *

**Tolling Agreement**

This Agreement is entered into effective ***February 26, 2020*** (the "Effective Date"), by the Bureauof Consumer Financial Protection ("Bureau") and Fifth Third Bancorp ("Fifth Third"). The Bureau and Fifth Third are sometimes referred to herein after individually as a "Party" and jointly as the "Parties."

***On November 3, 2016, the Bureau notified Fifth Third that the Bureau was conducting an investigation ("the Investigation") of Fifth Third to determine whether, in connection with unauthorized consumer bank, credit card, and other accounts, there were violations of §§ l031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S .C. §§ 5531, 5536; the Truth In Savings Act, 12 U.S.C. § 4301 et seq.; the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.; the Truth in Lending Act, 15 U.S.C. § 1601 et seq.; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.; their implementing regulations; or any other laws enforceable by the Bureau.***

NOW THEREFORE, the Parties, through their authorized representatives, stipulate and agree as follows:

l. The running of any applicable unexpired statute of limitations for any cause of action or related claim or remedy that could be brought against Fifth Third by the Bureau arising from the Investigation shall be suspended from February 26, 2020 to March 9, 2020 (the "Tolling Period"). In the event Fifth Third raises or asserts a statute of limitations defense, or any other defense based on delay or passage of time, the Parties hereby expressly agree that the Tolling Period is excluded for purposes of calculating the statute of limitations or delay period.

2. This Agreement is not intended and shall not be construed as an admission of liability by any Party, and the Parties continue to reserve all rights and defenses available to them, except as provided by this Agreement.

3. This Agreement may be modified, amended, or supplemented only by a written instrument signed by both Parties. This Agreement may be executed in counterparts. Facsimile and pdf signatures are acceptable.

4. This Agreement is binding on both Parties and their respective successors in interest and assigns.

(Emphasis added in bold and italics).

392. When combined with the other red flags, the multiple tolling agreements, which span from November 2016 to February 2020, further support an inference that the Defendants knew of the illegal sales activity.

393. All of these red flags viewed collectively support an inference that a majority of the Director Defendants consciously disregarded their fiduciary duties to prevent the aforesaid consumer abuses despite their knowledge that officers and employees were engaged in decades-long, widespread illegal account-creation activities. Therefore, there is a substantial likelihood of director oversight liability.

394. Plaintiffs have pointed to a battery of particularized factual allegations that strongly support an inference that the Board knew of the widespread illegal activity but nonetheless failed to take action. A board that fails to act to prevent continued illegality in the face of such information makes a conscious decision, and the decision not to act is just as much of a decision as a decision to act.

395. In sum, the abundance of particularized allegations in this Third Amended Complaint support an inference that a majority of the Director Defendants – and in particular the Director Defendants who were on the Risk and Compliance Committee and the Audit Committee – knew about widespread, decades-long, illegal activity, but failed to take action to bring such

illegality to a halt at the Bank, thereby consciously disregarding their fiduciary duty to monitor and oversee the business. As a result, they face a substantial likelihood of liability for Plaintiffs' breach of fiduciary duty claims.

## XVII. DAMAGES TO THE COMPANY

396. As a direct and proximate result of Defendants' conduct, Fifth Third has lost and expended, and will continue to lose and expend, many millions of dollars.

397. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers, The Consumer Class Actions, and the 2020 CFPB Action filed against Fifth Third Bank, any internal investigations, and any amounts paid to outside lawyers, accountants, and investigators in connection thereto, including in connection with the extensive three-year investigation that led to the 2020 CFPB Action.

398. Such losses include, but are not limited to, handsome compensation and benefits paid to Defendants who breached their fiduciary duties to the Company.

399. Such losses include the Company's overpayment by approximately $2 billion for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

400. As a direct and proximate result of Defendants' conduct, Fifth Third has also suffered and will continue to suffer a loss of reputation and goodwill, including but not limited to damage to its reputation with consumers and loss of business with consumers, and a "liar's discount" that will plague the Company's stock in the future due to Defendants' misrepresentations, breaches of fiduciary duties and unjust enrichment.

## XVIII. DERIVATIVE ALLEGATIONS

401. Plaintiffs bring this action derivatively and for the benefit of Fifth Third to redress injuries suffered, and to be suffered, as a result of Defendants' breaches of their fiduciary duties as directors and/or officers of Fifth Third, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

402. Fifth Third is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

403. Plaintiffs are, and have continuously been at all relevant times, shareholders of Fifth Third. Plaintiffs will adequately and fairly represent the interests of Fifth Third in enforcing and prosecuting its rights, and, to that end, have retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

## XIX. DEMAND FUTILITY ALLEGATIONS

404. Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

405. A pre-suit demand on the Board of Fifth Third is futile and, therefore, excused. At the time of filing of the *Pemberton* action (the first action filed of these consolidated actions), the Board consisted of the following fourteen individuals: Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Feiger, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams (the "Demand Futility Director Defendants"). Plaintiffs only need to allege demand futility as to seven of these fourteen Directors.

406. Defendant Burris is not included as a Demand Futility Director Defendant because he resigned from the Board in June 2020 and before the filing of the *Pemberton* action. Therefore, Defendant Burris is not included in this section as demand futility need not be alleged as to him. Further, non-party Director Clement-Holmes is not included as a Demand Futility

Director Defendant because she joined the board on July 17, 2020, after the *Pemberton* Action was filed. Therefore, Clement-Holmes is not included in this section as demand futility need not be alleged as to her.

407. Demand is excused as to all of the Demand Futility Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of (1) the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while three of them (Defendants Carmichael, Brumback, and Hoover) engaged in insider sales based on material non-public information, (2) while at the same time causing the Company to overpay by approximately $2 billion for repurchases of its own stock, all of which renders, and (3) failing to implement and maintain appropriate internal controls. As a result, the Demand Futility Director Defendants were and are unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

408. In complete abdication of their fiduciary duties, the Demand Futility Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Demand Futility Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Defendant Carmichael**

409. Demand on Defendant Carmichael is futile. Defendant Carmichael has served as the Company's President, CEO and as a Company director since 2015. He has also served as the

elected Chairman of the Board since 2018. Thus, as corporate filings filed by the Defendants admit, he is a non-independent director.

410. The Company provides Defendant Carmichael with his principal occupation, and he receives handsome compensation as described above, including $8,999,237 during the fiscal year ended December 31, 2019.

411. Defendant Carmichael was ultimately responsible for the false and misleading statements and omissions made during his tenure, including those contained in the 2015, 2016, 2017, 2018 and 2019 Form 10-Ks, which he signed and signed SOX certifications for and the January 30, 2020 press release.

412. As the Company's highest officer and as a trusted director, Defendant Carmichael conducted little, if any, oversight of the Relevant Period Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to implement appropriate internal controls and monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.

413. His insider sales before the fraud was exposed, which yielded at least $5.8 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Carmichael is a defendant in the Securities Class Action.

414. Additionally, Defendant Carmichael had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third's sales practices (which investigation commenced on or about November 3, 2016). Additionally, Defendant Carmichael was alerted to or recklessly disregarded the spotlight focused on the wrongful sales practices years earlier

through employee communications whether through its EthicsLine or otherwise.

415. Each of these events was a red flag.

416. In breach of his fiduciary duties, Defendant Carmichael ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from Fifth Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

417. In further breach of his fiduciary duties, Defendant Carmichael permitted or otherwise took no action against the insider sales identified herein and permitted the repurchases of Company stock during the Relevant Period.

418. Thus, for these reasons and others described herein, Defendant Carmichael breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon Defendant Carmichael is futile and, therefore, excused.

**Audit Committee Directors**

419. As stated in its Proxy Statements filed with the SEC on forms DEF 14A from 2008 through 2020, the Audit Committee serves in a dual capacity of Fifth Third and Fifth Third Bank.

420. The 2020 CFPB Action alleges the Relevant Period Misconduct actually commenced as early as 2008. From 2008 to the present, the Fifth Third Audit Committee was comprised of the directors identified on the chart attached hereto as Exhibit 2 and incorporated by reference.

421. Defendant Benitez joined the Audit Committee in September 2018. Defendant Blackburn served on the Audit Committee until September 2018. Defendant Burris joined the Audit Committee in December 2016. Defendant Mallesch joined the Audit Committee in

September 2018. Defendant McCallister served on the Audit Committee until April 2015 and currently is a member of this committee once again. Defendant Williams served on the Audit Committee until April 2017 and since then as Lead Independent Director, serves as an ex-officio member of the Audit Committee.

422. The Audit Committee is presently comprised of Defendants Blackburn, Harvey, Hoover, McCallister, and Mallesch (as its Chair).

423. In addition to the above-named present Audit Committee members, during the Relevant Period, the Audit Committee included Defendants Benitez, Brumback, Burris, Daniels, and Williams.

424. In addition to the above-named present Audit Committee members and Relevant Period Audit Committee members, Defendant Akins joined the Board in 2013 and was a member of the Audit Committee in 2014 and 2015.

425. As a result, demand on any Director Defendant who served as a member of the Audit Committee from 2008 to the present, and particularly those who served on the Audit Committee during the Relevant Period, would be futile.

426. Pursuant to the Audit Committee Charter, the Audit Committee members are tasked with oversight responsibilities relating to the Company's accounting and financial reporting process and the audits of the Company's financial statements. The Audit Committee Charter provides that its primary purposes include that it is required to provide assistance to Fifth Third and Fifth Third Bank by monitoring the Company's and Fifth Third Bank's system of internal controls and compliance by Fifth Third Bank's compliance with applicable legal and regulatory requirements.

427. With specific regard to compliance oversight, the Audit Committee Charter

charges the Audit Committee members with:

- Review procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure.

- Establish procedures and require the Corporation to obtain or provide the necessary resources and mechanisms for (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

- Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports which raise material issues regarding the Corporation's financial statements or accounting policies.

- Discuss with the Corporation's General Counsel and Chief Risk Officer legal matters that may have a material impact on the financial statements and that may have an impact on the Corporation's compliance policies.

- Oversee the administration of the Corporation's Code of Business Conduct and establish an enforcement mechanism for the Corporation's Code of Business Conduct and Ethics.

- Consider any material waivers of the Corporation's Code of Business Conduct and recommend to the Board of Directors of the Corporation whether or not to grant such waiver.

- Receive and review reporting regarding calls to the Corporation's EthicsLine.

428. [redacted]

[redacted]

429. [redacted]

430. [redacted]

431. The Director Defendants serving on the Audit Committee failed to adequately perform their oversight responsibilities as required by the Audit Committee Charter even though they had knowledge of the Company's internal weaknesses [redacted] Additionally, based on the Audit Committee Charter, the Audit Committee members were tasked with periodically meeting with the Company's legal counsel and Chief Risk Officer, and therefore, were aware, or should have been aware, of the impending 2020 CFPB Action. Further, the Audit Committee is responsible for handling reports submitted to the Company's EthicsLine; however, at least one employee noted that the response to reported issues on the Company's EthicsLine was non-existent or deficient and according to the CFPB there was an increase in the number of calls by employees to the EthicsLine.

432. As such, the Director Defendants serving on the Audit Committee were aware or should have been aware of the potential misconduct occurring at the Company by approximately 2010. Additionally, the Director Defendants serving on the Audit Committee "[r]eport to the full Board of Directors on the Committee's activities at each meeting of the Board of Directors of the Corporation and the Bank." Therefore, the Director Defendants serving on Audit Committee had the duty to inform the entire Board of the misconduct reported to the Company's EthicsLine. As a result, each member of the Board was aware, should have been aware, or recklessly ignored the

misconduct occurring within the Company.

433. Moreover, the Director Defendants serving on the Audit Committee were responsible for assisting the Board with the Company's financial statements, reporting, disclosures, and the application of legal and regulatory requirements. The Director Defendants serving on Audit Committee once again failed to perform their responsibilities as required by the Audit Committee Charter, as they permitted the Company and remaining Defendants to issue materially false and/or misleading SEC filings. As a result, the Director Defendants serving on the Audit Committee face a substantial likelihood of liability for their breaches of fiduciary duties.

434. The conduct of the Director Defendants serving on the Audit Committee is particularly egregious in light of their knowledge of the 2015 CFPB Credit Card Action and Consent Order against Fifth Third Bank, 2015 CFPB Auto Lending Enforcement Action and Consent Order against Fifth Third Bank, and the Wells Fargo Cross-Selling Scandal. The Audit Committee members with knowledge of these 2015 CFPB Actions during the Relevant Period were Defendants Benitez, Blackburn, Brumback, Hoover, McCallister, and Williams. In addition to these Defendants, the Audit Committee members with knowledge of the Wells Fargo Cross-Selling Scandal include Defendants Mallesch and Burris.

**Regulatory Oversight Committee Directors**

435. The Regulatory Oversight Committee was created and existed in 2015 through 2016 and was established as a requirement of the 2015 CFPB Credit Card Action and Consent Order against Fifth Third Bank, 2015 CFPB Auto Lending Enforcement Action and Consent Order against Fifth Third Bank.

436. As stated in the Company's Proxy Statements filed with the SEC on forms DEF 14A from 2008 through 2020, the Regulatory Oversight Joint Committee served in a dual capacity

of Fifth Third and Fifth Third Bank.

437. The members of the Regulatory Oversight Committee were Defendants Blackburn, Brumback, Hoover, and Williams.

438. Pursuant to the Regulatory Oversight Committee Charter, the Regulatory Oversight Committee members were tasked with oversight responsibilities relating to compliance with regulatory findings or supervisory issues. The 2015 CFPB Credit Card Consent Order against Fifth Third Bank and 2015 CFPB Auto Lending Consent Order do not limit the obligations of the Board of Directors or this committee to the matters detailed in each CFPB action. Notably, the wrongful conduct of Defendants during the Relevant Period (and which the CFPB asserts began in at least 2008) falls squarely within the conduct alleged in the 2015 CFPB Credit Card Action and Consent Order against Fifth Third Bank.

439. Additionally, pursuant to the Regulatory Oversight Committee Charter, the Regulatory Oversight Committee members are required to report to the full Board of Directors on the Committee's activities at each meeting of the Board of Directors of Fifth Third and Fifth Third Bank.

440. [redacted]

441. [redacted]

442. The Director Defendants serving on the Regulatory Oversight Committee failed to adequately perform their oversight responsibilities as required by the Regulatory Oversight Committee Charter as evidenced by the CFPB investigation and commencement of the 2020 CFPB Action.

443. The conduct of the Director Defendants serving on the Regulatory Oversight Committee is particularly egregious in light of their knowledge of the 2015 CFPB Credit Card Action and Consent Order against Fifth Third Bank, 2015 CFPB Auto Lending Enforcement Action and Consent Order against Fifth Third Bank, and the Wells Fargo Cross-Selling Scandal.

444. Based on the foregoing, demand on Director Defendants Blackburn, Brumback, Hoover, and Williams would be futile.

**Risk and Compliance Committee**

445. The Risk and Compliance Committee was formed in March 2003 and replaced the Board's Compliance Committee.

446. As stated in the Company's Proxy Statements filed with the SEC on forms DEF 14A from 2008 through 2020, the Risk and Compliance Committee serves in a dual capacity of Fifth Third and Fifth Third Bank.

447. Upon dissolution of the Regulatory Oversight Committee, the charter of the Risk and Compliance Committee was amended to include certain responsibilities previously held by the Regulatory Oversight Committee.

448. The 2020 CFPB Action alleges the Relevant Period Misconduct actually commenced as early as 2008. From 2008 to the present, the Fifth Third Risk and Compliance Committee was comprised of the directors identified on the chart attached hereto as Exhibit 3 and incorporated by reference.

449. The Risk and Compliance Committee is presently comprised of Defendants Brumback (as its Chair), Daniels, Heminger, Hoover, and Mallesch.

450. In addition to the above-named present Risk and Compliance Committee members, during the Relevant Period, the Risk and Compliance Committee included Defendants Benitez, Blackburn, Burris, Harvey, and Williams.

451. Defendant Blackburn joined the Risk and Compliance Committee in September 2018. Defendant Harvey and non-party director Linda W. Clement-Holmes joined the Risk and Compliance Committee in September 2019. Defendant Mallesch joined the Risk and Compliance Committee in December 2016 and remained a member through 2018 and rejoined this committee in 2020. Defendant Williams served on the Risk and Compliance Committee from 2010 until April 2017 and since then as Lead Independent Director, serves as an ex-officio member of the Risk and Compliance Committee.

452. Pursuant to the Risk and Compliance Committee Charter, the members of this committee are tasked with oversight responsibilities relating to the "risk management policies of the Corporation's and the Bank's global operation and oversight of its global risk management framework." The Risk and Compliance Committee Charter provides in relevant part and its responsibilities include:

> Oversee management's compliance with all of the Corporation's and the Bank's regulatory obligations arising under applicable federal and state banking laws, rules and regulations;

***

Oversee the fiduciary activities and fiduciary policies of the Corporation and its bank subsidiaries; and

Ensure that risk processes are supported by a risk governance structure that includes oversight by the Boards of Directors of the Corporation and the Bank, policies, risk limits, and risk committees, and further by a safe and sound culture that supports risk management objectives and reflects appropriate accountability by all lines of defense.

***

Review management reports relating to operational risk issues in areas including but not limited to: fraud; development of material products and services; execution, delivery and process management; acquisition integration issues; technology risks and technology strategies; cybersecurity incidents and privacy breaches; business disruption and system failures; and business practices generally

***

Review management reports relating to legal and regulatory compliance risk issues in areas including but not limited to: material litigation, legal settlements and defense complaints, new regulations and their impact, information safeguarding, anti-money laundering, and fair lending, as well as information regarding the adequacy of the Corporation's compliance risk management program and significant compliance issues and/or findings.

***

Discuss with management, the Audit Committee of the Corporation's Board of Directors and the internal auditors the Bank's compliance with applicable laws and regulations and from time to time advise the Bank's Board of Directors with respect to the same.

453. [redacted]

[redacted]

454. [redacted]

455. [redacted]

456. The members of the Risk and Compliance Committee failed to adequately perform their oversight responsibilities as required by the Risk and Compliance Committee

Charter. Additionally, based on the Board's Risk and Compliance Committee Charter, the members of the Risk Committee were aware, should have been aware, or willfully ignored the Company's regulatory violations with regard to the unauthorized accounts and/or predatory nature of Fifth Third Bank employees and management.

457. Furthermore, the Risk and Compliance Committee and its members were responsible for addressing and overseeing the Company's operational risk, legal risk, and reputational risk. The Risk Committee again failed to perform their responsibilities as required by the Risk and Compliance Committee Charter because as members of the Risk Committee they permitted the Company to allegedly violate federal and state banking laws, rules, and regulations, and similarly, failed to ensure that reported instances of misconduct were adequately addressed and remediated to prevent reputational harm.

458. The conduct of the Director Defendants serving on the Risk and Compliance Committee is particularly egregious in light of their knowledge of the 2015 CFPB Credit Card Action and Consent Order against Fifth Third Bank, 2015 CFPB Auto Lending Enforcement Action and Consent Order against Fifth Third Bank, and the Wells Fargo Cross-Selling Scandal.

459. Based on the foregoing, members of the Risk and Compliance Committee face a substantial likelihood of liability for their breaches of fiduciary and demand on Director Defendant Brumback, Daniels, Heminger, Hoover, Mallesch, Benitez, Blackburn, Burris, Harvey, and Williams would be futile.

**Human Capital and Compensation Committee**

460. The 2020 CFPB Action alleges the Relevant Period Misconduct actually commenced as early as 2008. From 2008 to the present, the Fifth Third Human Capital and Compensation Committee was comprised of the directors identified on the chart attached hereto

as Exhibit 4 and incorporated by reference.

461. The Human Capital and Compensation Committee is presently comprised of Defendants Brumback, Heminger, Mallesch, McCallister (as its Chair), and Williams.

462. In addition to the above-named present Human Capital and Compensation Committee members, during the Relevant Period, the Human Capital and Compensation Committee included Defendant Akins (who served on this committee from 2014 through 2019), and non-party Meijer (who served on this committee from at least 2008 through April 2017).

463. In addition to presently serving on the Human Capital and Compensation Committee, Defendant Brumback also served on this committee from 2010 through April 2014. In addition to presently serving on the Human Capital and Compensation Committee, Defendant Heminger served on this committee from at least 2008 through the present. In addition to presently serving on the Human Capital and Compensation Committee, Defendant McCallister has continuously served on this committee since 2015 and has been the committee's Chairman since 2016.

464. Demand upon members of the Board's Human Capital and Compensation Committee would be futile. Pursuant to the Human Capital and Compensation Committee Charter:

> The Committee's primary purposes are to:
>
> - Discharge the Corporation's responsibilities relating to the compensation of the Corporation's Executive Officers. The Committee has overall responsibility for overseeing the benefit, bonus, incentive compensation, severance, equity-based or other compensation plans, policies and programs of the Corporation and its subsidiaries.
>
> - **Oversee management's development and implementation of the incentive compensation strategy for the Corporation.**
>
> - **Oversee the incentive compensation plans, policies and programs**

**encompassing those employees of the Corporation and its subsidiaries who, either individually or as part of a group, have the ability to expose the Corporation to material risk ("Covered Employees").**

- Implement Chief Executive Officer ("CEO") succession planning.
- Make recommendations regarding director compensation to the Board of Directors.
- Prepare the annual report on executive compensation for inclusion in the Corporation's proxy statement, including review and discussion of the Compensation Discussion & Analysis with Management and disclosure of whether the Committee has retained or obtained the advice of a compensation consultant and if the work of the compensation consultant has raised any conflict of interest and, if so, the nature of the conflict and how it is being addressed.

[Emphasis added].

465. Additionally, the Human Capital and Compensation Committee is responsible for executive compensation/approval of transactions, as well as risk and compliance oversight with regard to the Company's incentive compensation strategy.

466. The Human Capital and Compensation Committee and its members failed to adequately perform their oversight responsibilities as required by the Human Capital and Compensation Committee Charter. Additionally, based on the Board's Human Capital and Compensation Committee Charter, the members of this committee drafted, approved, and supported the questionable incentive-based compensation as alleged in this Complaint, the 2020 CFPB Action, and the Securities Class Action. Further, the Human Capital and Compensation Committee Defendants determined, should have determined, or willfully ignored the risk of potential harm to the Company through Fifth Third's incentive-based compensation structure. Moreover, the members of the Human Capital and Compensation Committee failed to

Identify and limit features of:

a. Executive Officer compensation plans that could lead the officer to take

unnecessary and excessive risks;

b. Employee compensation plans that pose risks to ensure the Corporation is not unnecessarily exposed to risk; and

c. Both Executive Officer and employee compensation plans that encourage behavior focused on short-term results rather than long-term value creation.

467. As such, the Human Capital and Compensation Committee failed to perform their responsibilities as required by the Human Capital and Compensation Committee Charter. Therefore, the members of the Human Capital and Compensation Committee face a substantial likelihood of liability for their breaches of fiduciary duties and demand on Director Defendant Brumback, Heminger, Mallesch, McCallister, Williams, and Akins would be futile.

**Nominating and Corporate Governance Committee**

468. The 2020 CFPB Action alleges the Relevant Period Misconduct actually commenced as early as 2008. From 2008 to the present, the Fifth Third Nominating and Corporate Governance Committee was comprised of the directors identified on the chart attached hereto as Exhibit 5 and incorporated by reference.

469. The Nominating and Corporate Governance Committee is presently comprised of Defendants Akins (as its Chair and who served on this committee since 2016), Bayh (who served on this Committee since 2012), Benitez (who served on this committee since 2016), Blackburn (who served on this committee since 2017), Harvey (who joined this committee in September 2019), and Williams (who was a member of this committee from 2009 through 2011 and again from 2016 to the present).

470. In addition to the above-named present Nominating and Corporate Governance Committee members, Defendant Heminger previously served on the Nominating and Corporate Governance Committee during the Relevant Period.

471. Pursuant to the Board's Nominating and Corporate Governance Committee:

> The Committee's primary purposes are to:
>
> • Develop and recommend to the Board of Directors corporate governance policies and guidelines for the Corporation and for identifying and nominating director and committee member candidates; and
>
> • Nominate directors for election to the Board of Directors and recommend appointment to committee membership.

472. Additionally, the Corporate Governance Committee Defendants are responsible for annually reviewing:

> the corporate governance policies of the Corporation, including Corporate Governance Guidelines, and Code of Business Conduct and Ethics and the Government Affairs Policy, to ensure that they are appropriate for the Corporation and comply with applicable laws, regulations and listing standards, and to recommend any desirable changes to the Board of Directors.

473. The Corporate Governance Committee Defendants failed to act in good faith in the performance of their responsibilities outlined in the Nominating and Corporate Governance Committee Charter. The Corporate Governance Committee Defendants were aware, should have been aware, or willfully ignored the allegations contained within this Complaint, the 2020 CFPB Action, and the Securities Class Action; yet the Corporate Governance Committee Defendants continued to nominate the same set of directors for service on the Board. The lack of action by the Corporate Governance Committee Defendants permitted the aforementioned allegations and harm to perpetually continue.

474. Based on the foregoing, members of the Corporate Governance Committee face a substantial likelihood of liability for their breaches of fiduciary and demand on Director Defendant Akins, Bayh, Benitez, Blackburn, Harvey, and Williams would be futile.

**Demand Futility Director Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Feiger, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams**

475. As Defendants admitted in the March 2020 Responses, the Company was aware of over 1,000 Unauthorized Accounts opened between 2010 and 2016.

476. Furthermore, the Board's intentional and knowing failure to make proper and/or complete disclosures and concerted effort to conceal facts from the public at large demonstrates that demand upon the Board would be a futile and useless act.

477. The Director Defendants' conduct described herein and summarized above demonstrates a pattern of misconduct that could not have been the product of legitimate business judgment, as it was based on intentional, reckless, grossly negligent, and disloyal misconduct. The Board's misconduct – through both their intentional actions and conscious inaction – was in bad faith and breached their duty of loyalty. Thus, none of the Board can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

478. As a majority of the Board faces a substantial likelihood of liability, they are self-interested in the conduct, policies, and procedures complained of herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the Company.

479. Furthermore, Demand upon the Demand Futility Director Defendants is futile because a majority of the Board has demonstrated that their personal and financial interests are superior to those of Fifth Third. As aforementioned, a mere two (2) weeks after the filing of the 2020 CFPB Action, the Director Defendants authorized the Amended Regulations which attempted to fully indemnify the Director Defendants to the fullest extent permitted by law.

480. Additionally, the Amended Regulations authorized and adopted by the Director Defendants permit the Director Defendants, as well as other executives and employees, to receive advanced expense payments on their behalf, including expenses related to attorney's fees.

481. The Amended Regulations approved by the Director Defendants demonstrate that the Board and certain executive officers are not acting in the best interests of Fifth Third, and instead are elevating their own interests above the interests of the Company and its shareholders. As such demand upon the Board is futile.

482. The Board may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors and officers liability insurance if they caused the Company to purchase it for their protection with corporate funds. If there is a directors and officers liability insurance policy covering the Board, it may contain a provision that eliminates coverage for any action brought directly by the Company against the Board, known as the "insured-versus-insured exclusion." As a result, if the Board were to sue themselves or certain of the officers of the Company, there would be no directors and officers insurance protection. Accordingly, the Board cannot be expected to bring such a suit. Alternatively, if the suit is brought derivatively, such an insurance policy will provide a basis for the Company to effectuate a recovery.

483. If there is no directors and officers liability insurance, the Board will not instruct Fifth Third to sue the Director Defendants, including themselves, because they would face a large uninsured individual liability if they did. Consequently, demand would also be futile for this additional reason.

484. Based on the foregoing, the Board faces a sufficiently substantial likelihood of liability and, accordingly, there is a reasonable doubt as to each Board member's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest. Additionally, the Board has repeatedly failed to act and has shown its unwillingness to address the unauthorized accounts, and the illegitimate and unethical practices employed by Fifth Third, which indicates

that demand upon the Director Defendants is futile. Accordingly, demand upon the Director Defendants is excused as being futile.

**Inside Seller Defendants Carmichael, Brumback, and Hoover**

485. Defendant Carmichael has served as the Company's President since September 2012, CEO since November 2015 and has served as a member of the "Board since 2015, and as its Chairman since 2018.

486. During the Relevant Period, Defendant Carmichael made the following Company stock sales:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 10/29/2019 | 55,251 | $29.59 | $1,634,877.09 |
| 02/13/2018 | 87,613 | $32.37 | $2,836,032.81 |
| 11/16/2016 | 36,821 | $25.11 | $924,575.31 |
| 11/10/2016 | 17,689 | $23.45 | $414,807.05 |

487. Defendant Brumback has served as a Company director since 2009, served as a member of the Board's Audit Committee from 2010 through 2015 and as the Audit Committee's Chair from 2016 through 2019, presently serves as chairman of the Board's Risk and Compliance Committee, and served as a member of the Board's Regulatory Oversight Committee during its term of existence in 2015 to 2016.

488. During the Relevant Period, Defendant Brumback made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 03/05/2018 | 3,000 | $33.44 | $100,320.00 |

489. Defendant Hoover has served as a Company director since 2009, served as a member of the Board's Audit Committee since 2010, served as a member of the Board's Risk and Compliance Committee since 2010, including as its Chair from 2016 through 2019, and served

as a member of the Board's Regulatory Oversight Committee during its term of existence in 2015 to 2016.

490. During the Relevant Period, Defendant Hoover made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 06/03/2019 | 3,739 | $26.51 | $99,120.89 |
| 02/12/2018 | 3,700 | $32.40 | $119,880.00 |
| 04/28/2017 | 2,000 | $24.82 | $49,640.00 |

491. Defendants Carmichael, Brumback, and Hoover each knew of 2015 CFPB Credit Card Action and Consent Order and 2015 CFPB Auto Lending Enforcement Action and Consent Order because they were members of the Board at the time. Additionally, Defendants Brumback and Hoover were members of the Board's Regulatory Oversight Committee which was created and required by these Consent Orders. Defendant Carmichael was the Company's president and a member of its Board at the time of these actions and Consent Orders.

492. Additionally, Defendants Carmichael, Brumback, and Hoover knew about the Wells Fargo Cross-Selling Scandal [redacted]

493. On November 3, 2016, the CFPB served a Civil Investigative Demand ("CID") addressed to Defendant Carmichael. Between 2017 and 2019, the CFPB issued five additional CIDs to Fifth Third regarding the use of unauthorized accounts and predatory consumer practices at the Company.

494. Each of these events was a red flag.

495. Defendants Carmichael, Brumback, and Hoover sold Company stock on the dates

listed above using the inside information.

496. Additionally, during this time Defendants Carmichael, Brumback, and Hoover failed to inform Plaintiffs and the investing public of the existence and subject matter of each of these CIDs.

497. The conduct of Defendants Carmichael, Brumback, and Hoover was a breach of their fiduciary duties and therefore, they cannot disinterestedly consider a demand, and each faces a substantial likelihood of liability.

**Defendant Akins**

498. Defendant Akins has been a director of the Company since 2013.

499. Defendant Akins had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to its wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

500. Each of these events was a red flag.

501. Additionally, based on his membership on various Company committees as set forth herein, Defendant Akins was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties.

502. In breach of his fiduciary duties, Defendant Akins ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers

from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

503. In further breach of his fiduciary duties, Defendant Akins permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

504. Moreover, Defendant Akins beneficially owns 38,494 shares of the Company's common stock and, in 2019, received $230,000 in compensation.

505. Defendant Akins signed the false and misleading 2015 Form 10-K, 2016 Form 10-K, 2018 Form 10-K, and 2019 Form 10-K.

506. Therefore, Defendant Akins cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**Defendant Bayh**

507. Defendant Bayh has been a director of the Company since 2011.

508. Defendant Bayh had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to the wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

509. Each of these events was a red flag.

510. Additionally, based on his membership on various Company committees as set forth herein, Defendant Bayh was aware or should have been aware of the misconduct alleged

herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties.

511. In breach of his fiduciary duties, Defendant Bayh ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

512. In further breach of his fiduciary duties, Defendant Bayh permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

513. Further, Defendant Bayh cannot disinterestedly consider a demand made as to Defendant Heminger. Defendant Bayh previously served on the board of Marathon Petroleum Corporation and Heminger is CEO and Chair of Marathon Petroleum Corporation.

514. Moreover, Defendant Bayh beneficially owns 23,981 shares of the Company's common stock and, in 2019, received $220,000 in compensation.

515. Defendant Bayh signed the false and misleading 2015 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K.

516. Therefore, Defendant Bayh cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**Defendant Benitez**

517. Defendant Benitez has been a director of the Company since 2015.

518. Defendant Benitez had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the

CFPB was investigating Fifth Third's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to the wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

519. Each of these events was a red flag.

520. Additionally, based on his membership on various Company committees as set forth herein, Defendant Benitez was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties.

521. In breach of his fiduciary duties, Defendant Benitez ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

522. In further breach of his fiduciary duties, Defendant Benitez permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

523. Moreover, Defendant Benitez beneficially owns 26,856 shares of the Company's common stock and, in 2019, received $230,000 in compensation.

524. Defendant Benitez signed the false and misleading 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K.

525. Therefore, Defendant Benitez cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**Defendant Blackburn**

526. Defendant Blackburn has been a director of the Company since 2014.

527. Defendant Blackburn had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to the wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

528. Each of these events was a red flag.

529. Additionally, based on her membership on various Company committees as set forth herein, Defendant Blackburn was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with her fiduciary duties.

530. In breach of her fiduciary duties, Defendant Blackburn ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

531. In further breach of her fiduciary duties, Defendant Blackburn permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

532. Further, Defendant Blackburn's appointment to the Board occurred in 2014 which coincides with a five (5) year contract extension with the Cincinnati Bengals worth $7.9 million.

533. Defendant Blackburn is and has been a party to related party transactions with

the Company. Defendant Blackburn is the Executive Vice President of the Cincinnati Bengals, which the Company also paid $1.8 million for sponsorship arrangements, tickets, and advertising expenses. According to the 2020 Proxy Statement, "[b]y virtue of Ms. Blackburn's being an executive officer and a principal owner of the Cincinnati Bengals, she is deemed to be a related party having a direct material interest in these arrangements." These conflicts of interest preclude Defendant Blackburn from suing the other Director Defendants because of the Cincinnati Bengals' desire and need for these funds.

534. Moreover, Defendant Blackburn beneficially owns 111,734 shares of the Company's common stock and, in 2019, received $220,000 in compensation.

535. Defendant Blackburn signed the false and misleading 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K.

536. Therefore, Defendant Blackburn cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**Defendant Brumback**

537. Defendant Brumback has been a director of the Company since 2009.

538. Defendant Brumback had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to its wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

539. Each of these events was a red flag.

540. Additionally, based on his membership on various Company committees as set forth herein, Defendant Brumback was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties.

541. In breach of his fiduciary duties, Defendant Brumback ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

542. In further breach of his fiduciary duties, Defendant Brumback permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

543. Moreover, Brumback beneficially owns 66,471 shares of the Company's common stock and, in 2019, received $255,000 in compensation.

544. Defendant Brumback's insider sale before the fraud was exposed, which yielded at least $100,320 in proceeds, demonstrates his motive in facilitating and participating in the fraud.

545. Therefore, Defendant Brumback cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**<u>Defendant Daniels</u>**

546. Defendant Daniels has been a director of the Company since 2019.

547. Defendant Daniels had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the

CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to the wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

548. Each of these events was a red flag.

549. Additionally, Defendant Daniels serves on the Board's Risk and Compliance Committee. Previously, Daniels served on the Board's Audit Committee, as such Defendant Daniels was aware or should have been aware of the misconduct alleged herein and failed to effectively remediate the damage caused to the Company.

550. In breach of his fiduciary duties, Defendant Daniels ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

551. In further breach of his fiduciary duties, Defendant Daniels permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period and while he was a member of the Board.

552. Prior to joining the Company's Board, Defendant Daniels served as a director of MB Financial and upon Fifth Third's acquisition of MB Financial, Daniels was appointed to the Board.

553. Defendant Daniels cannot disinterestedly consider a demand made as to Defendants Harvey or Feiger due to their prior relationship at MB Financial. All three (Daniels, Harvey, and Feiger) served at MB Financial prior to the merger with the Company, and all three have been appointed to the Board of Fifth Third as a result.

554. Defendant Daniels is the co-founder and principal of Prairie Capital, a private equity firm, that has done business with MB Financial and Fifth Third.

555. Defendant Daniels beneficially owns 208,324 shares of the Company's common stock and, in 2019, received $176,075 in compensation.

556. Defendant Daniels signed the 2019 Form 10-K that contained false and misleading statements.

557. Therefore, Defendant Daniels cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**Defendant Harvey**

558. Defendant Harvey has been a director of the Company since 2019.

559. Defendant Harvey had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to its wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

560. Each of these events was a red flag.

561. Additionally, Defendant Harvey serves on the Board's Audit Committee and Nominating and Corporate Governance Committee. Previously, Harvey served on the Board's Risk and Compliance Committee. Defendant Harvey was aware or should have been aware of the misconduct alleged herein and failed to effectively remediate the damage caused to the Company.

562. In breach of his fiduciary duties, Defendant Harvey ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

563. In further breach of his fiduciary duties, Defendant Harvey permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period and while he was a member of the Board.

564. Prior to joining the Company's Board, Defendant Harvey served as a chairman of MB Financial and upon Fifth Third's acquisition of MB Financial Harvey was appointed to the Board.

565. Defendant Harvey cannot disinterestedly consider a demand made with regard to Defendants Daniels or Feiger due to their prior relationship at MB Financial. All three (Daniels, Harvey, and Feiger) served at MB Financial prior to the merger with the Company, and all three have been appointed to the Board of Fifth Third as a result.

566. Moreover, Defendant Harvey beneficially owns 188,968 shares of the Company's common stock, and in 2019, received $176,075 in compensation.

567. Defendant Harvey signed the 2019 Form 10-K that contained false and misleading statements.

568. Therefore, Defendant Harvey cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**Defendant Heminger**

569. Defendant Heminger has been a director of the Company since 2006.

570. Defendant Heminger had knowledge of, should have known of, or recklessly

disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to its wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

571. Each of these events was a red flag.

572. Additionally, based on his membership on various Company committees as set forth herein, Defendant Heminger was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties.

573. In breach of his fiduciary duties, Defendant Heminger ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

574. In further breach of his fiduciary duties, Defendant Heminger permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

575. Further, Defendant Heminger cannot disinterestedly consider a demand made as to Defendant Bayh. Defendant Heminger is CEO and Chair of Marathon Petroleum Corporation and Defendant Bayh previously served on Marathon Petroleum Corporation's board.

576. Moreover, Defendant Heminger beneficially owns 76,502 shares of the Company's common stock and, in 2019, Defendant Heminger received $265,000 in

compensation.

577. Defendant Heminger signed the false and misleading 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K.

578. Therefore, Defendant Heminger cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**Defendant Hoover**

579. Defendant Hoover has been a director of the Company since 2009.

580. Defendant Hoover had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to its wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

581. Each of these events was a red flag.

582. Additionally, based on her membership on various Company committees as set forth herein [redacted] Defendant Hoover was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with her fiduciary duties.

583. In breach of her fiduciary duties, Defendant Hoover ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as

alleged herein.

584. In further breach of her fiduciary duties, Defendant Hoover permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

585. Moreover, Defendant Hoover beneficially owns 57,976 shares of the Company's common stock and, in 2019, received $265,000 in compensation.

586. Defendant Hoover signed the false and misleading 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K.

587. Therefore, Defendant Hoover cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**Defendant Mallesch**

588. Defendant Mallesch has been a director of the Company since 2016.

589. Defendant Mallesch had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to the wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

590. Each of these events was a red flag.

591. Additionally, based on her membership on various Company committees as set forth herein, Defendant Mallesch was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the

Company in accordance with her fiduciary duties.

592. In breach of her fiduciary duties, Defendant Mallesch ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

593. In further breach of her fiduciary duties, Defendant Mallesch permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

594. Further, Defendant Mallesch cannot disinterestedly consider a demand made with regard to Defendants Carmichael and Burris. Defendant Mallesch previously served as CFO at General Electric ("GE"), Defendant Burris held numerous management positions with GE for nearly twenty (20) years, and Defendant Carmichael held multiple leadership roles with GE.

595. Moreover, Defendant Mallesch beneficially owns 23,541 shares of the Company's common stock and, in 2019, received $220,000 in compensation.

596. Defendant Mallesch signed the false and misleading 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K.

597. Therefore, Defendant Mallesch cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**<u>Defendant McCallister</u>**

598. Defendant McCallister has been a director of the Company since 2011.

599. Defendant McCallister had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the

CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to the wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

600. Each of these events was a red flag.

601. Additionally, based on his membership on various Company committees as set forth herein, Defendant McCallister was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties.

602. In breach of his fiduciary duties, Defendant McCallister ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

603. In further breach of his fiduciary duties, Defendant McCallister permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

604. Moreover, Defendant McCallister beneficially owns 59,566 shares of the Company's common stock and, in 2019, received $235,000 in compensation.

605. Defendant McCallister signed the false and misleading 2015 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K.

606. Therefore, Defendant McCallister cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**Defendant Williams**

607. Defendant Williams has been a director of the Company since 2008.

608. Defendant Williams had knowledge of, should have known of, or recklessly disregarded the 2015 CFPB Credit Card Action and Consent Order, the 2015 CFPB Auto Lending Enforcement Action and Consent Order, the Wells Fargo Cross-Selling Scandal, and that the CFPB was investigating Fifth Third Bank's sales practices (which investigation commenced on or about November 3, 2016). Additionally, the Company was alerted to the wrongful sales practices years earlier through employee communications whether through its EthicsLine or otherwise.

609. Each of these events was a red flag.

610. Additionally, based on her membership on various Company committees as set forth herein, Defendant Williams was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with her fiduciary duties.

611. In breach of her fiduciary duties, Defendant Williams ignored these red flags, failed to implement and/or otherwise oversee the Company's internal controls to protect its customers from First Third Bank's wrongful conduct, and permitted the false and misleading statements, as alleged herein.

612. In further breach of her fiduciary duties, Defendant Williams permitted or otherwise took no action against the insider sales identified herein and repurchases of Company stock during the Relevant Period.

613. Moreover, Defendant Williams beneficially owns 77,508 shares of the Company's common stock and, in 2019, received $300,000 in compensation.

614. Defendant Williams signed the false and misleading 2015 Form 10-K, 2016 Form

10-K, 2017 Form 10-K, and 2019 Form 10-K.

615. Therefore, Defendant Williams cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

**The Board's Knowledge of Widespread Improper Sales Conduct**

616. *See* paragraphs 346 to 395 above.

## XX. CAUSES OF ACTION

**COUNT I**

**(Against Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act)**

617. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

618. Defendants participated in a scheme to defraud with the purpose and effect of defrauding Fifth Third. Not only is Fifth Third now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Fifth Third by Defendants. With the price of its common stock trading at artificially inflated prices during the Relevant Period due to Defendants' misconduct (including active concealment and the failure to timely disclose the CFPB investigation that prompted the 2020 CFPB Action), Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Fifth Third.

619. During the Relevant Period, Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's periodic reports filed with the SEC while engaging in and/or allowing the conduct described above.

620. Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fifth Third not misleading.

621. Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Fifth Third.

622. Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

623. In addition to each of the Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

624. By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

## (Against the Director Defendants for Breach of Fiduciary Duties)

625. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

626. The Director Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fifth Third's business and affairs.

627. The Director Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

628. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Director Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fifth Third.

629. In breach of their fiduciary duties owed to Fifth Third, the Director Defendants willfully or recklessly engaged in and/or facilitated the Relevant Period Misconduct, and made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Relevant Period Misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the Relevant Period Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Relevant Period Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory

scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) the Company failed to maintain internal controls.

630. As a result of the foregoing, the public statements were materially false and misleading at all relevant times.

631. The Director Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

632. In further breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

633. The Director Defendants also breached their fiduciary duties by causing the Company to waste its corporate assets, repurchasing over 216 million shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while three of them engaged in improper insider sales, netting proceeds of approximately $6.1 million.

634. The Director Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising

insider sales.

635. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

636. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

637. As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Fifth Third has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

638. Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

## COUNT III

**(Against Defendants Tuzun and Forrest (the "Officer Defendants") for Breach of Fiduciary Duty)**

639. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

640. The Officer Defendants owed and owe Fifth Third fiduciary obligations,

including the obligations of good faith, loyalty, and care. Among other things, the Officer Defendants owed and owe a fiduciary duty to Fifth Third to disseminate accurate, truthful, and complete information to the Company's shareholders.

641. The Officer Defendants have a duty to Fifth Third and its shareholders to prudently supervise, manage, and control the operations, business and internal financial accounting, and disclosures of the Company.

642. As alleged herein, the Officer Defendants had and have a fiduciary duty to, among other things, exercise good faith to ensure that the Company's business practices were maintained in good faith and, when put on notice of problems with the Company's business practices and operations by customers, state officials and regulators, and other members of the public, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

643. The Officer Defendants breached their duties of loyalty, care and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with state and federal laws and the Company's internal policies and procedures; (iii) consciously disregarding and failing to ensure that the Company was following proper sales practices, resulting in the commencement of the 2020 CFPB Action and the Securities Class Action; (iv) failing to fully, fairly, and timely disclose the scope and impact of the improper sales practices taught to and used by the Company's employees and managers; (v) failing to timely take corrective action to reduce and/or eliminate the illegal sales practices taught to and used by the Company's employees and managers; (vi) failing to revise the Company's incentive pay structure to reduce the likely hood of employees and managers engaging in unlawful sales practices; (vii) making and/or causing the Company to make false and misleading statements and/or material

omissions resulting in the commencement of the Securities Class Action; (viii) allowing the Company to violate multiple federal and state laws and regulations; (ix) failing to take appropriate remedial action when the Board knew, or should have known, that there was pervasive misconduct at the Company; (x) failing to act in the best interests of the Company and instead acting for their own self-interest; and (xi) consciously causing substantial damage to the Company's credibility, corporate image, and goodwill.

644. The Officer Defendants' actions could not have been a good faith exercise of prudent business judgment.

645. The Officer Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and failed to correct the Company's public statements and representations or, in the alternative, cause the corrections to be issued by another director or officer of Fifth Third. The Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that The Officer Defendants failed to ascertain and to disclose such facts even though such facts were readily available. Such material misrepresentations and omissions were committed knowingly or recklessly.

646. The Officer Defendants had actual or constructive knowledge that the Company was engaging in the practices as set forth herein, and that internal controls and procedures were not adequately maintained and applied.

647. As a direct and proximate result of the Officer Defendants foregoing breaches of his fiduciary duties, the Company has suffered and will continue to suffer significant damages, as alleged herein. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

648. The Officer Defendants' misconduct – through both their actions and conscious inaction – cannot be exculpated.

649. Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

**COUNT IV**

**(Against Defendant Carmichael for Breach of Fiduciary Duty)**

650. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

651. Defendant Carmichael owed and owes Fifth Third fiduciary obligations, including the obligations of good faith, loyalty, and care. Among other things, Defendant Carmichael owed and owes a fiduciary duty to Fifth Third to disseminate accurate, truthful, and complete information to the Company's shareholders.

652. Defendant Carmichael has a duty to Fifth Third and its shareholders to prudently supervise, manage, and control the operations, business and internal financial accounting, and disclosures of the Company.

653. As alleged herein, Defendant Carmichael had and has a fiduciary duty to, among other things, exercise good faith to ensure that the Company's business practices were maintained in good faith and, when put on notice of problems with the Company's business practices and operations by customers, state officials and regulators, and other members of the public, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

654. Defendant Carmichael breached his duties of loyalty, care, and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with state

and federal laws and the Company's internal policies and procedures; (iii) consciously disregarding and failing to ensure that the Company was following proper sales practices, resulting in the commencement of the 2020 CFPB Action and the Securities Class Action; (iv) failing to fully, fairly, and timely disclose the scope and impact of the improper sales practices taught to and used by the Company's employees and managers; (v) failing to timely take corrective action to reduce and/or eliminate the illegal sales practices taught to and used by the Company's employees and managers; (vi) failing to revise the Company's incentive pay structure to reduce the likely hood of employees and managers engaging in unlawful sales practices; (vii) making and/or causing the Company to make false and misleading statements and/or material omissions resulting in the commencement of the Securities Class Action; (viii) allowing the Company to violate multiple federal and state laws and regulations; (ix) failing to take appropriate remedial action when the Board knew, or should have known, that there was pervasive misconduct at the Company; (x) failing to act in the best interests of the Company and instead acting for their own self-interest; and (xi) consciously causing substantial damage to the Company's credibility, corporate image, and goodwill.

655. Defendant Carmichael's actions could not have been a good faith exercise of prudent business judgment.

656. Defendant Carmichael had actual or constructive knowledge that the Company issued materially false and misleading statements, and he failed to correct the Company's public statements and representations or, in the alternative, cause the corrections to be issued by another director or officer of Fifth Third. Defendant Carmichael had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that Defendant Carmichael failed to ascertain and to disclose such facts

even though such facts were readily available. Such material misrepresentations and omissions were committed knowingly or recklessly.

657. Defendant Carmichael had actual or constructive knowledge that the Company was engaging in the practices as set forth herein, and that internal controls and procedures were not adequately maintained and applied.

658. As a direct and proximate result of Defendant Carmichael's foregoing breaches of his fiduciary duties, the Company has suffered and will continue to suffer significant damages, as alleged herein. As a result of the misconduct alleged herein, Defendant Carmichael is liable to the Company.

659. Defendant Carmichael's misconduct – through both his actions and conscious inaction – cannot be exculpated.

660. Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

## COUNT V

**(Against Defendants Carmichael, Brumback, and Hoover for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information)**

661. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

662. At the time of the stock sales set forth above, Defendants Carmichael, Brumback, and Hoover knew or recklessly disregarded the information described in this Complaint regarding the illicit account-creation scheme and sold Fifth Third common stock on the basis of that information.

663. The information described above was proprietary non-public information

concerning the Company's unlawful conduct associated with its cross-selling strategy. The information was a proprietary asset belonging to the Company, which these Defendants used for their own benefit when they sold Fifth Third common stock.

664. Defendants Carmichael, Brumback, and Hoover sales of Fifth Third common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

665. Because the use of the Company's proprietary information for their own gain constitutes a breach of these Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendants Carmichael, Brumback, and Hoover obtained thereby.

## COUNT VI

## (Against the Director Defendants for Unjust Enrichment)

666. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

667. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Director Defendants were unjustly enriched at the expense of, and to the detriment of, Fifth Third.

668. The Director Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Fifth Third that was tied to the performance or artificially inflated valuation of Fifth Third or received compensation that was unjust in light of Defendants' bad faith conduct.

669. Plaintiffs, as shareholders and representatives of Fifth Third, seek restitution from

the Director Defendants and seek an order from this Court disgorging all profits— including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Director Defendants due to their wrongful conduct and breach of their fiduciary duties.

670. Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

**COUNT VII**

**(Against Defendant Carmichael for Unjust Enrichment)**

671. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

672. Through the wrongful course of conduct and actions complained of herein, Defendant Carmichael was unjustly enriched at the expense of, and to the detriment to, Fifth Third. The wrongful conduct was continuous and resulted in ongoing harm to the Company. Defendant Carmichael was unjustly enriched pursuant to receiving compensation and director remuneration.

673. Plaintiffs, as shareholders of Fifth Third, seeks restitution from Defendant Carmichael, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendant Carmichael from his wrongful course of conduct and fiduciary breaches.

674. By reason of the foregoing, Fifth Third has sustained and continues to sustain damages.

675. Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

**COUNT VIII**

**(Against Tuzun and Forrest for Unjust Enrichment**

676. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

677. Through the wrongful course of conduct and actions complained of herein, the Officer Defendants were unjustly enriched at the expense of, and to the detriment to, Fifth Third. The wrongful conduct was continuous and resulted in ongoing harm to the Company. The Officer Defendants were unjustly enriched pursuant to receiving compensation and officer remuneration.

678. Plaintiffs, as shareholders of Fifth Third, seek restitution from the Officer Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Officer Defendants from their wrongful course of conduct and fiduciary breaches.

679. By reason of the foregoing, Fifth Third has sustained and continues to sustain damages.

680. Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

**COUNT IX**

**(Against Defendants for Waste of Corporate Assets)**

681. Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

682. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Fifth Third to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer

trust the Company and its products. In addition, Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

683. As a result of the waste of corporate assets, Defendants are each liable to the Company.

684. Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

**COUNT X**

**(<u>Against Defendants for Violations of Section 14(a) of the Exchange Act</u>)**

685. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants.

686. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that

> [i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

687. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading. [17 C.F.R. §240.14a-9].

688. Under the direction and watch of the Director Defendants, the 2018, 2019 and 2020 Proxy Statements (the "Proxy Statements") failed to disclose and/or misstated, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-

based programs tied to unrealistic sales targets, caused employees to engage in the Relevant Period Misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the Relevant Period Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Relevant Period Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

689. The Director Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including linking incentive awards, that "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder capital is used efficiently to generate competitive returns, and assesse[d] the cost efficiency of the Company's operations[,]"while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein. while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Director Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

690. Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of

Conduct, due to Defendants' failures to abide by them, their insider trading, and their engagement in the Relevant Period Misconduct and the scheme to issue false and misleading statements and omissions of material fact.

691. In the exercise of reasonable care, Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, advisory approval of executive compensation, and ratification of the Company's independent auditor.

692. The false and misleading information contained in the Proxy Statements was material to Fifth Third shareholders in determining whether to elect the Director Defendants. The false and misleading information led to the re-election of Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams during the Relevant Period, which allowed them to continue breaching their fiduciary duties to Fifth Third.

693. The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxy Statements.

694. This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiffs discovered or reasonably could have discovered the facts on which this claim is based.

695. Plaintiffs on behalf of Fifth Third have no adequate remedy at law

## XXI. REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C. Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D. Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiffs, on behalf of Fifth Third, have an effective remedy;

E. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## XXII. DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 29, 2022

Respectfully submitted,

**HEFFNER HURST**

*/s/Matthew Thomas Heffner*____
Matthew Thomas Heffner
Heffner Hurst
30 North Lasalle Street Suite 1210
Chicago, IL 60602
Tel: (312) 346-3466
Mheffner@heffnerhurst.com

***Liaison Counsel for Plaintiffs in the Consolidated Action***

Phillip C Kim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: 212-686-1060
Pkim@rosenlegal.com

Timothy W Brown
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Tbrown@thebrownlawfirm.Net

***Co Lead Counsel for Plaintiffs in the Consolidated Actions***

Jennifer W. Sprengel
Daniel O. Herrera
Kaitlin Naughton
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, Illinois 60606
Telephone: 312-782-4880
Facsimile: 318-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
knaughton@caffertyclobes.com

**GAINEY McKENNA & EGESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue South, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
tjmckenna@gme-law.com
gegleston@gme-law.com

***Counsel for Plaintiff Hansen***

**LYNCH CARPENTER LLP**
Kyle A. Shamberg
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
kyle@lcllp.com

**FARUQI & FARUQI, LLP**
Nina M. Varindani
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
nvarindani@faruqilaw.com

***Attorneys for Plaintiffs Cox and Dill***

# VERIFICATION

I, Stephen Pemberton am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 4/28/2022, 2022.

DocuSigned by:

Stephen Pemberton

88B682360CFC47F...

Stephen Pemberton

# VERIFICATION OF DERIVATIVE COMPLAINT

I, Merrill Dill, hereby verify that I am a shareholder of Fifth Third Bancorp (the "Company"), and am ready, willing, and able to pursue this action. I have reviewed the allegations in this Verified Amended Consolidated Shareholder Derivative Complaint ("Complaint") and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on April 28, 2022.

DocuSigned by:

8B9FD36665B24FB...

____________________________

Merrill Dill

**VERIFICATION OF DERIVATIVE COMPLAINT**

I, William Cox, hereby verify that I am a shareholder of Fifth Third Bancorp (the "Company"), and am ready, willing, and able to pursue this action. I have reviewed the allegations in this Verified Amended Consolidated Shareholder Derivative Complaint ("Complaint") and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on April 28, 2022.

DocuSigned by:
William Cox
AA2B8103D1F8452...

____________________________
William Cox