# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE FIFTH THIRD BANCORP DERIVATIVE LITIGATION | ) ) ) ) ) | No. 20 C 4115<br><br>Judge Sara L. Ellis |

## OPINION AND ORDER

Fifth Third Bancorp ("Fifth Third") shareholders filed this shareholder derivative action against Defendants Fifth Third; Fifth Third board members Nicholas K. Akins, B. Evan Bayh III, Jorge L. Benitez, Katherine B. Blackburn, Emerson L. Brumback, Jerry W. Burris, Greg. D. Carmichael, C. Bryan Daniels, Mitchell S. Feiger, Thomas H. Harvey, Gary R. Heminger, Jewell D. Hoover, Eileen A. Mallesch, Michael B. McCallister, Marsha C. Williams (the "Director Defendants"); and former Fifth Third officers Tayfun Tuzun and Frank Forrest (the "Officer Defendants," and together with the Director Defendants, the "Individual Defendants"). In this action, Plaintiffs seek to remedy wrongdoing allegedly committed by the Individual Defendants from February 26, 2016 through the present (the "relevant time period"). Specifically, Plaintiffs allege that the Individual Defendants breached their fiduciary duties to Fifth Third, were unjustly enriched, wasted corporate assets, and committed violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

On March 30, 2022, the Court dismissed Plaintiffs' consolidated complaint pursuant to Federal Rule of Civil Procedure 23.1 for failure to plead demand futility. Doc. 107. Plaintiffs filed an amended complaint, which Defendants have moved to dismiss for failure to plead demand futility and, pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private

Securities Litigation Reform Act of 1995 (the "PSLRA"), for failure to state a claim.  Because Plaintiffs have again failed to specifically allege the futility of a demand upon the Director Defendants, the Court grants Defendants' motion to dismiss [121] and dismisses this action with prejudice.

## BACKGROUND[1]

### I.     Fifth Third's Cross-Sell Strategy

Fifth Third, headquartered in Cincinnati, provides financial services to corporations, individuals, and non-profits, including an assortment of checking, savings, and money market accounts, wealth management solutions, payments and commerce solutions, insurance services, and credit products such as commercial loans and leases, mortgage loans, credit cards, installment loans, and auto loans.  Fifth Third operates full-service banking centers across Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, and North Carolina.

Between 2010 and at least 2019, Fifth Third employed a cross-sell strategy, encouraging employees to sell additional services and/or products to existing customers to meet aggressive

---

[1] The Court takes the facts in the background section from Plaintiffs' amended complaint and the exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).  Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).  The Court "may also take judicial notice of matters of public record."  *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).  Plaintiffs filed their amended complaint and response under seal and Defendants filed their memorandum in support of the motion to dismiss under seal, also providing redacted versions.  If the Court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential.  Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning.  *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

sales targets, all supported and awarded through various incentive programs.  As part of this strategy, Fifth Third set a goal of providing each customer with at least four products.  To meet these sales targets, management encouraged or pressured employees into using improper sales tactics, such as opening false accounts, also known as gaming.[2]  The success of the cross-sell strategy led to inflated financial results and the impression that Fifth Third was growing organically.

Fifth Third did not have a system to detect or stop unauthorized account activity, instead relying on customer or employee reports of misconduct.  This led to the underreporting of the scope of the problem.  But Fifth Third did engage in monthly testing and reviews of account documentation, with a special investigation group reporting suspicious activities to senior executives.  To the extent Fifth Third reviewed improper activity, it only recorded the conduct as improper if the allegation was escalated above the bank branch, internally investigated, and determined to be substantiated by an investigator.  A senior vice president in March 2015 noted that 568 Fifth Third branches did not escalate or report a single complaint.

## II.    The Individual Defendants

### A.    The Director Defendants

The Director Defendants are current and former members of Fifth Third's Board of Directors.  When this action was filed, the Board consisted of fourteen members, Fifth Third's Chief Executive Officer, Carmichael, and thirteen independent directors: Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Feiger, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams.  Burris resigned from the Board in June 2020.

---

[2] Plaintiffs define gaming as "manipulation or concealment of accounts or activities with intent to deceive either customer or bank for personal gain, including goal attainment, financial gain, retention of position, etc."  Doc. 112-1 ¶ 155.

### 1. Committee Membership

The Director Defendants have all served on various Fifth Third committees. The Audit Committee has oversight responsibilities relating to Fifth Third's accounting and financial reporting processes and the audits of its financial statements. The Audit Committee also monitors Fifth Third's system of internal controls and compliance with applicable legal and regulatory requirements. Akins, Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Hoover, Mallesch, McCallister, and Williams have served on the Audit Committee.

Akins, Blackburn, Brumback, Hoover, and Williams also served on the Regulatory Oversight Committee, which had oversight responsibilities relating to compliance with regulatory findings and supervisory issues between 2015 and December 2016, after which some of its responsibilities moved to the Risk and Compliance Committee. The Risk and Compliance Committee oversees the risk management policies of Fifth Third's global operation and oversight of its global risk management framework. It also oversees Fifth Third's operational, legal, and reputational risks. Bayh, Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Heminger, Hoover, Mallesch, and Williams have served on the Risk and Compliance Committee.

Akins, Brumback, Heminger, Mallesch, McCallister, and Williams served on the Human Capital and Compensation Committee. This committee oversees the development and implementation of Fifth Third's incentive compensation strategy, policies, and programs. Finally, Akins, Bayh, Benitez, Blackburn, Harvey, Heminger, and Williams have served on Fifth Third's Nominating and Corporate Governance Committee. This committee develops, recommends, and performs annual reviews of Fifth Third's corporate governance policies and guidelines. It also identifies and nominates director and committee member candidates.

### 2. Outside Relationships

Several of the Director Defendants have longstanding business and personal relationships with one another and Fifth Third. Harvey, Daniels, and Feiger all have ties to MB Financial Bank, N.A. ("MB Financial"), where Harvey served as Chairman of the Board of Directors, Daniels served as a director, and Feiger served as president and CEO. On May 3, 2019, MB Financial merged with and into Fifth Third Bank, N.A., with Fifth Third Bank, N.A. as the surviving entity. Fifth Third Bank, N.A. is an indirect subsidiary of Fifth Third. Feiger then served as the chairman and CEO of Fifth Third Bank Chicago until he retired from these positions on May 29, 2020. Upon Fifth Third's acquisition of MB Financial, Daniels became a Fifth Third director. Daniels is also the co-founder and principal of Prairie Capital, a private equity firm that has done business with MB Financial and Fifth Third.

Bayh previously served on the board of Marathon Petroleum Corporation, for which Heminger served as the CEO and Board Chair. Mallesch, Burris, and Carmichael have all had management and leadership positions at General Electric in the past, with Mallesch having served as its Chief Financial Officer.

Finally, Blackburn serves as the Executive Vice President of the Cincinnati Bengals. Fifth Third has paid the Bengals $1.8 million for sponsorship arrangements, tickets, and advertising expenses. Around the same time that Blackburn became a director, Fifth Third signed a five-year extension contract with the team, paying a total of $7.9 million to the Bengals. Fifth Third's 2020 Proxy Statement discloses that "[b]y virtue of Ms. Blackburn's being an executive officer and a principal owner of the Cincinnati Bengals, she is deemed to be a related party having a direct material interest in these arrangements." Doc. 111 ¶ 533.

### 3.     Director Compensation and Stock Trades

The Director Defendants receive compensation from Fifth Third for their service as Board members, including stock awards.  Carmichael has served as Fifth Third's President since September 2012, its CEO since November 2015, a director since 2015, and the elected Chairman of the Board since 2018.  At the end of fiscal year 2019, Carmichael received $8,999,237 in compensation from Fifth Third, including $1,100,070 in salary, $4,462,507 in stock awards, $787,498 in option awards, $2,200,000 in non-equity incentive plan compensation, and $449,162 in other compensation.  As of December 31, 2019, Carmichael owned 1,336,633 shares of Fifth Third's common stock.  From 2016 through 2019, Carmichael made the following sales of Fifth Third's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 10/29/2019 | 55,251 | $29.59 | $1,634,877.09 |
| 02/13/2018 | 87,613 | $32.37 | $2,836,032.81 |
| 11/16/2016 | 36,821 | $25.11 | $924,575.31 |
| 11/10/2016 | 17,689 | $23.45 | $414,807.05 |

*Id*. ¶ 53.

Similarly, both Hoover and Brumback sold Fifth Third's common stock during the relevant time period.  Hoover made the following sales of Fifth Third's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 06/03/2019 | 3,739 | $26.51 | $99,120.89 |
| 02/12/2018 | 3,700 | $32.40 | $119,880.00 |
| 04/28/2017 | 2,000 | $24.82 | $49,640.00 |

*Id*. ¶ 86.  Brumback made the following sale of Fifth Third's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 03/05/2018 | 3,000 | $33.44 | $100,320.00 |

*Id*. ¶ 69.

**B.      The Officer Defendants**

As for the Officer Defendants, Tuzun served as Fifth Third's Executive Vice President and Chief Financial Officer ("CFO") from 2013 through November 9, 2020.  As CFO, Tuzun had responsibility for Fifth Third's financial planning and reporting, among other things.  Before becoming CFO, Tuzun served as Fifth Third's treasurer and assistant treasurer, with his responsibilities including Fifth Third's balance sheet, capital and liquidity management, and risk management and compliance.  Forrest currently serves as Fifth Third's executive vice president and special advisor to the CEO.  Prior to assuming this role in January 2020, Forrest served as Fifth Third's chief risk officer.

## III.      Fifth Third's Code of Business Conduct and Ethics

Fifth Third maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which applies to all officers, directors, and employees.  The Code of Conduct states that "[k]eeping the customer at the center of everything we do and delivering a world-class customer experience every time are paramount to our success," and that "every employee plays a part in building and maintaining a strong culture at Fifth Third, a culture in which ethics and compliance are the standard."  *Id*. ¶ 288 (alteration in original).  The Code of Conduct requires all employees to raise any issues when they become aware of misconduct or other violations of the Code.

The Code of Conduct also reiterates Fifth Third's "commit[ment] to providing customers with financial products and services in ways that avoid any practices that could be deemed predatory, unfair, deceptive or abusive."  *Id.* ¶ 292.  In a section entitled "Fair and Honest Business Practices," it specifically provides:

> Unethical business practices are strictly prohibited.  Examples of such activities include, but are not limited to:
>
> • Incentive gaming.

> • Falsifying documents or inflating performance results.
> • Manipulating records.
> • Opening bogus or fake accounts.
> • Opening accounts or selling products without customer
> authorization.
> • Offering customers unnecessary products.
> • Falsifying records or applications in order to benefit yourself or
> other Fifth Third employees.

*Id.* ¶ 291.

The Code of Conduct also provides that those subject to it cannot "buy, sell or recommend the securities (or derivatives in respect thereof) of any issuer (including Fifth Third) for any proprietary, customer, employee, or other account while in possession of material, non-public information (MNPI)," further indicating that Fifth Third has "zero tolerance for internal fraud." *Id.* ¶¶ 294–95. The Code of Conduct requires the reporting of all internal fraudulent activity to Fifth Third's bank protection division when suspected. Further, in a section titled "Maintaining Accurate Records and Accounts," the Code of Conduct provides:

> Business and financial records are critical to Fifth Third Bancorp's
> operations. We rely on the integrity and accuracy of those records
> for both internal decision-making and for the benefit of our
> investors, government agencies, regulators and others to whom we
> report. It is imperative that all records and public communications,
> including, but not limited to, those filed or produced with the
> Securities Exchange Commission, are complete, fair, accurate,
> timely, clear and transparent.

*Id.* ¶ 296.

Fifth Third also has Corporate Governance Guidelines, which it most recently revised in September 2019. The Corporate Governance Guidelines provide in relevant part:

> In addition to monitoring Fifth Third's Chief Executive Officer
> and senior executives, the Board is responsible for the following
> matters, among other things:
>                                    ***
> • enhancing Fifth Third's integrity and reputation by ensuring that
> the corporation establishes, implements and maintains policies,

> practices and procedures for full compliance with all applicable laws and for meeting the high ethical standards that the Board and the public expect of a leading financial institution.

*Id*. ¶ 299.  The Guidelines also state:

> Directors are subject to the provisions of various policies, other than these Guidelines, which have been adopted by the Board of Directors, including, but not limited to, the Code of Business Conduct and Ethics, Director Air Travel Guidelines, the Enterprise Insider Trading and Ethical Investing Policy, the Information Disclosure Policy, the Transactions with Insiders Policy, the Non-Retaliation Policy for Employees who Report Potential Violations, and the Social Media Use Policy.  These policies are approved annually by the Board and available to all Board members in the Diligent Boards portal.

*Id*.

## IV.   Prior Actions Before the Relevant Period at Issue

### A.   The 2015 Consumer Financial Protection Bureau ("CFPB") Credit Card Action

On September 28, 2015, the CFPB issued a press release announcing that it intended to take action against Fifth Third Bank "for violations of the Dodd-Frank Act for deceptive acts or practices" relating to Fifth Third Bank's marketing and sales practices with respect to a credit card add-on product.  *Id*. ¶ 113.  The CFPB found that Fifth Third enrolled bank customers or cardholders in the add-on product without the customer's consent between January 2007 and February 2013.

The CFPB and Fifth Third entered into a Consent Order relating to the 2015 CFPB Credit Card Action.  Fifth Third agreed to pay at least $3 million as redress to damaged consumers and a $500,000 civil penalty.  Additionally, Fifth Third agreed to establish a Board-level Regulatory Oversight Committee that would monitor and coordinate compliance with the Consent Order. The Consent Order also imposed specific requirements upon Fifth Third's Board to ensure compliance with Fifth Third's obligations under the Consent Order.

### B.    The 2015 CFPB Auto Lending Enforcement Action

In the same September 28, 2015 press release, the CFPB announced the 2015 CFPB Auto

Lending Enforcement Action against Fifth Third.  This action resulted from a joint CFPB and

Department of Justice ("DOJ") examination and investigation that began in January 2013 into

Fifth Third's indirect auto-lending program's compliance with the Equal Credit Opportunity

Act's prohibition on discriminating against loan applicants on the basis of characteristics such as

race and national origin.  The CFPB and DOJ found that Fifth Third violated the Equal Credit

Opportunity Act between January 2010 and September 2015 by charging African American and

Hispanic borrowers higher markups for their auto loans than white borrowers.  On September 28,

2015, the CFPB and Fifth Third entered into another Consent Order relating to the 2015 CFPB

Auto Lending Enforcement Action, which required Fifth Third's Regulatory Oversight

Committee to monitor and coordinate compliance with the Consent Order.  Fifth Third also

agreed to pay $18 million to affected consumers.

### C.    Wells Fargo Consent Order

On September 8, 2016, the CFPB filed a Consent Order against Wells Fargo.  In that

order, the CFPB determined that Wells Fargo employees opened unauthorized deposit accounts

that could have been funded by the transfer of funds from existing accounts without the

consumer's knowledge or consent.  The CFPB also found that Wells Fargo employees submitted

unauthorized credit card applications and used email addresses not belonging to consumers to

enroll consumers in online banking services without their knowledge or consent.  The Consent

Order imposed specific requirements on Wells Fargo's Board of Directors, similar to the

obligations imposed on the Fifth Third Board in the 2015 CFPB Credit Card Action, and also

required Wells Fargo to pay civil redress to impacted customers and a $100 million civil

monetary penalty. The CFPB's action against Wells Fargo resulted in congressional investigations and received national attention. For example, CNN published an article with the title "5,300 Wells Fargo employees fired over 2 million phony accounts," reporting that Wells Fargo needed to make changes to its sales practices and internal oversight. *Id*. ¶ 149.

## V.    The CFPB's Investigation into Fifth Third's Sales Practices

About two months after the disclosure of the Wells Fargo Consent Order, on November 3, 2016, the CFPB notified Fifth Third of an investigation into its sales practices, providing Fifth Third with a Civil Investigation Demand ("CID") addressed to Carmichael. The CID indicated that the CFPB had concerns with Fifth Third's practices in, among other things, "opening an account for any product or service offered by the Company without the knowledge and consent of a consumer," "changing, without the consumer's knowledge and consent, the type of account or service in which the consumer is enrolled," and "engaging in unauthorized transactions on behalf of a consumer." *Id*. ¶ 150. The CFPB issued five additional CIDs to Fifth Third concerning the use of unauthorized accounts and predatory consumer practices between 2017 and 2019, all addressed to Carmichael. Fifth Third entered into eight tolling agreements with the CFPB on April 17, 2018; November 6, 2018; June 5, 2019; August 4, 2019; November 27, 2019; December 17, 2019; January 28, 2020; and February 26, 2020.

In response to the requests, Fifth Third provided nearly a half-billion data points, thousands of documents, and extensive testimony to the CFPB. Fifth Third also admitted in 2017 that it had opened unauthorized accounts every year between 2010 and 2017, that it knew that employees opened unauthorized accounts by at least 2010, and that it had detected approximately 1,100 unauthorized accounts opened between 2010 and 2016. After March 2020, Fifth Third conducted a further investigation and identified an additional 800 customers entitled

to relief because of unauthorized accounts opened during that time period.  Fifth Third also admitted to almost 400 instances of abusive practices, including changing the types of accounts or services in which consumers were enrolled without their consent, making false representations about financial products to induce consumers to enroll in those products, using consumers' credit reports without an authorized purpose, and assigning personal identification numbers or falsified contact information to facilitate unauthorized enrollment.  Fifth Third also admitted to having enrolled over 125 consumers in overdraft protection without their consent in 2015 and 2016.

## VI.    The Director Defendants' Knowledge of the Alleged Misconduct

The commencement of the CFPB investigation was the latest in a string of events that should have alerted the Director Defendants to the existence of pervasive issues within Fifth Third's retail banking division.  For example, a June 2010 internal email from Fifth Third's "head of retail banking" stated that the Chicago "leadership team ha[s] a reputation of less than desirable sales management practices" and that "[b]ullying and threats are often used to achieve results."  *Id.* ¶ 152(a).  The email further noted "consistent problems around unauthorized credit card sales in Chicago."  *Id.*  And in a 2011 letter to management, a Fifth Third employee raised concerns about Fifth Third's culture, highlighting unethical behavior with respect to customer accounts and perceived sexual harassment.  In particular, the employee described Fifth Third as "becoming a 'predatory' institution," with customers "hav[ing] 2 or 3 other checking accounts that they didn't even know they had."  *Id.* ¶ 152(b).  The employee further described how "regional and market management" encouraged the sales practices, which employees "openly discussed on . . . conference calls."  *Id.*

Fifth Third's various Board and committee meeting minutes reflect the Director Defendants' knowledge of risks associated with Fifth Third's cross-selling strategy.  Notes from

Audit Committee meetings on March 18, 2013, March 17, 2014, and March 16, 2015, attended by Brumback, Hoover, McCallister, Williams, and sometimes Blackburn, Forrest, and Tuzun, indicate that the committee discussed call volume on the ethics line that alleged some type of account gaming. The March 16, 2015 minutes further highlighted the need to improve oversight and risk management procedures. The minutes for the September 19, 2016 Regulatory Oversight Committee meeting, attended by Bayh, Benitez, Blackburn, Brumback, Carmichael, Forrest, Heminger, Hoover, and Williams, indicate that, in addition to discussing the Wells Fargo Consent Order related to cross-selling, the committee discussed Fifth Third's product sales practices, including that Fifth Third had recently moved away from product specific sales goals. A November 7, 2016 Audit Committee meeting, attended by Brumback, Burris, Carmichael, Forrest, Hoover, Tuzun, and Williams, discussed a proposed audit process for sales practices and Fifth Third's processes for identifying and terminating employees who engaged in improper sales practices. Notes from the February 27, 2017 Risk and Compliance Committee meeting, attended by Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Carmichael, Forrest, Heminger, Hoover, Mallesch, McCallister, Tuzun, and Williams, identified sales practices and conduct risk as top operational risks. At a March 16, 2017 Audit Committee meeting, attended by Blackburn, Brumback, Burris, Hoover, Tuzun, and Williams, the committee discussed the results of the fourth quarter 2016 internal audit, observing that Fifth Third's oversight, prevention, and detection systems needed improvement but that Fifth Third had action plans to address the remaining issues. And at a June 19, 2017 Audit and Risk and Compliance Committee joint meeting, Forrest noted that compliance, operational (including sales practices/conduct), and strategic risk remained "above tolerance," with "Operational Risk's move into moderate tolerance . . . delayed" and subject to further evaluation "in subsequent quarters.'" Doc. 112-1

¶ 154(g). Forrest also noted that "risks relating to Regulatory Inquiries and investigations were increasing due to increased scrutiny of sales practices in the wake of recent industry events." *Id.* ¶ 368. Members in attendance also heard that an elevated number of consumer compliance-related issues continued to exist. That same day, at a Board meeting, attended by Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, McCallister, and Williams, the Board members learned that a strategic review revealed opportunities for enhancement of sales practices controls. Forrest then reported at the September 18, 2017 Audit and Risk and Compliance Committee joint meeting that sales and conduct risk remained "flat," while "inherent Operational risk remained High." *Id.* ¶ 154(h). The Board reviewed sales practices enhancement activities at a December 19, 2017 meeting, with the Audit Committee following up at a March 15, 2018 meeting on ongoing consumer audit results and remediation plans. And at several Board meetings and joint meetings of the Risk and Compliance and Audit Committees between December 2017 and April 2019, attendees discussed the fact that Fifth Third's ethics line's call volume had increased.

## VII. Fifth Third's SEC Filings

### A. Annual Reports

On February 25, 2016, Fifth Third filed its annual report with the SEC for the fiscal year ended December 31, 2015 on a Form 10-K (the "2015 10-K"), which Akins, Bayh, Benitez, Blackburn, Brumback, Carmichael, Heminger, Hoover, McCallister, Tuzun, and Williams signed. The 2015 10-K stated that Fifth Third benefited from cross-sell opportunities generated by synergies formed by its business segments.

The 2015 10-K also highlighted Fifth Third's comprehensive compliance and risk management systems, stating that "Fifth Third focuses on managing regulatory compliance risk

14

in accordance with [its] integrated risk management framework, which ensures consistent processes for identifying, assessing and monitoring, and reporting risks." Doc. 111 ¶ 210. The report also emphasized Fifth Third's internal reporting systems for overseeing compliance concerns and Fifth Third management's commitment to addressing compliance concerns, stating in part that "Fifth Third . . . focuses on reporting and escalation of compliance issues to senior management and the Board." *Id*. ¶ 211. It also noted that "[t]he Management Compliance Committee addresses Fifth Third-wide compliance issues, industry best practices, legislative developments, regulatory concerns, and other leading indicators of compliance risk" and "reports to the Enterprise Risk Management Committee, which reports to Risk and Compliance Committee of the Board of Directors." *Id*. Further, the 2015 10-K generally identified risk factors Fifth Third faced, including that "the CFPB . . . ha[s] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary." *Id*. ¶ 212.

Subsequent Form 10-Ks included statements similar to those in the 2015 10-K. Bayh, Benitez, Blackburn, Brumback, Carmichael, Heminger, Hoover, Mallesch, Tuzun, and Williams signed the 2016, 2017, 2018, and 2019 Form 10-Ks. Akins signed all but the 2017 Form 10-K, and McCallister signed all but the 2016 Form 10-K. Burris, Daniels, and Harvey also signed the 2019 Form 10-K. The 2019 Form 10-K, filed on March 2, 2020, stated that the CFPB had notified Fifth Third Bank that "it intends to file an enforcement action in relation to alleged unauthorized account openings." *Id*. ¶ 239. It further went on to say that "Fifth Third believes that the facts do not warrant an enforcement proceeding and intends to defend itself vigorously if such an action should be filed" and that "[t]he impact of this potential enforcement action has been reflected in our reasonably possible losses." *Id*. ¶ 241 (alteration in original).

15

### B.     Proxy Statements

In Fifth Third's 2017 Proxy Statement, it noted that the 2017 executive compensation plan changed to include the addition of "customer experience [ ] as a funding modifier."  *Id.* ¶ 184.  The statement further explained that "[t]he addition of customer experience to the plan will add specific focus to the cornerstone of our business strategy of 'putting the customer at the center of all we do.'"  *Id.*  The 2017 Proxy Statement also included changes to performance goals to award executives for objectives such as customer growth and the number or type of customer relationships.

On March 6, 2018, Fifth Third filed its 2018 Proxy Statement.  Akins, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams solicited the 2018 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act.  The 2018 Proxy Statement indicated that "[t]he Board of Directors has also adopted the Fifth Third Bancorp Code of Business Conduct and Ethics which applies to our directors; Chief Executive Officer, Chief Financial Officer, and Controller; and our other employees."  *Id.* ¶ 219.  The 2018 Proxy Statement further described Fifth Third's risk management practices, noting that the Board "sets [Fifth Third's] overall risk appetite, including the establishment and monitoring of risk tolerances," while the Risk and Compliance Committee had primary responsibility for risk management oversight and governance.  *Id.* ¶ 221.  It further stated that Fifth Third had "a multi-faceted strategy toward mitigating risk in incentive plans," with transparency in compensation "to ensure that pay facilitates the appropriate strategic and risk awareness behaviors."  *Id.* ¶ 222.  Additionally, the 2018 Proxy Statement noted that executive compensation "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder capital is used efficiently to generate

competitive returns, and assesse[d] the cost efficiency of the Company's operations." *Id.* ¶ 223 (alterations in original).

Similarly, the 2019 Proxy Statement, solicited by Akins, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams, stated that "[d]irectors receive annual ethics training and directors must review and acknowledge the Code of Business Conduct and Ethics." *Id.* ¶ 228 (alteration in original). It included similar language to the 2018 Proxy Statement concerning executive compensation. The 2020 Proxy Statement, solicited by Akins, Benitez, Blackburn, Brumback, Burris, Carmichael, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams, touted Fifth Third's compensation program as supported by certain "best practices" such as a "[r]obust code of business conduct and ethics," as well as the fact that directors received annual ethics training and had to follow Fifth Third's Corporate Governance Guidelines and Code of Conduct. *Id.* ¶ 245.

### C. January 2020 Form 8-K

On January 30, 2020, Fifth Third filed a Current Report on Form 8-K (the "January 2020 Form 8-K"), indicating that Forrest had assumed the role of executive vice president and special advisor for risk management and regulatory matters, a role in which he planned to serve through the end of the year, when he planned to retire. The January 2020 Form 8-K further provided that Fifth Third had promoted James C. Leonard to executive vice president and chief risk officer, Forrest's former role. Fifth Third also issued a press release the same day making similar statements about the transition.

## VIII. CFPB Action against Fifth Third

On March 9, 2020, the CFPB filed a complaint against Fifth Third in the United States District Court for the Northern District of Illinois, *Bureau of Consumer Financial Protection v.*

17

*Fifth Third Bank, N.A.*, No. 20 C 1683 (the "2020 CFPB Action"). The CFPB complaint alleged that Fifth Third violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices, the Truth in Lending Act, and the Truth in Savings Act. The CFPB claimed that Fifth Third used a cross-sell strategy to increase the total number of products and services to existing customers and used an incentive-compensation program that rewarded managers and their subordinate employees for selling new products and services to existing customers. The CFPB also claimed that Fifth Third opened deposit and credit card accounts without customers' knowledge or consent and imposed aggressive sales goals for its employees to enroll consumers in its online banking services.

The CFPB asserted that "despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers." *Id.* ¶ 250. Even Fifth Third's Director of Corporate Investigations and its corporate designee in the 2020 CFPB Action, Darrin Steinmann, acknowledged that Fifth Third Bank did not "have a systematic way of detecting gaming." *Id.* ¶ 169.

After the lawsuit became public, Fifth Third's stock price fell from closing at $18.30 per share on March 9, 2020 to closing at $17.66 per share on March 11, 2020, two trading sessions later. Fifth Third's stock price further declined by $1.76 the following trading session to close at $15.90 per share on March 12, 2020. Between March 2 and March 12, 2020, Fifth Third's stock dropped $8.50 per share, a market capitalization decline of $6 billion.

## IX.    Fifth Third's Response to the CFPB Action

In response to the 2020 CFPB Action, on March 9, 2020, Fifth Third filed a Current Report on Form 8-K (the "March 9, 2020 Form 8-K"), along with an attached press release

entitled "Fifth Third Bancorp Rejects Charges in CFPB's Civil Lawsuit, Points to Its Customer Commitment and Proven Track Record of Aligning Employee Incentives with Customer-Focused Best Practices" (the "March 2020 PR"), a fact sheet (the "March 2020 Fact Sheet"), and a list of frequently asked questions (the "March 2020 FAQ").

The March 9, 2020 Form 8-K stated that "[o]n March 9, 2020, Fifth Third Bancorp issued a press release regarding its litigation with the Consumer Financial Protection Bureau. Fifth Third is also furnishing a fact sheet and answers to frequently asked questions relating to this matter." *Id*. ¶ 253. In both the March 2020 PR and the March 2020 Fact Sheet, Fifth Third rejected the CFPB's allegations. The March 2020 Fact Sheet stated, in part:

> While Fifth Third Bank respects and values the important role that the Consumer Financial Protection Bureau (CFPB) plays in protecting consumers, the allegations in the civil lawsuit brought by the CFPB against Fifth Third are unsubstantiated, based on limited, non-systemic, and remediated events, and reflect misunderstandings of our products, services, and work culture.
>
> When a federal court examines the evidence, we believe it will agree with Fifth Third that the civil suit filed today is unnecessary and unwarranted.

*Id*. ¶ 255. The March 2020 Fact Sheet admitted that Fifth Third identified over a thousand unauthorized accounts opened between 2010 and 2016, but it highlighted that this amounted to only 0.01% of all accounts and that Fifth Third found no evidence of systemic misconduct. Fifth Third further acknowledged that it had received "424 complaints regarding unauthorized accounts" from the same subset of analyzed accounts. *Id*. ¶ 256. The March 2020 Fact Sheet indicated that "[i]ncentives have always been modest" and that Fifth Third's "retail employee compensation structure is designed to deter the opening of unauthorized accounts." *Id*. ¶ 257 (alteration in original). The March 2020 FAQ admitted to "[l]imited instances of employee

misconduct" and stated that "only a small percentage [of compensation] is based on sales

performance." *Id*. ¶ 258 (alterations in original).

Fifteen days after the filing of the 2020 CFPB Action, on March 24, 2020, Fifth Third

filed another Current Report on Form 8-K (the "March 24, 2020 Form 8-K"), which indicated

that Fifth Third had made amendments to its Code of Regulations. Specifically, the March 24,

2020 Form 8-K states:

> Section 17 of Article III of the Regulations was also revised to
> allow indemnification of employees to the fullest extent permitted
> by Ohio law. Lastly, a new Section 18 of Article III was added to
> the Regulations in order to expressly allow, with certain
> exceptions, the advancement of expenses (including attorney's
> fees) to anyone defending an action pursuant to the
> indemnification provisions of the Regulations.

*Id*. ¶ 261. The amended Section 17 of Article III states, in part:

> Indemnification. The Corporation shall indemnify, to the full
> extent permitted or authorized by applicable law, as it may from
> time to time be amended, any person made or threatened to be
> made a party to any threatened, pending, or completed action, suit,
> or proceeding, whether civil, criminal, administrative, or
> investigative, by reason of the fact that he or she is or was a
> director, officer, or employee of the Corporation, or is or was
> serving at the request of the Corporation as a director, trustee,
> officer, or employee of a bank, other corporation, partnership, joint
> venture, trust, or other enterprise.

*Id*. ¶ 262. The newly added Section 18 of Article III states:

> Advancement of Expenses. To the extent permitted by applicable
> law, expenses (including attorneys' fees) incurred by a director
> subject to Section 17 in defending any action, suit or proceeding
> referred to in Section 17 shall be paid by the Corporation as
> incurred, in advance of the final disposition of such action, suit or
> proceeding, upon receipt by the Corporation of an undertaking by
> or on behalf of such director that satisfies the conditions for such
> advancement under Ohio law. To the extent permitted by
> applicable law, liabilities and expenses (including attorneys' fees)
> incurred by any person subject to Section 17 other than a director
> in defending any action, suit or proceeding referred to in Section

> 17 may be paid by the Corporation as incurred, in advance of the
> final disposition of such action, suit or proceeding, if and to the
> extent so determined by the Board of Directors (including pursuant
> to policies adopted from time to time by the Board of Directors),
> subject to compliance by such person with the applicable
> conditions for such advancement under Ohio law and any other
> conditions determined by the Board of Directors.

*Id*. ¶ 263.

On April 14, 2020, Fifth Third filed another Current Report on Form 8-K (the "April 2020 Form 8-K"), which contained a presentation prepared for Fifth Third's 2020 annual shareholder meeting. The presentation made no mention of the 2020 CFPB Action, instead touting Fifth Third's resilient balance sheet, proactive management, and its diversified revenue mix. Similar to the April 2020 Form 8-K, Fifth Third's First Quarter 2020 Earnings Presentation filed with the SEC on April 21, 2020 failed to mention the 2020 CFPB Action or any subsequent lawsuits filed against Fifth Third. But Fifth Third's Quarterly Report on Form 10-Q for the period ending on March 31, 2020 specifically mentioned the 2020 CFPB Action, as well as a securities class action filed against Fifth Third on April 7, 2020.

## X. Stock Repurchases and Damages to Fifth Third

The Director Defendants caused Fifth Third to initiate repurchases of its common stock throughout the relevant time period. In total, Fifth Third spent an aggregate amount of over $5.6 billion to repurchase approximately 216,504,051 shares of its own common stock at artificially inflated prices from March 2016 through the end of February 2020. In total, Plaintiffs calculate that Fifth Third overpaid for repurchases of its own stock by over $2 billion.

## XI. CFPB's Amended Complaint

The CFPB filed an amended complaint on June 16, 2021. In the amended complaint, the CFPB alleges that Fifth Third acknowledged in 2017 that it had opened consumer financial

products without customer authorization from 2010 to 2017, and that Fifth Third and senior management could have implemented unauthorized account identification methods beginning in 2010. But the CFPB claims that Fifth Third chose not to take action then because it determined that greater identification would cause it reputational and financial harm. The CFPB amended complaint identifies Carmichael as the responsible individual for reviewing and overseeing the retail banking business and its sales and practices during the relevant time period. It also highlights that executives who directly reported to Carmichael contemporaneously detailed illicit sales practices, indicating that the practices were "widely known within the organization." *Id.* ¶ 30.

According to the CFPB, its investigation revealed "hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization." *Id.* ¶ 35 (emphasis omitted). Specifically, the amended complaint alleges that since 2010, Fifth Third issued over 218,000 consumer credit cards that have never been activated or used for consumer-initiated transaction, with an additional over 4,000 consumer credit card accounts that were opened, associated with a Fifth Third email address, and did not have any consumer-initiated purchases. Further, according to the CFPB, in over 26,000 instances since 2010, a new Fifth Third deposit account was funded with $100 or less from an existing account and had no activity other than the subsequent transfer of those funds back to the original account. The CFPB also alleges that since 2010, more than 124,000 new deposit accounts were funded with $100 or less and then defunded to a zero balance within ninety days.

According to the CFPB amended complaint, Fifth Third allowed its employees to take credit card applications over the phone, with no indication of the consumer's consent aside from writing "phone application" and the date and time on the signature line of the application. *Id.*

¶ 126.  Fifth Third allegedly continued this practice despite the fact that Fifth Third's head of retail banking advised the head of Fifth Third's consumer bank in 2010 that Fifth Third continued having issues with unauthorized credit card applications and should suspend employees' ability to take applications without a wet signature.  The CFPB also alleges that Fifth Third employees suppressed paper account statements in instances where they had no email address to send an electronic statement.  Because Fifth Third incentivized employees for enrolling customers in online banking services provided that the customer logged into the account at least three times, the CFPB also alleges that Fifth Third employees enrolled over 48,000 accounts in online banking using a Fifth Third email address since 2010.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).  To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Securities fraud claims must also satisfy Rule 9(b)'s particularity requirement, which requires a party to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P.

9(b); *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614–15 (7th Cir. 2011). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Congress further heightened the pleading standards for securities fraud claims when it enacted the PSLRA "[a]s a check against abusive litigation by private parties" in securities fraud suits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires "complaints alleging securities fraud [to] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Cornielsen*, 916 F.3d at 598–99 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The PSLRA also requires "[a]ny complaint alleging a material misstatement or omission [to] 'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.'" *Id.* at 599 (quoting 15 U.S.C. § 78u-4(b)(1)). On motion by a defendant, the Court must dismiss a complaint that does not meet these requirements. 15 U.S.C. § 78u-4(b)(3)(A).

Shareholder derivative actions must also satisfy Rule 23.1(b)(3), which requires a complaint to state with particularity "any effort by the plaintiff to obtain the desired action from the directors" and, if applicable, "the reasons for not obtaining the action or not making effort." Fed. R. Civ. P. 23.1; *In re Abbott Lab'ys Derivative S'holders Litig.*, 325 F.3d 795, 803–04 (7th Cir. 2003) ("Rule 23.1 requires the plaintiff 'to allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort.'" (citation omitted)).

## ANALYSIS

Defendants seek to dismiss Plaintiffs' amended complaint pursuant to Rules 23.1 and 12(b)(6), arguing that Plaintiffs have again failed to sufficiently assert demand futility under Ohio law or otherwise state a claim. Because Defendants' demand futility argument is dispositive, the Court limits its analysis to that argument.

The Court looks to the substantive law of Fifth Third's state of incorporation, Ohio, in addressing demand futility. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108–09 (1991). Plaintiffs do not allege that they made a demand on the Director Defendants and so they must instead allege why making such a demand would be futile. *See In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 617 (6th Cir. 2008) ("Ohio recognizes an exception to the general demand rule, which permits a shareholder to proceed with an independent suit without making a demand when the shareholder can demonstrate that the demand would have been futile."); *Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d 664, 670 (S.D. Ohio 2003) ("Under Ohio Rule 23.1, a complaining shareholder must (1) spell out the efforts made to have the directors or other shareholders take the action demanded; (2) explain why he failed in this effort or did not make it; and (3) show that he fairly and adequately represents the interests of other similarly situated shareholders.").

Under Ohio law, "[t]he board of directors has the primary authority to file a lawsuit on behalf of the corporation." *Drage v. Procter & Gamble*, 694 N.E.2d 479, 482 (Ohio Ct. App. 1997). Ohio law presumes "that any action taken by a director on behalf of the corporation is taken in good faith and for the benefit of the corporation." *Id.* While "[t]he shareholders may make a demand on the directors to bring a suit on behalf of the corporation, . . . no shareholder has an independent right to bring suit unless the board refuses to do so *and* that refusal is

wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the part of the directors." *Id*.

Plaintiffs carry the burden of showing futility and must plead with particularity that "a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Caston v. Hoaglin*, No. 2:08-cv-200, 2009 WL 3078214, at *7 (S.D. Ohio Sept. 23, 2009) (citation omitted); *Davis*, 259 F. Supp. 2d at 670 ("Futility means that the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed."). The standard to establish demand futility is difficult and "not just a procedural technicality." *Monday v. Meyer*, No. 1:10 CV 1838, 2011 WL 5974664, at *4 (N.D. Ohio Nov. 29, 2011).

The Court considers demand futility with respect to the Board as it existed at the time of the initial filing of the complaint. *McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001); *Drage*, 694 N.E.2d at 483. Thus, Plaintiffs must set forth particularized facts establishing that at least eight of the fourteen Fifth Third Board members on July 13, 2020 were not disinterested and thus could not have fairly considered a demand.[3] *See In re Cardinal Health, Inc. Derivative Litig.*, 518 F. Supp. 3d 1046, 1064 (S.D. Ohio 2021) (pleading demand futility requires particularized facts "creating a reasonable doubt that a majority of the board of directors is capable of making a disinterested and independent decision about whether to initiate litigation"). Plaintiffs argue that they have met this requirement by pleading that the Director Defendants were not independent and that they all face a substantial likelihood of personal liability on Plaintiffs' claims. The Court addresses these arguments in turn.

---

[3] Because Burris had resigned from Fifth Third's Board at the time one of the Plaintiffs, Stephen Pemberton, initiated this lawsuit on July 13, 2020, the Court's references to the Director Defendants going forward in this Opinion do not include Burris.

I.      **The Directors' Independence**

The Court first addresses Defendants' argument that Plaintiffs' amended complaint does not create the required reasonable doubt as to the Director Defendants' independence to excuse demand futility.  The amended complaint includes identical allegations to that of the consolidated complaint concerning the Director Defendants' independence, focusing on Harvey, Daniels, and Feiger's personal relationships with each other, Blackburn's affiliation with the Bengals, and the amendment of the Code of Regulations.[4]  The Court previously rejected each of these bases for finding the Director Defendants' independence compromised.  Doc. 107 at 21–24.  Specifically, the Court first concluded that "'[n]othing about the relationship between [Harvey, Daniels, and Feiger], as alleged by Plaintiffs, so much as hints at an inference that [they] would sacrifice [their] personal reputation for the sake of [their] relationship' with each other."[5]  *Id.* at 22–23 (quoting *In re Keithley Instruments, Inc., Derivative Litig.*, 599 F. Supp. 2d 875, 893 (N.D. Ohio 2008) ("The only fact set forth in the Complaint regarding the relationship between Reddy and Keithley is that both serve on the board of directors at another unaffiliated company.  In all likelihood, such an allegation—that two individuals on a board also serve together on another board—could be levied against hundreds, if not thousands, of public company directors."))  The Court also found that Plaintiffs had not alleged particularized facts to

---

[4] As with their response to the motion to dismiss the consolidated complaint, Plaintiffs do not address Defendants' arguments concerning the existence of a directors' and officers' insurance policy and so the Court understands that they do not pursue the policy's existence as a basis for excusing demand futility. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (a party waives an argument "by not responding to alleged deficiencies in a motion to dismiss").

[5] Like in the consolidated complaint, the amended complaint also alleges that Bayh and Heminger have a relationship outside of Fifth Third and that Carmichael and Mallesch previously held management and leadership positions at General Electric.  Plaintiffs again do not focus on these relationships and so, for the same reasons as discussed with respect to Harvey, Daniels, and Feiger, the Court again would not find that these outside relationships sufficiently compromised Bayh, Heminger, Carmichael, and Mallesch's independence so as to make demand futile.

suggest that Blackburn's ties to the Bengals compromised her independent discretion and, even were her ties sufficient to call into question her independence, that would not get Plaintiffs far enough in establishing demand futility on the Director Defendants as she is only one of fourteen directors. *Id.* at 23. Finally, the Court agreed with Defendants that the amendments to the Code of Regulations did not create any new rights for the Director Defendants but instead codified Fifth Third's existing obligations under Ohio law. *Id.* at 24.

In amending their complaint, Plaintiffs did not add any additional allegations concerning the Director Defendants' alleged lack of independence, instead resting on the same allegations the Court previously rejected as insufficient. And in their response to the motion to dismiss, Plaintiffs do not even acknowledge the Court's prior ruling and instead make the same arguments the Court already rejected.[6] The Court does not find any reason to deviate from its prior conclusions about Plaintiffs' allegations concerning the Director Defendants' independence and so again finds that Plaintiffs cannot show demand futility on this basis. *Id.* at 21–24.

## II. Substantial Likelihood of Liability

Plaintiffs alternatively may establish demand futility through allegations that suggest that the Director Defendants face a substantial likelihood of personal liability on the asserted claims. *In re Keithley*, 599 F. Supp. 2d at 895 ("The demand futility issue thus turns entirely on whether the allegations in the Complaint sufficiently establish a substantial likelihood of liability as to [the majority of the] directors"). The Court thus must examine whether a majority of the

---

[6] More egregiously, in language that recurs throughout Plaintiffs' response, with respect to the amendment of the Code of Regulations, Plaintiffs merely "reallege and incorporate by reference herein arguments . . . as found in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Verified Shareholder Derivative Consolidated Complaint." Doc. 130 at 27. Although this may be an attempt to preserve their arguments for appellate review, this practice suggests an unwillingness to acknowledge and grapple with the analysis conducted by the Court in ruling on the same issues in the March 30, 2022 Opinion.

Director Defendants face a substantial likelihood of personal liability for their alleged wrongdoing on each of Plaintiffs' claims.[7]

### A.        Breach of Fiduciary Duty Based on Failure of Oversight Claim

Directors of an Ohio corporation face personal liability if clear and convincing evidence shows that they "acted with reckless disregard for the corporation's best interest, or with deliberate intent to cause injury to the corporation." *In re Cardinal Health*, 518 F. Supp. 3d at 1065 (citing Ohio Rev. Code Ann. § 1701.59(E)). Directors "have a duty to exercise oversight and to monitor the corporation's operational viability, legal compliance, and financial performance" under Ohio law. *Emps. Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-cv-04813, 2021 WL 1890490, at *20 (S.D. Ohio May 11, 2021) (citing *Marchand v. Barnhill*, 212 A.3d 805, 809 (Del. 2019)). "In cases like this one, directors face liability when they ignore 'red flags' that put them on notice of possible misconduct, and they recklessly fail to investigate and take affirmative action to protect the interests of the company." *Id.*; *see also Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, CA. No. 1091-VCL, 2007 WL 2982247, at *7 (Del. Ch. Oct. 9, 2007) (in a failure of oversight case involving a board of directors, liability hinges on whether the directors "ignore 'red flags' that actually come to their attention, warning of compliance problems").[8] Such "red flags" are "facts showing that the board ever was aware that [the corporation's] internal controls were inadequate." *King ex rel. Cephalon Inc. v. Baldino*, 409 F.

---

[7] Although Defendants first argue that the Court should dismiss the amended complaint because Plaintiffs have engaged in group pleading, failing to allege specific facts about each of the Director Defendants, as it did in considering the consolidated complaint, the Court finds it more appropriate to consider whether Plaintiffs have sufficiently pleaded a substantial likelihood of liability on any of their claims.

[8] "Ohio courts routinely look to Delaware case law for guidance in deciding corporate law issues generally, and demand futility issues specifically." *In re Cardinal Health*, 518 F. Supp. 3d at 1064 n.7 (quoting *In re Keithley*, 599 F. Supp. 2d at 888 n.10).

App'x 535, 538 (3d Cir. 2010) (alteration in original) (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

As they did in their consolidated complaint, Plaintiffs assert that the Director Defendants conducted little, if any, oversight over Fifth Third's cross-selling practices and thus consciously disregarded their duties to monitor these areas of operation. Plaintiffs also assert that the Director Defendants knew of red flags regarding the risk associated with Fifth Third's improper cross-selling strategy, pointing specifically to the CFPB's 2015 Auto-Lending and Credit Card Actions, Board and committee meeting minutes, internal complaints, and the Wells Fargo Consent Order.

"[T]he alleged red flags must involve or relate to conduct sufficiently similar to the alleged wrongful conduct [concerning cross-selling practices] to alert a reasonable director or officer to potential misconduct [involving cross-selling]." *In re Cap. One Derivative S'holder Litig.*, 952 F. Supp. 2d 770, 786 (E.D. Va. 2013). The CFPB 2015 Auto-Lending and Credit Card Actions and the ensuing Consent Orders had nothing to do with the cross-selling practices at issue in this lawsuit and thus cannot serve as red flags regarding the risks associated with Fifth Third's cross-selling strategy. *See id.* at 787 (consent order concerning account closing processes did not serve as red flag for call center misconduct where the conduct implicated in the consent order was "significantly different from the alleged misconduct at the call centers"); *In re Dow Chem. Co. Derivative Litig.*, No. CIV.A. 4349-CC, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010) ("Plaintiffs argue that because bribery may have occurred in the past (Dow paid a fine to the SEC in January 2007), by different members of management, in a different country (India), and for a different transaction (pesticide registrations), the board should have suspected similar conduct by different members of management, in a different country, in an unrelated

transaction. This argument is simply too attenuated to support a [failure of oversight] claim." (footnote omitted)). But even treating the Consent Orders as red flags, because Fifth Third established a Board-level Regulatory Oversight Committee that monitored and coordinated compliance, the Director Defendants "would be reasonable in concluding that [Fifth Third] cured the earlier flagged deficiencies when it entered into the [Consent Orders]." *In re Abbott Depakote S'holder Derivative Litig.*, 909 F. Supp. 2d 984, 996 (N.D. Ill. 2012) (board could rely on Abbott's entry into a corporate integrity agreement agreeing to reform its sales and marketing practices "to believe that Abbott did indeed reform its sales and marketing practices after 2003"); *see also Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, No. 10872-VCMR, 2016 WL 4076369, at *12 (Del. Ch. Aug. 1, 2016) ("In this case, even if the alleged red flags actually constituted evidence of misconduct at Qualcomm, it is unreasonable to infer that the Board consciously disregarded its fiduciary duties in response to those red flags. The Complaint concedes that the Board continuously monitored each of the three alleged red flags as well as the NDRC Decision."), *aff'd*, 158 A.3d 449 (Del. 2017).

Plaintiffs' allegations concerning knowledge of the Wells Fargo Consent Order also do not suggest that the Director Defendants recklessly failed to investigate or take affirmative action to protect Fifth Third's interests. Misconduct at other companies does not serve as a red flag concerning the same or similar misconduct at Fifth Third. *See Okla. Firefighters Pension & Ret. Sys. v. Corbat*, No. CV 12151, 2017 WL 6452240, at *22 (Del. Ch. Dec. 18, 2017) ("But directors' failure to act in the face of warnings about misconduct at other businesses does not imply bad faith with respect to the entity to which the directors owe fiduciary duties."). Nor does the fact that the CFPB's director indicated that the Wells Fargo Consent Order "should serve notice to the entire industry." Doc. 111 ¶ 147; *see In re Cap. One*, 952 F. Supp. 2d at 787

31

("[P]laintiffs allege that defendants should have been alerted by regulatory agencies' public statements that these agencies intended to begin more rigorous enforcement of consumer protection laws related to the sales of credit card add-on products. Yet, the mere fact that the agencies were increasing enforcement in no way suggests or indicates that wrongful conduct was occurring at the call centers. To serve as a red flag, there must be some link between the alleged red flag and an actual problem within the company, and there is no such link between the agency statements about more vigorous enforcement of the consumer protection laws and the alleged call center misconduct.").

Moreover, the amended complaint undermines the contention that the Director Defendants ignored the increased focus on regulation of sales practices evidenced by the Wells Fargo Consent Order or otherwise acted in bad faith with respect to the cross-selling misconduct at issue. For example, the amended complaint highlights Audit Committee notes that, in November 2016, Fifth Third engaged an outside party to perform an assessment of Fifth Third's "sales practices against regulatory and industry expectations." Doc. 112-1 ¶ 359. And subsequent meeting minutes indicate that the Director Defendants received updates on the outside assessment and steps Fifth Third had taken to improve areas of concern. *See, e.g.*, *id.* ¶¶ 372, 375 (reporting on recommendations from the assessment and the fact that "a cross-functional team had been managing the ongoing progress of each enhancement"). Similarly, the September 19, 2016 Regulatory Oversight Committee meeting minutes reflect discussion of Fifth Third's product sales practices and additional measures that Fifth Third had recently implemented in light of the Wells Fargo cross-selling scandal, including moving away from product specific sales goals that allegedly encouraged cross-selling. *See id.* ¶ 154 (additionally highlighting March 18, 2013, March 17, 2014, and March 16, 2015 Audit Committee meetings

32

that discussed certain actions taken by management to address call volume that alleged account gaming). Plaintiffs argue that these meeting minutes are too vague to suggest that Fifth Third actually took any action to address the underlying issues leading to account gaming, particularly given that the issue persisted for years. But "showing that a board took insufficient remedial action—or remedial action that, in hindsight, could have been better or more robust—is not the standard." *In re Chemed Corp., S'holder Derivative Litig.*, No. CV 13-1854-LPS-CJB, 2019 WL 3215852, at *24 (D. Del. Feb. 26, 2019). In other words, Plaintiffs' criticism of the Director Defendants for not taking strong enough action to end the problematic cross-selling practices does not serve as a basis for a finding of bad faith. *See Corbat*, 2017 WL 6452240, at *17 ("[I]t is not enough to say that the board's response was ineffective. 'Plaintiffs here simply seek to second-guess the . . . manner of the board's response to the red flags, which fails to state a *Caremark* claim.'" (second alteration in original) (quoting *In re Qualcomm Inc. FCPA S'holder Derivative Litig.*, 2017 WL 2608723, at *4 (Del. Ch. June 16, 2017))); *Reiter v. Fairbank*, No. CV 11693-CB, 2016 WL 6081823, at *13 (Del. Ch. Oct. 18, 2016) ("[T]he same reports that described the Company's heightened compliance risk simultaneously explained to the directors in considerable detail on a regular basis the initiatives management was taking to address those problems and to ameliorate the AML compliance risk. Thus the factual context here is fundamentally inconsistent with the inference plaintiff asks the Court to draw—that the directors must have known they were breaching their fiduciary duties by tolerating a climate in which the Company was operating part of its business in defiance of the law."); *cf. Marchand*, 212 A.3d at 822 ("When a plaintiff can plead an inference that a board has undertaken no efforts to make sure it is informed of a compliance issue intrinsically critical to the company's business operation, then that supports an inference that the board has not made the good faith effort that

*Caremark* requires."); *Inter-Mktg. Grp. USA, Inc. v. Armstrong*, C.A. No. 2017-0030, 2020 WL 756965, at *14 (Del. Ch. Jan. 31, 2020) ("[B]ecause Armstrong clearly stated that pipeline integrity was 'not discussed at the board level,' Plaintiff reasonably infers that . . . the board-level reports did not actually address pipeline integrity.").

Therefore, even taking all the alleged red flags together, the Court cannot conclude that Plaintiffs have sufficiently alleged that the majority of the Director Defendants face a substantial likelihood of personal liability on the failure of oversight claim.[9]  *See Marchand*, 212 A.3d at 823–24 ("In decisions dismissing *Caremark* claims, the plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors, or consultants."); *Stone*, 911 A.2d at 372–73 ("[A report's] findings reflect that the Board received and approved relevant policies and procedures,

---

[9] Plaintiffs' newfound reliance on *Shaev v. Baker*, No. 16-CV-05541, 2017 WL 1735573 (N.D. Cal. May 4, 2017), is not persuasive despite the fact that both cases involve allegations of cross-selling misconduct. In *Shaev*, the Wells Fargo board had received letters from a regulator that specifically identified Wells Fargo's "lack of an appropriate control or oversight structure given corporate emphasis on product sales and cross-selling" and its "lack of a formalized governance process to oversee sales practices."  *Id.* at *12  A Wells Fargo board member also testified that the board received reports of the opening of fraudulent accounts, and a former employee directly advised the board of the improper cross-selling practices.  *Id.* at *10–11.  Despite these and other red flags, the complaint alleged that, aside from including a new entry code in ethics complaint forms for cross-selling, *id.* at *15, the board did not take any action to address the cross-selling issues, in part because of the importance of cross-selling to Wells Fargo's business model, and thus "consciously disregarded their fiduciary duties"  *Id.* at *13, 15.  Here, however, Plaintiffs have not marshalled the same type of allegations, with the amended complaint instead suggesting that Fifth Third and the Board responded to reports of wrongdoing, complied with the CFPB's investigative demands, refined their compliance procedures, and oversaw steps management took to address areas of concern.  While Plaintiffs have identified a potentially flawed and inadequate response to the cross-selling problems at Fifth Third, their allegations do not suggest a conscious disregard for the Board's duties similar to that found in *Shaev*.  *See Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."); *Corbat*, 2017 WL 6452240, at *17, 23 (finding demand futility was not excused where the board took action in response to reports of wrongdoing, explaining that "a board's efforts can be ineffective, its actions obtuse, its results harmful to the corporate weal, without implicating bad faith" and that instead "[b]ad faith may be inferred where the directors knew or should have known that illegal conduct was taking place, yet 'took *no steps* in a good faith effort to prevent or remedy that situation'" (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996))).

delegated to certain employees and departments the responsibility for filing SARs and monitoring compliance, and exercised oversight by relying on periodic reports from them. Although there ultimately may have been failures by employees to report deficiencies to the Board, there is no basis for an oversight claim seeking to hold the directors personally liable for such failures by the employees.").

### B. Breach of Fiduciary Duty Based on False and Misleading Statements

Plaintiffs contend that the Director Defendants deliberately misled their shareholders in violation of their fiduciary duties by representing that Fifth Third's cross-selling strategy and success resulted from legitimate sales practices, not false, illegally generated cross-sell numbers. Defendants argue that Plaintiffs have again failed to plead particularized allegations sufficient to show that the Director Defendants face a substantial likelihood of personal liability for a breach of the fiduciary duty of disclosure based on the dissemination of allegedly false and misleading statements.[10]

As with the consolidated complaint, Plaintiffs again assert no specific allegations that, individually, the Director Defendants had direct involvement in the preparation of Fifth Third's filings apart from affixing their signatures. *See Monday*, 2011 WL 5974664, at *6 (plaintiffs failed to allege sufficient facts to show how and when defendants participated in the purported misleading statements). Indeed, "[e]ven the fact that [the Director] Defendants signed and approved [Fifth Third's] annual reports does not mean that they had actual knowledge of the [ ] errors contained within the reports." *Ferro Corp.*, 511 F.3d at 621. And, as the Court previously discussed, Plaintiffs have not sufficiently alleged red flags that would have put the Director

---

[10] Defendants question whether Ohio law even recognizes a claim for breach of fiduciary duty of disclosure outside of the context of matters requiring shareholder action, while Plaintiffs argue to the contrary. The Court again finds that it need not decide this issue to resolve Defendants' motion to dismiss.

Defendants on notice of the allegedly false and misleading statements. Thus, the Court again finds that Plaintiffs have not adequately pleaded that the Director Defendants face a substantial likelihood of personal liability for the dissemination of false and misleading statements. *See Drage*, 694 N.E.2d at 486 ("[A]llegations in appellant's amended complaint of the nondefendant directors' acquiescence, even if true, do not state with particularity a reason that demand upon the nondefendant directors would be futile.").

### C.     Breach of Fiduciary Duty Based on Insider Trading Claim

A breach of fiduciary duty claim based on insider trading requires allegations sufficient to support a reasonable inference that "(1) the corporate fiduciary possessed material, nonpublic company information; and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *In re Gas Nat., Inc.*, No. 1:13 CV 02805, 2015 WL 3557207, at *21 (N.D. Ohio June 4, 2015). The Court previously found that Plaintiffs had not sufficiently alleged demand futility on this claim because they only contended that three of the Director Defendants (Brumback, Carmichael, and Hoover) had knowledge of material, non-public information and made stock trades based on that information. Doc. 107 at 30. Plaintiffs make no additional allegations or arguments in their amended complaint or response to the motion to dismiss, and so the Court adopts its prior analysis that Plaintiffs cannot allege demand futility as to this claim. *See id.*; *In re Goodyear Tire & Rubber Co. Derivative Litig.*, No. 5:03CV2180, 2007 WL 43557, at *6 (N.D. Ohio Jan. 5, 2007) ("Only Gibara is alleged to have engaged in insider trading. Because a majority of the directors are not alleged to have engaged in insider trading, the Court finds that the plaintiffs' insider trading allegations do not raise a reasonable doubt that the Board is incapable of being impartial in considering a demand.").

### D.    Breach of Fiduciary Duty Based on Corporate Waste

Under Ohio law, corporate waste constitutes one form of demonstrating breach of fiduciary duty and does not amount to a separate cause of action. *See In re Keithley*, 599 F. Supp. 2d at 903 ("[U]nder Ohio law, corporate waste and gross mismanagement are ways in which fiduciary duty can be breached, not separate causes of action independent of a fiduciary breach."). Thus, in order to show demand futility for breach of fiduciary duty based on corporate waste, Plaintiffs must allege that the Director Defendants undertook their actions concerning the repurchase of Fifth Third's stocks and the payment of legal fees "'with deliberate intent to cause injury to the corporation' or 'with reckless disregard for the best interests of the corporation'— and then only if that misconduct is proved by 'clear and convincing evidence.'" *Stanley v. Arnold*, No. 1:12-cv-482, 2012 WL 5269147, at *5 (S.D. Ohio Oct. 23, 2012) (citing Ohio Rev. Code Ann. § 1701.59(E)). In considering the consolidated complaint, the Court found that Plaintiffs had not sufficiently alleged demand futility with respect to the corporate waste claim because the consolidated complaint lacked specific allegations suggesting that the Director Defendants acted with reckless disregard for Fifth Third's best interests. Doc. 107 at 31–32. Plaintiffs make no additional allegations or arguments in their amended complaint or response to the motion to dismiss, and so the Court adopts its prior analysis that Plaintiffs cannot allege demand futility as to their claim for breach of fiduciary duty based on corporate waste. *Id.*

### E.    Unjust Enrichment Claim

Under Ohio law, a claim for unjust enrichment must allege: (1) a benefit conferred upon the Director Defendants; (2) the Director Defendants' knowledge of said benefit; and (3) "retention of the benefit by [the Director Defendants] under circumstances where it would be inequitable for [the Director Defendants] to do so without compensation." *In re Gas Nat., Inc*,

37

2015 WL 3557207, at *19.  The Court found that the consolidated complaint's allegations of unjust enrichment fell short because Plaintiffs did not tie the Director Defendants' compensation to harm suffered by Fifth Third or the shareholders, or otherwise suggest why the compensation was improper or excessive.  Doc. 107 at 32–33.  Plaintiffs have not added any allegations to the amended complaint that would overcome this conclusion, and so the Court again finds that Plaintiffs fall short of pleading facts that would suggest that the Director Defendants "intended to harm or acted with conscious disregard when determining executive compensation" so as to establish demand futility on this claim.  *Monday*, 2011 WL 5974664, at *7; *see also In re Gas Nat., Inc.*, 2015 WL 3557207, at *20 ("Plaintiffs' bare assertion that they have stated a valid claim for unjust enrichment because it would be unconscionable to allow [the Individual Defendants] to retain the compensation they received while knowingly breaching their fiduciary duties to Gas Natural and causing the Company to incur severe damages falls short of stating a cognizable claim of unjust enrichment." (alteration in original) (internal quotation marks omitted)).

### F.      Section 10(b) Claim

Next, Defendants argue that Plaintiffs fail to set forth particularized facts showing that the Director Defendants face a substantial likelihood of personal liability on the Section 10(b) claim.  Section 10(b) and SEC Rule 10b-5 "prohibit fraudulent or misleading statements of material fact in connection with the purchase or sale of a security."  *Walleye Trading LLC v. AbbVie Inc.*, 962 F.3d 975, 977 (7th Cir. 2020).  Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of" the SEC's rules and regulations.  15 U.S.C. § 78j(b).  Relevant here, Rule 10b-5 implements Section 10(b) by making it unlawful to "make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

To state a claim under Section 10(b) and Rule 10b-5(b), Plaintiffs must allege that "(1) [the Director Defendants] made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which [Plaintiffs] justifiably relied (6) and that the false statement proximately caused [Plaintiffs'] damages." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 896 (N.D. Ill. 2020) (citations omitted). In considering the consolidated complaint, the Court concluded that Plaintiffs had not adequately pleaded scienter. Doc. 107 at 34–38. Because Defendants' scienter argument is again dispositive, the Court only addresses that argument.

To meet the scienter requirement, Plaintiffs must allege with particularity facts giving rise to a strong inference that each Director Defendant acted with the required state of mind, which is "'an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.'" *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "*each* act or omission alleged to violate this chapter." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). To meet this "strong inference" standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiffs must allege facts showing that each of the Director Defendants "had the requisite scienter at the time that they made each allegedly

39

fraudulent statement." *In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533, at *6 (N.D. Ill. Feb. 23, 2007); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 692–95, 697–98 (7th Cir. 2008) (where the plaintiffs alleged that both a corporate defendant and its executive officers violated Section 10(b), addressing separately whether the plaintiffs had adequately pleaded scienter for the individual officers and the corporate defendant).

Plaintiffs repeat their argument that the amended complaint gives rise to a strong inference that the Director Defendants knew of the risks involved in the unauthorized conduct related to cross-selling. Plaintiffs again urge the Court to infer scienter based on a "core operations" theory, in other words, because of the significance of the consumer business operation to Fifth Third's overall operations. *See W. Palm Beach Firefighters Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 661 (N.D. Ill. 2020) ("Scienter can be inferred when executives make statements about core or critical aspects of their own companies."), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022). This doctrine "typically applies only where the operation in question constitute[s] nearly all of a company's business." *Das v. Rio Tinto plc*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (alteration in original) (citation omitted). Defendants dispute that the consumer business operation qualifies as a core operation. But even assuming that it does, Plaintiffs do not provide any reason for the Court to diverge from its prior conclusion that the core operations theory does not support a strong inference of scienter here because "it does not necessarily follow that [the Director Defendants] disbelieved their statements or sought to deceive [shareholders] with their statements." Doc. 107 at 35 (quoting *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 CV 1713, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018)).

Plaintiffs also focus on the same red flags the Court previously found insufficient when considering the consolidated complaint.  *See* Doc. 107 at 35–38.  The Court reiterates that the 2015 CFPB Credit Card and Auto Lending Consent Orders, as well as the Wells Fargo Consent Order, do not suggest that the Director Defendants willfully or recklessly disregarded the existence of problematic practices.  *See Stambaugh v. Corrpro Cos.*, 116 F. App'x 592, 595, 597 (6th Cir. 2004) (no scienter arising "from the prior SEC enforcement action because the complaint contained no allegation establishing that current officers should have reason to know of accounting irregularities occurring at an Australian subsidiary" (internal quotation marks omitted)).  As for the Board and committee meeting minutes, although they suggest that the Director Defendants had some knowledge of customer complaints, they do not suggest that the Director Defendants knew of the falsity of any of the allegedly actionable statements.  Further, to the extent Plaintiffs rely on disclosures from before the relevant period, those disclosures cannot support a strong inference that the Director Defendants knew that statements made during the relevant period were materially false.  *See Smallen v. W. Union Co.*, 950 F.3d 1297, 1314 (10th Cir. 2020) (pre-class period statement did not allow inference of knowledge of ongoing, class period legal violations).  And while knowledge of pre-class period facts can be relevant to the analysis, *see In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (considering pre-class period sales data as relevant to what executives should have predicted for class period sales), these facts, even taken together, do not support Plaintiffs' conclusion of persistent account problems or a culture of abusive sales practices.  *See Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *10 (N.D. Ill. Mar. 27, 2012) ("diffuse" allegations of fraudulent activity insufficient).

41

With respect to the CFPB's multi-year investigation of Fifth Third, the allegations concerning the six CIDs that Fifth Third received at this stage only demonstrate Carmichael's and certain other Director Defendants' knowledge of the investigation, not necessarily of the problem itself. *See Higginbotham*, 495 F.3d at 758 ("[T]here is a big difference between knowing about the reports . . . and knowing that the reports are false."). And the fact that Fifth Third cooperated in the investigation and disclosed a small number of unauthorized accounts to the CFPB undercuts Plaintiffs' assertion that the Director Defendants consciously underreported or refused to look for instances of misconduct. *See Pugh*, 521 F.3d at 694 (rejecting plaintiff's conclusory allegation about weak internal controls as "fraud by hindsight").

Further, while government investigations such as that conducted by the CFPB can reinforce allegations of scienter, *see In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("That the SEC and DOJ initiated investigations provides additional support for finding that scienter has been adequately pleaded."), making such an inference on its own amounts to improperly inferring fraud by hindsight, *see Societe Generale*, 2018 WL 4616356, at *3 (the PSLRA's heightened pleading requirements are intended "to discourage claims of so-called fraud by hindsight" (citations omitted) (internal quotation marks omitted)); *see also Conagra Brands*, 495 F. Supp. 3d at 659 ("The Seventh Circuit has emphasized that 'hindsight' cannot be the 'only basis' of a proposed scienter inference, since there is no 'fraud by hindsight.'" (citing *Higginbotham*, 495 F.3d at 759)). "Courts in this district have declined to allow plaintiffs to use a must have known theory as an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly." *Conagra Brands*, 495 F. Supp. 3d at 659 (citations omitted) (internal quotation marks omitted). Further, Plaintiffs point to nothing in the 2020 CFPB Action that suggests that the Director Defendants had

personal knowledge of any problematic practices at the time they made the challenged statements. And although Plaintiffs present the allegations in the CFPB's amended complaint as conclusions or findings, the Court does not find it appropriate to give the amended complaint any additional weight or to infer scienter from conclusory statements made in that litigation, especially where the CFPB's allegations do not specifically name the Director Defendants or detail their personal knowledge. *See In re Herbal Supplements Mktg. & Sales Pracs. Litig.*, No. 15-CV-5070, 2017 WL 2215025, at *6 (N.D. Ill. May 19, 2017) (treating factual allegations from government investigation as properly pleaded allegations in private complaint); *K.H. through Murphy v. Morgan*, 914 F.2d 846, 848 (7th Cir. 1990) ("[A]llegations in a complaint are not proven facts."). At most, the CFPB investigation and litigation allow an inference that some of the Director Defendants should have known about the fraud, but what they should have known does not suffice to show that they acted recklessly. *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020) ("Knowledge of the risk of fraud does not automatically mean that Cboe was severely reckless, or intended that fraud to continue."). Because Plaintiffs have again failed to sufficiently plead allegations that give rise to a strong inference of scienter as to a majority of the Director Defendants, they have not established demand futility as to the Section 10(b) claim.

### G.    Section 14(a) Claim

Finally, Plaintiffs allege that the Director Defendants violated Section 14(a) of the Exchange Act by omitting certain material information from Fifth Third's Proxy Statements. "Section 14(a) of the Exchange Act makes it unlawful to solicit shareholder approval by using proxy statements that do not comply with the rules and regulations of the Securities Exchange Commission." *Emps. Ret. Sys.*, 2021 WL 1890490, at *6 (citing 15 U.S.C. § 78n(a)(1)). "To

state a claim under Section 14(a), a plaintiff must allege: (i) that the proxy statement contained a material misstatement or omission that (ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 637 (7th Cir. 2021). In reviewing the consolidated complaint, the Court found that Plaintiffs had failed to sufficiently allege a material misstatement or omission for purposes of their Section 14(a) claim. Doc. 107 at 39–41. Defendants argue that the amended complaint has failed to cure this problem.

Both Rule 9(b) and the PSLRA require Plaintiffs to identify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if based on information and belief, all facts on which they form that belief. *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 868 (S.D. Ohio 2013). "Omission of information from a proxy statement will violate Section 14(a) . . . only if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Local 295/Local 851 IBT Emp. Grp. v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 716 (S.D. Ohio 2010). An omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," with the plaintiff required to allege "a substantial likelihood that the disclosure of the omitted fact would have . . . significantly altered the 'total mix' of information" available to the shareholders. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (7th Cir. 1976).

Here, Plaintiffs assert that the Director Defendants caused the issuance of materially misleading statements and failed to disclose material facts in the Proxy Statements from 2018 to 2020. As in the consolidated complaint, they pursue the same three categories of statements. First, Plaintiffs contend that the Proxy Statements hid from shareholders the true operational and

44

financial state of Fifth Third by omitting the fact that Fifth Third's apparent success was based in part on false cross-sell numbers. Second, they allege that the Proxy Statements falsely and misleadingly stated that Fifth Third's directors and officers were subject to the Code of Conduct while omitting that the Code of Conduct was not being followed or enforced. And third, Plaintiffs maintain that the Proxy Statements were false and misleading with regard to executive compensation because they represented that Fifth Third used a pay for performance element but did not disclose that the price of Fifth Third's stock was artificially inflated, meaning that executive compensation was similarly artificially inflated.

Again, the Court agrees that Plaintiffs have failed to sufficiently plead the required false and misleading statements so as to suggest that the Director Defendants face personal liability as to those statements. For the first category of statements, as opposed to the consolidated complaint, the amended complaint sets forth the relevant Proxy Statements' descriptions of Fifth Third's risk management practices that Plaintiffs contend were problematic. *Cf.* Doc. 107 at 39 ("Plaintiffs only generally cite to the Proxy Statements without identifying the specific statements made misleading by the Director Defendants' alleged omissions concerning cross-selling and related investigations, which does not suffice."). Specifically, Plaintiffs focus on statements that the Board sets the overall risk appetite and monitors risk tolerances, with the Risk and Compliance Committee primarily responsible for risk management oversight and governance. *See* Doc. 111 ¶ 221. The amended complaint also highlights the Proxy Statements' representation that Fifth Third had a multi-faceted strategy toward mitigating risk in incentive plans, working "to ensure that pay facilitates the appropriate strategic and risk awareness behaviors." *Id.* ¶ 222. Among other things, Defendants contend that these statements about Fifth Third's risk management practices are general and aspirational statements that are not

45

actionable. Plaintiffs fail to respond to this argument, with which the Court agrees. Statements about oversight programs designed to mitigate risks are general and aspirational, and therefore not actionable. *See City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F. 4th 592, 595 (7th Cir. 2021) (statement not misleading when it did not make any "concrete assertion"); *Singh v. Cigna Corp.*, 918 F.3d 57, 63–64 (2d Cir. 2019) ("simple and generic assertions about having 'policies and procedures' and allocating 'significant resources'" would not mislead a reasonable investor); *In re Wells Fargo & Co. S'holder Deriv. Litig.*, No. 20-cv-08750, 2022 WL 345066, at *5–6 (N.D. Cal. Feb. 4, 2022) (vague, generalized statements concerning commitment to remedying problems or about company's risk management program not actionable under Section 14(a)) ; *cf. Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *6–7 (N.D. Ill. Oct. 30, 2012) (statements that regulatory problems were "behind us," when placed in context of alleged continuing problematic practices, sufficiently alleged falsity).[11] No reasonable shareholder would conclude that, by making these disclosures about Fifth Third's risk management practices that Fifth Third promised that its practices ensured that it faced no legal or compliance risks. *See Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15-CV-3187, 2016 WL 5720375, at *6 (N.D. Ill. Sept. 30, 2016) ("[D]efendants' statement was that there were measures to 'mitigate' the risk, not to 'eliminate' it."); *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 552 (W.D. Pa. 2019) ("[A] reasonable investor reading the 10-K risk disclosures would not conclude that [defendant] faced *no* legal or compliance risks, or that the risk management and compliance programs [defendant] had adopted were completely adequate to prevent all such risks."). Moreover, "Section 14(a) does not require that . . . uncharged, unadjudicated charges of mismanagement be disclosed." *Mogell v. Calhoun*, No. CV 15-1239,

---

[11] Although the Court cites to Section 10(b) cases for support, the same materiality standard applies to Section 14(a) cases. *See S.E.C. v. Black*, No. 04 C 7377, 2008 WL 4394891, at *13 (N.D. Ill. Sept. 24, 2008) (collecting cases).

2016 WL 3369233, at *5 (C.D. Ill. Mar. 15, 2016) (alteration in original) (quoting *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 322 (S.D.N.Y. 2007)); *see also In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, No. 19-md-2879, 2021 WL 2401641, at *14 (D. Md. June 11, 2021) ("Section 14(a) and Rule 14a-9 do not themselves impose a freestanding disclosure requirement, particularly regarding unadjudicated allegations." (collecting cases)). Thus, Plaintiffs' allegations that the Director Defendants' failure to disclose the ongoing CFPB investigation and the problematic cross-selling practices caused statements about Fifth Third's risk management practices to be materially misleading do not provide a basis for a Section 14(a) claim.

Plaintiffs' allegations concerning the remaining two categories of false statements have not changed from the consolidated complaint, nor do Plaintiffs make any additional arguments as to why the Court should reconsider its conclusions that they did not suffice to state a Section 14(a) claim. *See* Doc. 107 at 40–41. The Court thus reiterates its prior conclusions here. With respect to the statements about executive compensation, as the Court previously found, the Proxy Statements only provide the framework for how Fifth Third determines executive compensation, and Plaintiffs fail to provide any facts to suggest why the failure to include information about the allegedly artificially inflated nature of Fifth Third's stock made the Proxy Statements' representations about how executive compensation was determined misleading. *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2012 WL 1068761, at *2 (N.D. Ill. Mar. 29, 2012) ("[P]laintiffs must point to a specific statement that is made misleading by [an] omission,' and offer 'specific, contradictory information' known to Anixter sufficient to establish that Anixter made any misleading statements." (second alteration in original) (citations omitted)). As for the representations about the Code of Conduct, "a company's adoption and

publication of a code of ethics does not imply that all of its directors and officers are in compliance with that code." *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 859 (N.D. Ill. 2009). Thus, statements about the applicability of the Code of Conduct to the Board did not require the Director Defendants to provide detailed information about compliance with that Code. Nor do Plaintiffs suggest how omission of the Director Defendants' failure to comply with the Code of Conduct renders the statement about their being bound by it false or misleading; even if the Director Defendants did not follow the Code of Conduct, they still remained bound by it. Accordingly, the Court again finds that Plaintiffs have failed to demonstrate demand futility as to the Section 14(a) claim.

## III.     Demand Futility Summary

In summary, the Court cannot find that Plaintiffs have sufficiently alleged demand futility as required by Rule 23.1 to proceed with this shareholder derivative action. Plaintiffs' failure to comply with the demand requirements for shareholder derivative actions thus requires the Court to dismiss the amended complaint. And because Plaintiffs had an opportunity to amend their complaint to address the deficiencies the Court previously identified but failed to do so, the Court dismisses the amended complaint with prejudice.

<b>CONCLUSION</b>

For the foregoing reasons, the Court grants Defendants' motion to dismiss [121]. The Court dismisses the amended complaint with prejudice. Case terminated.

Dated: March 8, 2023

                                            SARA L. ELLIS
                                            United States District Judge